UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------X

LUCIANO SANTIAGO,

               *Plaintiff*,                  **MEMORANDUM AND ORDER**

   - against -             21-CV-7090 (KAM)(CLP)

MAKSUD TRAX AGADJANI and
TRAX NYC CORP.,

              *Defendants*.

-----------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

      Currently pending before this Court is a motion by Plaintiff Luciano Santiago (the "Plaintiff") to enforce a settlement agreement against Defendants Maksud Agadjani ("Agadjani") and Trax NYC Corp. ("Trax"). (ECF No. 44, Motion to Enforce Settlement Agreement ("Mot.").) The Court previously denied Plaintiff's motion without prejudice so that an evidentiary hearing could be held on the issue of the authority of Defendants' former counsel to enter into the settlement agreement on behalf of Defendants. (ECF No. 52, Order on R&R.) The Court subsequently held an evidentiary hearing on September 16, 2024, at which Mr. Agadjani and the former counsel of Mr. Agadjani and Trax offered testimony, and Plaintiff's motion to enforce the settlement was renewed at the conclusion of the hearing. (*See* Minute Entry and Order dated September 16, 2024.)

For the reasons set forth below, the Court finds that the parties entered into an enforceable oral agreement to settle the instant case, and therefore **GRANTS** Plaintiff's motion in part. Plaintiff's parallel motion for settlement approval is **DENIED** without prejudice to being refiled with additional information no later than Thursday, October 10, 2024.

**BACKGROUND**

### I.   Factual and Procedural Background

The Court assumes the parties' familiarity with the extensive facts thoroughly recounted in Magistrate Judge Pollak's thorough R&R on the Motion to Enforce the Settlement Agreement, as well as the Court's previous order on the R&R.  (*See* ECF No. 48, R&R; ECF No. 52, Order on R&R.)  The Court refers to and incorporates the aforementioned orders for the factual and procedural background of the instant case prior to the September 16th Evidentiary Hearing.

As previously mentioned, after denying the Plaintiff's Motion to Enforce the Settlement Agreement without prejudice, the Court ordered Mr. Agadjani and his former counsel to appear and testify at an evidentiary hearing regarding the authority of Defendants' former counsel to enter into a settlement agreement on their behalf.  (ECF No. 52, Order on R&R.)  Mr. Agadjani appeared, *pro se*, and his former counsel, Ryan Miller, Esq., and Scott Himes, Esq., appeared represented by Jeremy Bates, Esq., of Frankfurt Kurnit Klein & Selz, P.C.  (Minute Entry and Order dated September

2

16, 2024.)   The Court heard testimony from Mr. Agadjani, Mr. Miller, and Mr. Himes, and Mr. Bates offered, and the Court admitted, documentary evidence in support of Mr. Miller and Mr. Himes's testimony. (*Id.*)   The Court ordered Mr. Agadjani and his former counsel to submit any further documentary evidence to support the testimony offered at the hearing no later than September 23, 2024. (*Id.*)   Mr. Bates subsequently submitted 15 documents in support of Mr. Miller and Mr. Himes's testimony, and Mr. Agadjani declined to submit any documents in support of his own testimony. (*See* ECF No. 56, Declaration of Ryan Miller, Esq. ("Miller Decl."), and Exhibits; ECF No. 57, Declaration of Scott Himes, Esq. ("Himes Decl."), and Exhibits.)

## DISCUSSION

Plaintiff argues in his renewed motion for settlement enforcement that the Court should enforce the settlement agreement reached by attorneys for the parties prior to Mr. Agadjani's decision to decline to sign the settlement documents and relieve his counsel and proceed *pro se*. (*See* Mot. at 3-4[1].)   Plaintiff argues that the parties came to an agreement that Defendants would pay Plaintiff $180,000.00 total, with payments of $30,000 per month for 6 months, and that Defendants would execute a confession of judgment for $650,000.00 to secure payment. (*Id.* at 3.)   Plaintiff

---

[1] Because Plaintiff's Motion for Settlement Enforcement has no internal pagination, the Court utilizes the page numbers assigned by the CM/ECF system.

states that the settlement agreement was intended to resolve "all claims and counterclaims in the case" and that "the parties are mainly settling the numerous non-FLSA claims and counterclaims, which predominate the case and the settlement." (*Id.* at 4.) Plaintiff explains that the initial settlement in principle was reached at the October 31, 2023, settlement conference before Magistrate Judge Pollak, and that agreement on the payment terms and confession of judgment was reached a week later in early November 2023. (*Id.* at 3.)

In his opposition to Plaintiff's motion, Mr. Agadjani argues that he "consistently opposed settling the matter for the amount purported by Plaintiff" and that "emails and text messages illustrate that Mr. Agadjani never consented to a settlement of $180,000, casting doubt on the alleged settlement's validity." (ECF No. 45, Defendant's Opposition ("Def. Opp."), at 2.) Mr. Agadjani offered further documentary support to his assertion that his lawyers acted without his authority in his objection to Magistrate Judge Pollak's R&R. (ECF No. 51, Defendant's Objection ("Obj.").) In that letter, Mr. Agadjani includes a February 2022 email from former defense counsel Mr. Himes regarding settlement negotiations, to which Mr. Agadjani replied that he was "not settling," and an October 23, 2023, text message in which Mr. Agadjani told Mr. Miller that "[t]he bottom line offer is 130" and asked for a phone call. (*Id.* at 1-2.) Mr. Agadjani further argues

that he asked for Mr. Himes "to be removed from the case" and that "Mr. Himes unilaterally agreed to a settlement of $180,000" without Mr. Agadjani's "consent, or approval."  (*Id.* at 3.)

The Court will first examine Mr. Agadjani's contentions that his attorneys acted without his authority in entering into the settlement agreement before considering whether the settlement agreement is enforceable, notwithstanding the lack of a signed agreement.

## I.  The Authority of Mr. Agadjani's Attorneys to Settle the Instant Case

Having conducted an evidentiary hearing and reviewed the submissions of Mr. Agadjani's former counsel, the Court concludes that Mr. Agadjani has not rebutted the presumption that his lawyers had authority to enter into the settlement agreement on his behalf. Specifically, the Court finds that Mr. Agadjani's claims that he did not consent to a settlement amount of more than $130,000 are not credible.  The Court finds credible and is persuaded by the testimony of Mr. Miller, who maintained that he (and Mr. Himes) had the authority to settle the matter for up to $200,000 going into the settlement conference, and subsequently received authority from Mr. Agadjani to agree to a six-month payment plan following the settlement conference.

### A.  Applicable Law

The actions of a party's attorney are generally imputed to

5

the party. *See United States v. Cirami*, 535 F.2d 736, 739 (2d Cir. 1976) ("This Circuit has rather consistently refused to relieve a client of the burdens of a final judgment entered against him due to the mistake or omission of his attorney by reason of the latter's ignorance of the law or the rules of the court, or his inability to efficiently manage his caseload."); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 (1962) (describing "our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent").

While a court "'presume[s] that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so,' this presumption is rebuttable." *Gomez v. City of New York*, 805 F.3d 419, 424 (2d Cir. 2015) (quoting *Pereira v. Sonia Holdings Ltd.* (*In re Artha Mgmt.*), 91 F.3d 326, 329 (2d Cir. 1996)). If, however, a party challenges the authority of his attorney to settle the case, he "bear[s] the burden of proving that [he] did not give him authority to settle the case." *In re Artha Mgmt., Inc.*, 91 F.3d 326, 329 (2d Cir. 1996); *see also United States v. Int'l Bhd. of Teamsters*, 986 F.2d 15, 20 (2d Cir. 1993) ("The burden of proving that an attorney entered into a settlement agreement without authority is not insubstantial."). To meet that burden, a party must present "affirmative evidence" to show that a lawyer did not have that authority. *In re Artha Mgmt., Inc.*, 91 F.3d at 329.

6

In *Gomez*, the Second Circuit held that an evidentiary hearing is required "[i]n circumstances where a former attorney and his client dispute the giving of authority."  805 F.3d at 424 (quoting *Michaud v. Michaud*, 932 F.2d 77, 81 (1st Cir. 1991)).  "[A]fter such a hearing, of course, the court can resolve any conflict in the testimony; it may, for example, disbelieve the client. But such a determination cannot be made without first giving the client a fair opportunity to have his say." *Id.* (quoting *Michaud*, 932 F.2d at 81).

**B.   The September 16, 2024, Evidentiary Hearing**

The Court will briefly recount Mr. Agadjani's testimony at the evidentiary hearing, as well as that of Defendants' former counsel, before ruling on the issue of Mr. Agadjani's attorneys' authority to settle the case.

**1.   Mr. Agadjani's Testimony**

Mr. Agadjani testified at the evidentiary hearing that he was aware of the October 31, 2023, settlement conference for the instant case, but that he did not attend the conference because he was "relying on Mr. Miller."  (Transcript of September 16, 2024, Evidentiary Hearing ("Tr."), at 9.)   The Court questioned Mr. Agadjani regarding his text message about the "bottom line offer" of $130,000, and asked Mr. Agadjani what was discussed during the subsequent phone call he had with his counsel.  (*Id.* at 12-13.)  Mr. Agadjani said that he could not "exactly remember the

conversation" but testified that he was upset. (*Id.* at 13.)  Mr. Agadjani testified that he did not recall any conversations in which he indicated he would go above $130,000 to settle the case. (*Id.*)  Mr. Agadjani indicated that he did not have any other documentary evidence to support his contentions other than the messages he previously provided to the Court.  (*Id.* at 14.)

Mr. Agadjani had very few recollections about his conversations with his counsel and the settlement documents he was requested to execute after the settlement conference.  Mr. Agadjani testified that he was "not sure" when he received the settlement papers after the settlement conference, but also testified that he "never looked at" the settlement papers.  (*Id.* at 15.)  Mr. Agadjani testified that he did not "remember ever hearing $180,000" in regards to the settlement, and that his assistant "at some point presented [him] the papers." (*Id.* at 18-19.)  Mr. Agadjani later testified that he did not become aware of the settlement amount until August 2024.  (*Id.* at 35.)  Mr. Agadjani testified that "[t]o be completely honest" he did not remember what Mr. Miller said about the Plaintiff's demand for settlement at the time of the settlement conference.  (*Id.* at 21.)  Nonetheless, Mr. Agadjani remained "firm" in his testimony that $130,000 was the top amount for which he authorized his attorneys to settle the case.  (*Id.* at 23.)

### 2.  Mr. Miller's Testimony

In contrast, Mr. Agadjani's former counsel, Ryan Miller, Esq., clearly recalled the events leading up to and surrounding the October 2023 settlement conference, and supported his testimony with evidence.[2]  Mr. Miller testified that in the months leading into the October 2023 settlement conference, Mr. Agadjani had only provided authorization for a settlement of $130,000 or less.  (*Id.* at 50.)  Mr. Miller testified that he spoke to Mr. Agadjani on October 23, 2023, after Mr. Agadjani sent a text message reiterating his settlement position as being $130,000.  (*Id.*)  On that phone call, Mr. Miller testified that Mr. Agadjani authorized Mr. Miller "to settle the matter for up to $200,000."  (*Id.*)  Mr. Miller stated that he followed up his October 23 phone call with Mr. Agadjani with an email "confirming the conversation" and "the authorization" of $200,000 by Mr. Agadjani to settle the case.  (*Id.* at 50-51.)

Mr. Miller's counsel offered the October 23, 2023, email into evidence as Counsel's Exhibit A.  (*See* ECF No. 56-1, Exhibit A to the Miller Decl. ("Ex. A").)  The email corroborates Mr. Miller's version of events, with Mr. Miller writing the following:

As we discussed, while you have authorized me to settle

---

[2] The Court ordered Mr. Miller and Mr. Himes to testify under oath regarding conversations with Mr. Agadjani on the topic of settlement authority, and also advised Mr. Agadjani regarding the waiver of his attorney-client privilege and ruled earlier in the Evidentiary Hearing that Mr. Agadjani had waived the attorney-client privilege regarding discussions with his attorneys on the topic of settlement authority.  (Tr. at 4-6, 47, 92.)

> this matter for up to $200,000 with a payment plan of
> $10K per month, you have also made clear that we need to
> press [plaintiff] and his attorney to work a bit more on
> discovery while also talking settlement and that you
> want us to squeeze them much further down to a number
> closer to $130K (which of course we will do all we can
> to achieve that level of result for you).

(*Id.* at 1.)  Mr. Miller testified that he drafted the email to

"make clear to [Mr. Agadjani] exactly what he was authorizing me

to settle this case for so that there could be no confusion

between [us]."  (Tr. at 52-53.)

Mr. Miller further testified that he wrote a follow-up email

to Mr. Agadjani on October 30, 2023, in which he informed Mr.

Agadjani "that we were able to achieve a [settlement] figure based

on his authorization of $180,000."  (*Id.* at 58.)  The email was

entered into evidence as Counsel's Exhibit B, and includes the

following message from Mr. Miller to Mr. Agadjani:

> After much back and forth over the past week, we have
> gotten Santiago to agree to a settlement of this matter
> for a payment from you at $180,000 (which of course is
> below the figure you authorized at $200K). The issue now
> however to work through is in regard to a payment plan
> as we have received tremendous pushback on any type of
> payment plan.

(ECF No. 56-2, Exhibit B to the Miller Decl. ("Ex. B").)  Mr.

Miller testified that the agreement on $180,000 as the settlement

amount was reached through "back-and-forth" negotiation with

Plaintiff's counsel, which was conducted by Mr. Miller's law

partner, Mr. Himes.  (Tr. at 59.)  Mr. Miller testified that he

had further discussions with Mr. Agadjani at this time regarding

settlement but had yet to receive his authorization regarding a payment plan. (*Id.* at 61.)

Mr. Miller testified that Mr. Himes subsequently attended the settlement conference on October 31, 2023, before Magistrate Judge Pollak. (*Id.* at 64.) After that point, Mr. Miller testified that there was a delay before he next spoke with Mr. Agadjani regarding the timing of the payment plan. (*Id.* at 66.) On November 27, 2023, Mr. Miller testified that he contacted Mr. Agadjani "first by email" and provided Mr. Agadjani with a redline of the settlement agreement, which did not yet have specifics on the payment term or amount. (*Id.* at 67.) Mr. Miller testified that he subsequently texted Mr. Agadjani later on November 27, 2023, stating that they needed to get on a call "as soon as possible," Mr. Agadjani agreed, and Mr. Miller called Mr. Agadjani at 3:10pm on November 27, 2023. (*Id.*) Mr. Miller testified that during the seven-minute phone call, he explained the business rationale behind the settlement and the proposed six-month payment schedule, and "at the end of that [] phone call, [Mr. Agadjani] authorized me to settle at the six-month payment period." (*Id.* at 67-68.)

Mr. Miller testified that he also "reminded [Mr. Agadjani] about the concept of a confession of judgment" in the event of a failure to pay and "inform[ed] [Mr. Agadjani] it would be a heavy hammer" that would be "at least two to three times the amount that's being discussed in [the] settlement." (*Id.* at 68.) Mr.

11

Miller testified that as soon as he finished the call with Mr. Agadjani, he called Mr. Himes to "get the deal done at six months at 180,000." (*Id.*) Mr. Miller's counsel entered into evidence records of the text message exchange on November 27, 2023, (*see* ECF No. 56-3, Exhibit C to the Miller Decl. ("Ex. C")), and the email sent prior to the text messages explaining the status of settlement negotiations, (*see* ECF No. 56-4, Exhibit D to the Miller Decl. ("Ex. D")). Mr. Miller's counsel also entered into evidence phone records reflecting the phone call between Mr. Miller and Mr. Agadjani, and subsequently between Mr. Miller and Mr. Himes. (*See* ECF No. 56-5, Exhibit E to the Miller Decl. ("Ex. E"), at 14.) Mr. Miller's November 27, 2023, email specifies that the negotiations regarding payment terms regard "the $180,000 settlement [Mr. Miller and his law firm] were able to achieve for [Mr. Agadjani] in this case." (Ex. D at 1.)

Mr. Miller testified that he sent the finalized settlement agreement to Mr. Agadjani on December 8, 2023, and that Mr. Agadjani "began equivocating on any settlement" on December 11, 2023, referencing a text message sent by Mr. Agadjani on that date. (Tr. at 75.) Mr. Agadjani's text message reads as follows:

> I have not looked at [the settlement agreement], I feel defeated, I spent a quarter of a million dollars pushing papers around with you guys, he got me half a million in theft, now another 180, his bum lawyer was better then [sic] this entire legal team with doing absolutely nothing. I feel abused

(Ex. C at 5[3].)   The Court notes that Mr. Agadjani's text message, which refers to "another 180," clearly contradicts his testimony that he was not aware of the settlement amount until August 2024.

Mr. Miller testified that his firm's "attorney/client relationship [with Mr. Agadjani] began to spiral" after the December 11, 2023, text message, and that "shortly thereafter [his firm] sought to be relieved as Mr. Agadjani's counsel with a filing in court." (Tr. at 75-76.)  Mr. Miller testified that by the "18th or 19th" of December, "it became obvious that the attorney/client relationship had become irreparable." (*Id.* at 77.)  Mr. Miller filed his firm's motion to withdraw as counsel on the docket on December 21, 2023. (ECF No. 38.)  Magistrate Judge Pollak held a hearing on the motion on February 7, 2024, granted Mr. Miller's firm's application to withdraw as counsel for Defendants, and warned Mr. Agadjani that although he may proceed *pro se*, Trax must appear by counsel. (ECF No. 43, Order dated February 20, 2024.)

Mr. Miller testified that he believed an agreement as to the "payment amount" of $180,000 for settlement was reached as early as October 23, 2023, and that an agreement as to the payment term was reached on November 27, 2023. (Tr. at 78.)  Mr. Miller testified that he did not have specific conversations about the details of the confession of judgment with Mr. Agadjani, but that

---

[3] The Court utilizes the ECF-assigned page numbers for Exhibit C, which is not separately paginated.

he did discuss the notion and the concept of a confession of judgment with his client.  (*Id.*)  Mr. Miller testified that the details of the confession of judgment were included in the December 8, 2023, email he sent to Mr. Agadjani, which was entered into evidence as Counsel's Exhibit F.  (*Id.* at 79; ECF No. 56-6, Exhibit F to the Miller Decl. ("Ex. F").)  Counsel's Exhibit F is an email from Mr. Miller to Mr. Agadjani describing the major terms of the settlement agreement, including the $180,000 amount, with the final settlement agreement and $650,000 confession of judgment attached for Mr. Agadjani's signature.  (Ex. F at 1-2.)

Mr. Miller testified that he had no doubt that he was "fully authorized as early as October 23 to settle this case for up to $200,000."  (Tr. at 81.)  When the Court concluded its examination, Mr. Miller entered one further exhibit into evidence "for the sake of completeness of the record."  (Tr. at 85.)  The document, Counsel's Exhibit G, was an October 30, 2023, email from Mr. Agadjani to Mr. Miller responding to the Plaintiff's initial proposed payment terms of a $90,000 payment followed by three equal installments of $30,000.  (ECF No. 56-7, Exhibit G to the Miller Decl. ("Ex. G"), at 1.)  In the email, Mr. Agadjani stated that he "just [doesn't] have the money . . . [a]ll I have is 30k down. And 15k per month after."  (*Id.*)  Mr. Miller testified that the email confirmed that Mr. Agadjani "got the email [] about the settlement number" of $180,000 and also showed "Mr. Agadjani giving [] a sense

14

of his capacity to make payments based on that settlement number."
(Tr. at 86.)

### 3.  Mr. Himes's Testimony

Following the conclusion of Mr. Miller's testimony, the Court
called Mr. Himes to testify.  (*Id.* at 88.)  Mr. Himes testified
that he learned of the authorization to settle for up to $200,000
from Mr. Miller, and then negotiated within those parameters with
Plaintiff's counsel.  (*Id.* at 92-93.)  The Court asked Mr. Himes
whether Mr. Agadjani had indicated that he did not want Mr. Himes
"representing him on the case," and Mr. Himes responded that there
was an issue at "an earlier point in time that precedes this
considerably."  (*Id.* at 93.)  Mr. Himes testified that he
remembered "giving [his] best legal advice to [Mr. Agadjani] about
the advisability" of making posts on social media, given the
defamation claims in the instant case.  (*Id.* at 112.)  Mr. Himes
testified that he also remembered "a very heated conversation where
[Mr. Agadjani] became very, very upset and very agitated and,
frankly, very angry at [Mr. Himes] personally."  (*Id.*)
Subsequently, one of Mr. Agadjani's employees emailed Mr. Himes
"advising that [Mr. Agadjani] preferred to work with others in the
[law] firm."  (*Id.*)

Mr. Himes testified that the law firm worked internally "to
figure out the best game plan to represent the client" and agreed
that "Mr. Miller would handle the communications with [Mr.

Agadjani]" but that Mr. Himes "would continue to handle the litigation matters." (*Id.* at 112-13.)   The Court subsequently called Mr. Miller back to provide further testimony on the "issue" between Mr. Agadjani and Mr. Himes. (*Id.* at 117.)   Mr. Miller testified that he had "several heart-to-heart talks with [Mr. Agadjani] regarding why Mr. Himes was so important to carry on representation in this case." (*Id.* at 118.)   Mr. Miller explained that there was "a little bit of a personality issue between" Mr. Himes and Mr. Agadjani, and therefore Mr. Miller felt it was best that he, Mr. Miller, handled communications with Mr. Agadjani going forward. (*Id.* at 119.)   Mr. Miller testified that "there's no question that [Mr. Agadjani] was obviously aware of Mr. Himes's continued involvement" in the case, based on documents bearing Mr. Himes's name that were sent to Mr. Agadjani. (*Id.* at 120.)

### 4.   Supplemental Documentary Submissions

Following the hearing, Mr. Miller and Mr. Himes submitted additional documentary evidence to support their testimony that Mr. Agadjani had knowledge of, and consented to, Mr. Himes's continued appearance on his behalf in this matter.   Counsel's Exhibit I includes copies of billing records sent by Mr. Miller's law firm to Mr. Agadjani, reflecting that Mr. Himes was the attorney who continued to handle the litigation even after February 2022. (*See generally* ECF No. 56-9, Exhibit I to the Miller Decl. ("Ex. I").)   Mr. Miller also stated in his declaration that "until

16

late 2023 . . . Mr. Agadjani and his company paid" the invoices which included entries for Mr. Himes's work. (Miller Decl. ¶ 14.) Counsel's Exhibit J consists of internal time records covering November and December 2023, reflecting numerous discussions between Mr. Miller and Mr. Himes on "settlement matters" in the case. (*See* ECF No. 56-10, Exhibit J to the Miller Decl. ("Ex. J").)

Mr. Miller also submitted a redacted copy of an April 2023 memorandum from Mr. Himes and Mr. Miller to Mr. Agadjani, and explains in his declaration that shortly thereafter he and Mr. Himes "spoke by telephone with Mr. Agadjani about the matters contained in the memorandum." (Miller Decl. ¶¶ 21-23; ECF No. 56-11, Exhibit K to the Miller Decl. ("Ex. K").) Mr. Miller further submitted a selection of emails between himself and Mr. Agadjani in which Mr. Himes was "cc'd" as additional evidence of Mr. Agadjani's knowledge and consent to Mr. Himes's continued role as his attorney in the case. (ECF No. 56-12, Exhibit L to the Miller Decl. ("Ex. L"). Mr. Himes additionally submitted a declaration including further emails he sent to Mr. Agadjani. (Himes Decl. and Exhibits M-O to the Himes Decl.)

### C.  Analysis

Having summarized the testimony and evidence offered at the evidentiary hearing, the Court will now proceed to determine whether Mr. Miller and Mr. Himes acted with apparent or actual

17

authority to settle the instant case on Mr. Agadjani's behalf. The Court concludes that Mr. Miller and Mr. Himes had actual authority to negotiate up to a $200,000 settlement on Mr. Agadjani's between October 23, 2023, and December 11, 2023.

The Court finds Mr. Agadjani's testimony at the evidentiary hearing that he never provided authority for Mr. Miller to settle the case for more than is $130,000 not credible. *First*, Mr. Agadjani's testimony is clearly contradicted by documentary evidence, namely the emails from Mr. Miller to Mr. Agadjani memorializing the grant of settlement authority up to $200,000. Mr. Agadjani was clearly aware of these emails given he responded to at least one of them, (*see* Ex. G), and the emails clearly confirmed that Mr. Agadjani had provided settlement authority up to $200,000 to Mr. Miller. *Second,* Mr. Agadjani, by his own admission, could not "exactly remember the conversation" with Mr. Miller where he provided settlement authority of up to $200,000. (Tr. at 13.) *Third,* Mr. Agadjani's recollection on other matters is clearly belied by the record, such as his assertion that he was not aware of the settlement amount until August 2024. Given the inconsistencies in Mr. Agadjani's testimony and his lack of recollection regarding key information, the Court does not find him credible. The Court does not credit Mr. Agadjani's assertion that his attorney acted without his authority, and does not credit his testimony that he did not authorized a settlement of up to

18

$200,000.

In contrast, the Court finds Mr. Miller and Mr. Himes's testimony to be persuasive, plausible, and credible. Mr. Miller and Mr. Himes each supported their testimony with contemporaneous documentary evidence. In particular, the Court finds Counsel's Exhibit A, which memorializes Mr. Agadjani's granting of settlement authority "up to $200,000," prior to the settlement conference, to support Mr. Miller's version of events and undermine Mr. Agadjani's. Similarly, Counsel's Exhibit D, which memorializes the status of negotiations on the payment terms for the $180,000 settlement amount, in combination with Exhibit C and E, reflecting a phone call between Mr. Miller and Mr. Agadjani shortly thereafter, support Mr. Miller's contention that Mr. Agadjani was aware of and consented to a six-month payment term. Regarding Mr. Himes's authority to continue representing Mr. Agadjani, the Court finds the documentary evidence sent to Mr. Agadjani showing Mr. Himes's continued role in the litigation, and Mr. Agadjani's implied consent, to be persuasive evidence that Mr. Himes was authorized to continue representing Mr. Agadjani. (*See* Exs. M-O to the Himes Decl.; Exs. I-L to the Miller Decl.)

Having now conducted a hearing and given Mr. Agadjani an opportunity to present evidence, the Court concludes that Mr. Agadjani has not rebutted the presumption that Mr. Miller and Mr. Himes had the authority to negotiate and enter into a settlement

agreement on his and Trax's behalf.  Mr. Agadjani's testimony at the hearing did not come close to satisfying his "burden of proving that [he] did not give [his attorneys] authority to settle the case." *In re Artha Mgmt., Inc.*, 91 F.3d at 329.  Other than his assertions that he did not recall providing authority to settle the case for more than $130,000, Mr. Agadjani did not present any affirmative evidence that Mr. Miller did not have authority to negotiate a settlement for up to $200,000.  Rather, Mr. Agadjani's testimony was inconsistent and unconvincing, and contradicted by documentary evidence submitted by his former counsel, as detailed above.  In sum, based on the testimony presented at the hearing, the Court finds that Mr. Miller and Mr. Himes had authority to negotiate a settlement up to $200,000 and to enter into a settlement agreement for $180,000 on behalf of Mr. Agadjani and Trax.

## II.  Enforcement of the Settlement Agreement

Having found that Mr. Miller and Mr. Himes were authorized to negotiate and enter into a settlement agreement on behalf of Mr. Agadjani and Trax, the Court must now determine whether there is an enforceable settlement agreement in the instant case. Notwithstanding Mr. Agadjani's refusal to sign the final settlement agreement on behalf of himself and Tax, the Court finds that an enforceable oral settlement agreement was reached as of November 27, 2023.

**A.    Applicable Law**

"A settlement agreement is a contract that is interpreted according to general principles of contract law." *Acun v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 852 F. App'x 552, 553 (2d Cir. 2021) (quoting *Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007)).  "Settlement agreements receive a presumption in favor of enforcement and will not be disturbed by a change of heart of one of the parties." *Febus v. Guardian First Funding Grp., LLC*, 90 F. Supp. 3d 240, 245 (S.D.N.Y. 2015) (internal quotation marks and citation omitted).   "Even if parties to an oral settlement agreement contemplate memorializing that agreement in a formal written document that is intended to be subsequently executed, they will still be bound by the oral agreement." *U.S. Fire Ins. Co. v. Pierson & Smith, Inc.*, No. 06-CV-382 (CM)(LMS), 2007 WL 4403545, at *3 (S.D.N.Y. Dec. 17, 2007) (citing *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir. 1968)).  When determining whether to enforce a settlement in the absence of a signed writing, courts consider:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985). "No single factor is decisive, but each provides significant

guidance." *Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 323 (2d Cir. 1997). "[Courts] therefore evaluate each of the Winston factors separately . . . and then assess them together." *Shinhan Bank v. Lehman Bros. Holdings Inc. (In re Lehman Bros. Holdings Inc.)*, 739 F. App'x 55, 57 (2d Cir. 2018).

### B. Analysis

As discussed further above, and in the Court's previous Order denying Plaintiff's motion for settlement enforcement without prejudice, the parties reached a settlement in principle in the amount of $180,000 during a settlement conference before Magistrate Judge Pollak on October 31, 2023. (*See* Minute Entry dated November 1, 2023.) At that time, the parties had agreed that Defendants would pay $180,000 in resolution of all claims and counterclaims asserted in the instant case, but had yet to finalize the payment plan terms. (*Id.; see also* Ex. A.) The parties continued to negotiate over the coming weeks, and on November 27, 2023, Plaintiff agreed to a six-month payment plan, which would work out to equal payments of $30,000 per month. (*See* Ex. D. at 1.) As Mr. Miller testified, during a phone call on November 27, 2023, Mr. Miller presented Plaintiff's proposal for a six-month payment plan, and Mr. Agadjani "authorized [Mr. Miller] to settle at the six-month payment period." (Tr. at 68.) Mr. Miller also testified that he advised his client that a necessary aspect of the payment plan would be a "confession of judgment" and that the

confession of judgment would be for "at least two to three times
the amount that's being discussed in a settlement."  (*Id.*)
Accordingly, the Court finds that an oral settlement in the amount
of $180,000, payable in equal monthly installments of $30,000 over
six months, with a $650,000 confession of judgment, was reached
between the parties on November 27, 2023, and will now consider
the *Winston* factors in determining whether that agreement should
be enforceable notwithstanding the lack of a signed writing.

### 1.  Express Reservation

Regarding the first factor, there is no evidence that there
was an express reservation of rights not to be bound in the absence
of a writing.  This factor is "the weightiest of the four," and
favors enforcement of the oral settlement agreement.  See *Samuel
v. Bd. of Educ. of NYC*, No. 12-CV-4219 (ENV)(LB), 2015 WL 10791896,
at *3 (E.D.N.Y. Aug. 11, 2015), *aff'd sub nom. Samuel v. New York
City Bd. of Educ.*, 668 F. App'x 381 (2d Cir. 2016) (citation
omitted). In analyzing this factor, "[t]he court is to consider .
. . whether there has been an express reservation of the right not
to be bound in the absence of a writing."  *Winston*, 777 F.2d at
80; *Acun*, 852 F. App'x at 552 ("neither party made any express
reservation to be bound only by a writing" (quoting *Powell*, 497
F.3d at 130)).  In considering whether any party has reserved the
right not to be bound absent a signed writing, courts examine both
the oral agreement and whether surrounding "facts and

circumstances" implied this reservation. *Pullman v. Alpha Media Publ'g, Inc.*, No. 12-CV-1924 (PAC)(SN), 2014 WL 5043319, at *10 (S.D.N.Y. Mar. 14, 2014), *report and recommendation adopted in relevant part*, 2014 WL 5042250, at *3 (Sept. 10, 2014), *aff'd*, 624 F. App'x 774 (2d Cir. 2015).

That the parties later intended to execute a signed agreement does not constitute an implied or express reservation of rights. *See Pullman*, 2014 WL 5043319, at *10.  "An informal agreement can be binding even though the parties contemplate memorializing their contract in a formal document as the parties have the power to contract as they please." *Tangtiwatanapaibul v. Tom & Toon Inc.*, No. 20-3852, 2022 WL 17574580, at *2 (2d. Cir. Dec. 12, 2022) (internal quotation marks and citation omitted).

Mr. Agadjani does not dispute that a settlement in principle was reached by Defendants' former counsel and Plaintiff's counsel. Instead, Mr. Agadjani argues only that he "consistently opposed settling the matter for the amount purported by Plaintiff." (Def. Opp. at 2.)  As discussed further in Discussion Section I, *supra*, the Court has already concluded that Defendants' attorneys were fully authorized to negotiate a settlement up to $200,000 on behalf of Mr. Agadjani and Trax.  Having dispensed with that objection, the Court finds no suggestion that either Plaintiff or Defendants expressly reserved the right to be bound only if the agreement was reduced to writing. *See, e.g., Lopez v. City of New York*, 242 F.

Supp. 2d 392, 393 (S.D.N.Y. 2003) ("Even if the parties agreed to the settlement in open court with the intent to draft and sign a written settlement agreement and general release, this does not satisfy the express reservation requirement."). At bottom, "simply because the parties contemplated that the agreement would be reduced to writing does not indicate that they had agreed, either explicitly or implicitly, not to be bound until a written agreement was signed." *Aguiar v. New York*, No. 06-CV-3334 (THK), 2008 WL 4386761, at *5 (S.D.N.Y. Sept. 25, 2008), *aff'd as modified*, 356 F. App'x 523 (2d Cir. 2009). As such, the need to have a final written agreement was a formality, not a prerequisite to any settlement.

The facts of the instant case suggest, more than anything else, "buyer's remorse, not a reservation of a right not to be bound in the absence of a writing." *Patel v. Long Island Univ.*, No. 17-CV-2170 (NGG)(SJB), 2023 WL 6211769, at *10 (E.D.N.Y. Sept. 25, 2023). Mr. Agadjani's attorneys offered testimony to that effect, noting that Mr. Agadjani began "equivocating on any settlement" on December 11, 2023. (Tr. at 75.) "Post-hoc misgivings about a settlement that is yet to be reduced to writing is not an understanding that the settlement was not final unless written." *Patel*, 2023 WL 6211769, at *10. "The settlement remains binding even if a party has a change of heart between the time he agreed to the settlement and the time those terms are reduced to

25

writing." *Powell*, 497 F.3d at 129.  Therefore, the first factor weighs in favor of enforcement.

### 2.  Partial Performance

The second factor, whether any party has partially performed, weighs in favor of neither party.  This factor "under the *Winston* test is met when one party has partially performed its obligations under the settlement, and that performance has been accepted by the party disclaiming the existence of an agreement." *Conway v. Brooklyn Union Gas Co.*, 236 F. Supp. 2d 241, 250 (E.D.N.Y. 2002).

Here, Plaintiff appears to argue that the "many hours" of work contributed by attorneys for Plaintiff and Defendants to "drafting the settlement agreement, [*Cheeks*] agreement and the confession of judgment" constitute partial performance.  (Mot. at 4.)  Notwithstanding these joint efforts, no payment was made, and the parties' cessation of litigation did not impose any costs-- after the settlement conference, little activity beyond these enforcement proceedings has taken place.  Such circumstances suggest, as some courts have found, the absence of any partial performance. *Geneva Lab'ys Ltd. v. Nike W. Afr. Imp. & Exp. Inc.*, No. 19-CV-4419 (EK)(RER), 2021 WL 7287611, at *7 (E.D.N.Y. Aug. 16, 2021) ("No arrangements have been made or instructions given for how to exchange funds, no settlement funds have been paid, no liens have been granted, the parties have not signed a written agreement, and the case has not been dismissed."), *report and*

*recommendation adopted*, 2022 WL 673257 (Mar. 7, 2022); *Nieves v. Cmty. Choice Health Plan of Westchester, Inc.*, No. 08-CV-321 (VB)(PED), 2011 WL 5531018, at *4 (S.D.N.Y. Nov. 14, 2011) (finding cessation of litigation activities and absence of payment show absence of any performance).

In conclusion, the Second Circuit has "not specifically addressed" whether the cessation of litigation and the memorializing of the settlement agreement constitute partial performance. *Acun*, 852 F. App'x at 555. As such, "the absence of partial performance is at best neutral." *Id.*

### 3. Agreement to All Terms

The third factor, whether all terms have been agreed upon, weighs in favor of enforcement when "there was literally nothing left to negotiate.'" *Winston*, 777 F.2d at 82 (quoting *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 76 (2d Cir. 1984)); *Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825, 831 (2d Cir. 2019) (same). The inquiry in this regard is whether the agreement "contained all of the material terms of the settlement." *Acun*, 852 F. App'x at 555; *see also Ciaramella*, 131 F.3d at 325; *Tangtiwatanapaibul*, 2022 WL 17574580, at *3 ("Parties may choose to bind themselves before fully agreeing to all terms provided that the parties have agreed to the material terms."). As such, "this factor favors enforcement even when the parties are still negotiating certain terms." *Geneva Lab'ys Ltd.*, 2021 WL

7287611, at *7 (collecting cases).

In the instant case, the Court finds that the parties had negotiated all the material terms of the settlement as of November 27, 2023: the settlement amount of $180,000 to be paid in equal monthly installments. As of October 31, 2023, a major part of the agreement was still outstanding--the monthly payment amounts--but Mr. Agadjani's subsequent acquiescence to a six-month payment schedule on November 27, 2023, resolved this major outstanding issue, and there was an understanding that a confession of judgment was to be included. (Tr. at 68.) Neither Mr. Agadjani nor his counsel testified that any other material terms of the agreement remained to be negotiated as of November 27, 2023, and the Court therefore concludes that the remaining provisions of the written settlement agreement were not material to the agreement or Mr. Agadjani. Accordingly, the third factor favors enforcement.

### 4.   Type of Contract Usually Committed to Writing

Finally, the Court finds that the fourth factor, whether the contract is a type typically memorialized in writing, weighs slightly against enforcement. This reference to a writing "is a written instrument whose status as a binding contract has been acknowledged either by signature or by express oral acceptance." *Acun*, 852 F. App'x at 556.

As Magistrate Judge Pollak noted in her previously-issued R&R, "[i]n cases involving FLSA claims, settlement agreements

typically are reduced to writing and accompanied by a motion for court approval under *Cheeks*." (ECF No. 48, R&R, at 15.) The same is generally true of sizeable settlement agreements "whose terms were not announced in open court" on the record. *Powell*, 497 F.3d at 130-31 (collecting cases). Here, as Judge Pollak also noted, although the principal payment term was announced during a confidential settlement conference before Judge Pollak, neither that term nor any others were agreed to by counsel for both the parties in a judicial proceeding open to the public (i.e., in "open court"). As a result, the Court concludes, as Judge Pollak did, that the settlement agreement in the instant case is arguably the sort of contract that would ordinarily be reduced to writing under Second Circuit precedent. *Id.; but see Patel*, 2023 WL 6211769, at *5 ("because the agreement here was relatively simple and memorialized by a minute entry following the settlement conference . . . [the fourth] factor weighs slightly in favor of enforcing the agreement"). Nonetheless, even assuming that is the case, and thus that the fourth *Winston* factor, whether the agreement is typically one committed to writing, favors Mr. Agadjani, the first (and most important) and third factors both favor enforcement, and the second factor is neutral. The Court therefore concludes that the Agreement is enforceable notwithstanding the lack of a fully executed written agreement.

Accordingly, the Court finds that, as of November 27, 2023,

the parties had entered into an enforceable oral agreement to settle the instant case, resolving all claims and counterclaims asserted by the parties, in exchange for a payment of $180,000 from Defendants to Plaintiff, to be made over six equal monthly payments, and secured by a $650,000 confession of judgment.[4]

## III. Fairness Review of the Settlement Agreement

Plaintiff argues that the settlement agreement in the instant case should be approved, and that the Court's determination should be "informed" by the fact that Plaintiff's FLSA rights and claims "are extremely limited in scope, being worth almost nothing; and [] the parties are mainly settling the numerous non-FLSA claims and counterclaims, which predominate the case." (Mot. at 4, 8.)

### A.    Applicable Law

The Federal Rules of Civil Procedure afford litigants wide latitude in settling their disputes. *See* Fed. R. Civ. P. 41(a)(1)(A)(ii) (noting that "the plaintiff may dismiss an action without a court order by filing . . . a stipulation of dismissal signed by all parties who have appeared"). An exception to this rule exists for stipulated dismissals of FLSA actions. *See Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199, 206 (2d Cir. 2015). Parties may not stipulate to dismiss an FLSA action with prejudice

---

[4] The Court notes that where there is a "meeting of minds" and the parties "intended to be bound by the confession of judgment," the confession of judgment may be enforced "even without its subsequent execution." *Febus,* 90 F. Supp. 3d at 249.

without submitting the settlement offer to the district court for review. *Id.*

District courts in this circuit frequently look to the factors outlined in *Wolinsky v. Scholastic Inc.*, 900 F. Supp. 2d 332, 335 (S.D.N.Y. 2012), to determine the reasonableness of a proposed settlement. *See, e.g., Li Rong Gao v. Perfect Team Corp.*, 249 F. Supp. 3d 636, 638 (E.D.N.Y. 2017); *Cortes v. New Creators, Inc.*, No. 15-CV-5680 (PAE), 2016 WL 3455383, at *2 (S.D.N.Y. June 20, 2016). These factors include:

> (1) the plaintiff's range of possible recovery; (2) the extent to which the settlement will enable the parties to avoid anticipated burdens and expenses in establishing their respective claims and defenses; (3) the seriousness of the litigation risks faced by the parties; (4) whether the settlement agreement is the product of arm's-length bargaining between experienced counsel; and (5) the possibility of fraud or collusion.

*Wolinsky*, 900 F. Supp. 2d at 335 (internal quotation marks and citation omitted); *see also Mei Xing Yu v. Hasaki Rest., Inc.*, 944 F.3d 395, 413 (2d Cir. 2019) (referring to the *Wolinksy* factors examined as part of a district court's fairness review under *Cheeks*).

"In addition, if attorneys' fees and costs are provided for in the settlement, district courts will also evaluate the reasonableness of the fees and costs." *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 600 (2d Cir. 2020) (citing *Cheeks*, 796 F.3d at 206); *see also* 29 U.S.C. § 216(b) ("The Court . . . shall, in addition

to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.").  In the present case, attorneys' fees and costs arise in the context of a settlement incorporating attorneys' fees and costs into the settlement amount.  *See, e.g., Lopez v. Nights of Cabiria, LLC*, 96 F. Supp. 3d 170, 181-82 (S.D.N.Y. 2015) (reviewing FLSA settlement incorporating counsel's fees as part of the total settlement amount).

**B.   Analysis**

Unfortunately, the Court must conclude, as Magistrate Judge Pollak did before, that it lacks sufficient information to properly evaluate the merits of the proposed settlement.  As Magistrate Judge Pollak noted, Plaintiff has failed to provide any information regarding Plaintiff's possible range of recovery in the instant case, making it impossible to evaluate the first *Wolinsky* factor. Neither party provides any calculations for determining how many hours the Plaintiff was denied minimum and overtime wages, and the damages for his non-FLSA claims, to explain the Plaintiff's potential recovery in the instant case.

**1.   Failure to Provide Plaintiff's Range of Possible Recovery**

In performing a *Cheeks* review, the objective of the court is to protect the plaintiff from potential abuse in settlement. *Cheeks*, 796 F.3d at 206.  In order for the court to properly

evaluate the merits of a proposed settlement, each party must provide the court with estimates of the number of hours worked or applicable wage. See *Lopez*, 96 F. Supp. 3d at 176-77 (finding the court has "no sense" of how the parties arrived at the maximum recover figures where "the parties did not provide the Court with each party's estimate of the number of hours worked or the applicable wage") (internal quotation marks and citation omitted); *Douglas v. Allied Universal Sec. Servs.*, 371 F. Supp. 3d 78, 83 (E.D.N.Y. 2019) ("To indicate the range of recovery, a plaintiff must at least indicate 'each party's estimate of the number of hours worked or the applicable wage'") (quoting *Lopez*, 96 F. Supp. at 176). "A plaintiff's maximum possible recovery, and the basis for that estimate, is one of the categories of information minimally required in order for the Court to evaluate the bona fides of the dispute." *Luna v. J.S. Held LLC*, No. 21-CV-3072 (JMW), 2023 WL 2214012, at *6 (E.D.N.Y. Feb. 24, 2023). "A plaintiff can show the range of recovery based on, *inter alia*, facts alleged in the Complaint or revealed through discovery." *Li v. HLY Chinese Cuisine Inc.*, 596 F. Supp. 3d 439, 446 (E.D.N.Y. 2022). "Without some proof of the parties' calculations, the Court cannot find that the range of the plaintiff's recovery is reasonable." *Narvaez v. Black Label Salon 25 Corp.*, No. 20-CV-4465 (ER), 2021 WL 1118383, at *1 (S.D.N.Y. Feb. 1, 2021).

Here, the Court cannot properly evaluate the merits of the

proposed settlement as the Plaintiff's conclusion regarding the settlement amount is not supported by any data. Without an estimate of the number of hours worked or calculation of the Plaintiff's possible range of recovery, the Court's ability to evaluate the merits of the Settlement Agreement is ultimately impossible. Furthermore, the Plaintiff *should* provide at least some information regarding the state law claims, given the Second Circuit has noted that "[w]here a settlement dismisses with prejudice both FLSA and state law claims, it seems to us a district court must take into account at least the existence of the state law claims in assessing the reasonableness of the settlement, which turns in part on the total potential recovery." *Fisher*, 948 F.3d at 607 n.12. Without any estimates of Plaintiff's possible range of recovery, the Court cannot find that the settlement amount is reasonable.

### 2. The Remaining Factors

Although the deficiencies noted above require that the settlement not be approved at this time, other factors weigh in favor of approval if the motion is renewed with information on the range of recovery.

*First*, the Court agrees with Plaintiff that settlement will avoid extensive litigation costs, including discovery costs and the corresponding costs of briefing dispositive motions. (*See* ECF No. 39-2, Plaintiff's Draft *Cheeks* Letter.) The proposed

34

settlement would allow the parties to end this litigation, which has spanned five years across state and federal court.

Second, there is a legitimate legal dispute between the parties, and settlement is a means of avoiding significant litigation risks for both. Defendants contend that Plaintiff was compensated for all hours worked, and further alleged counterclaims against Plaintiff, presenting an additional risk to further litigation by Plaintiff. (Id.) These legal claims are sufficient to demonstrate the bona fide nature of the dispute.

*Third*, the Court finds that the parties properly engaged in bargaining at arms-length to reach the settlement agreement. This is shown by the parties' attendance at a settlement conference held by Magistrate Judge Pollak, their compromise of the heavily disputed claims presented in this litigation, and the negotiations that took place over the past year, which are also reflected in the emails, texts, and billing records provided by Defendants' former counsel.

*Fourth*, the parties and counsel negotiated in good faith and agreed upon the settlement terms outlined above. The record is devoid of any evidence of fraud or collusion by the parties.

*Fifth*, the record shows no presence of similarly situated employees. Even if it did, the settlement agreement would not bar their claims. This factor does not weigh against settlement.

*Sixth*, given the time and resources spent during this multi-

35

year litigation, it is likely that Defendants will be deterred from violating the FLSA.  Additionally, because the Plaintiff is no longer employed by Defendants, it is also unlikely the claimant's individual circumstances will recur.

*Seventh*, the record offers no history of previous non-compliance with the FLSA by the Defendants, nor has the Plaintiff alleged such previous non-compliance.  Thus, this factor does not weigh against settlement approval.

*Eighth*, the desirability for a mature record is weak.  The parties engaged in written discovery under the supervision of Magistrate Judge Pollak during 2023, and there is no evidence that further information is necessary for Plaintiff to determine his range of possible recovery in the instant case.

Accordingly, the Court finds that, should the motion for settlement approval be renewed with additional information regarding Plaintiff's range of possible recovery, the remaining factors weigh in favor of settlement approval.

### 3.    Attorney's Fees

Because the parties' motion for settlement approval requires denial at this time, Plaintiff's counsel should not be awarded attorneys' fees at this time.  *See Fisher,* 948 F.3d at 600 ("Under the FLSA and the NYLL, a prevailing plaintiff is entitled to reasonable attorneys' fees and costs").  However, even if Plaintiff's motion were to be granted, Plaintiff's counsel's

request for attorneys' fees would be denied for failing to provide adequate documentation supporting the requested fees.

"In an FLSA case, the Court must independently ascertain the reasonableness of the fee request." *Gurung v. White Way Threading LLC*, 226 F. Supp. 3d 226, 229-30 (S.D.N.Y. 2016) (citation omitted). When considering applications for attorneys' fees, courts in this circuit employ the lodestar method. *Kazadavenko v. Atl. Adult Day Care Ctr. Inc.*, No. 21-CV-3284 (ENV)(LB), 2022 WL 2467541, at *4 (E.D.N.Y. Apr. 14, 2022). The lodestar calculation, which is "the product of a reasonable hourly rate and the reasonable number of hours required by the case . . . creates a presumptively reasonable fee." *Millea v. Metro-North R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (internal quotation marks and citation omitted).

Courts may also employ the "percentage of the fund" method which permits attorneys to recover a percentage of the settlement amount via a previously determined contingency fee. *McDaniel v. County of Schenectady*, 595 F.3d 411, 417-19 (2d Cir. 2010). Courts in this Circuit routinely approve of one-third contingency fees for FLSA cases. *Lai v. Journey Preparatroy Sch., Inc.*, No. 19-CV-2970 (CLP), 2022 WL 3327824, at *3 (E.D.N.Y. May 26, 2022) ("With this method, courts in this Circuit have routinely found an award representing one-third of the settlement amount to be reasonable"); *Kazadavenko*, 2022 WL 2467541 at *4 (collecting

cases).  However, even where fees are reasonable when analyzed under the percentage method, courts will additionally perform a lodestar "cross-check" and "compare the fees generated by the percentage method with those generated by the lodestar method." *Mobley v. Five Gems Mgmt. Corp.*, 17-CV-9448 (KPF), 2018 WL 1684343, at *4 (S.D.N.Y. Apr. 6, 2018) (citations omitted).

Critically, "[t]he fee applicant must submit adequate documentation supporting the requested attorneys' fees and costs." *Fisher*, 948 F.3d at 600; *Wolinsky*, 900 F. Supp. 2d at 336 ("In the Second Circuit, that entails submitting contemporaneous billing records documenting, for each attorney, the date, the hours expended, and the nature of the work done").  "[E]ven when the proposed fees do not exceed one third of the total settlement amount, courts in this circuit use the lodestar method as a cross check to ensure the reasonableness of attorneys' fees." *Navarro Zavala v. Trece Corp.*, No. 18-CV-1382 (ER), 2020 WL 728802, at *2 (S.D.N.Y. Feb. 13, 2020) (quotation and citation omitted).

Here, Plaintiff's counsel requests $60,000 (or one third) out of the $180,000 settlement. (ECF No. 39-2, Plaintiff's Draft *Cheeks* Letter.)  Plaintiff's draft *Cheeks* letter refers to an "Exhibit B" which includes "detailed billing records," but no such Exhibit B is attached to the document.  Nor is there evidence of a contingency agreement.  Plaintiff's counsel also asserts that his filing, service, and deposition fees totaled $4,180, which are not

documented but will be deducted from counsel's portion of the $180,000. (*Id.*)

Although this amount represents a one-third contingency fee similar to those granted by courts in the Second Circuit, the Court cannot make a determination as to whether the proposed fees are reasonable or whether a one-third contingency agreement exists here. Plaintiff's counsel asserts that detailed billing records support the fees requested, but what is fatal to counsel's application is that there are no contemporaneous billing records conveying the attorneys' billing rates, description of services or the hours worked. Without this evidence, the Court cannot determine whether counsel's fee request is commensurate with the amount of time spent on this case and therefore reasonable. Plaintiff's counsel's failure to provide this documentation necessarily warrants denial of the fee application. *See, e.g., Fontana v. Bowls & Salads Mexican Grill Inc.*, No. 19-CV-1587 (JMA)(ARL), 2022 WL 3362181, at *8 (E.D.N.Y. Feb. 3, 2022), *report and recommendation adopted*, 2022 WL 2389298 (E.D.N.Y. July 1, 2022) ("Plaintiff has failed to provide contemporaneous billing records for attorneys involved, or even a list of attorneys involved and their billing rates . . . Accordingly, Plaintiff has failed to meet her burden of establishing the reasonableness of the fees requested"); *Lopez*, 96 F. Supp. 3d at 182 (denying application for attorneys' fees where plaintiff's counsel provided no

contemporaneous billing record evidence); *Mamani v. Licetti*, No. 13-CV-7002 (KMW) (JCF), 2014 WL 2971050, at *3 (S.D.N.Y. July 2, 2014) ("The parties . . . do not provide the Court with any information to aid the Court in assessing the reasonableness of the fee award. Accordingly, the Court cannot approve the Settlement Agreement's allocation of attorney's fees at this time").

### CONCLUSION

For the reasons set forth above, the Court finds that Defendants' former counsel, Mr. Miller and Mr. Himes, possessed actual authority to negotiate and enter into a settlement on Defendants' behalf, and Mr. Agadjani has failed to present evidence rebutting the presumption that his attorneys acted to settle this action with his authority. Accordingly, the Court finds that on November 27, 2023, the parties entered into a binding oral agreement to settle the instant case for $180,000, paid over six months in equal monthly payments of $30,000, to be secured by a confession of judgment of $650,000 to be executed by Defendants.

Notwithstanding the fact that an enforceable settlement agreement has been reached, the Court declines to approve the parties' proposed settlement. Plaintiff is directed to submit a revised *Cheeks* letter that satisfactorily address the Court's concerns about Plaintiff's range of possible recovery and attorney's fees set forth above. Plaintiff's letter shall be submitted no later than **October 10, 2024,** and shall include as an

exhibit detailed billing records substantiating Plaintiff's counsel's fee and cost requests, and a contingency agreement if one exists.   The Clerk of Court shall serve a copy of this Memorandum and Order on Defendants and file proof of service on the docket no later than **October 7, 2024.**


**SO ORDERED**

Dated:      October 4, 2024
            Brooklyn, New York

_____
**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York

41