1

```
1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
2       - - - - - - - - - - - - - - - X
                                      :
3         LUCIANO SANTIAGO,           :   21-CV-7090(KAM)
                                      :
4                     Plaintiff,      :
                                      :   United States Courthouse
5             -against-              :   Brooklyn, New York
                                      :
6         MAKSUD TRAX AGADJANI and    :
          TRAX NYC CORP.,             :   September 16, 2024
7                                     :   11:00 a.m.
                      Defendant.      :
8       - - - - - - - - - - - - - - - X
                                      :
9
              TRANSCRIPT OF CIVIL CAUSE FOR EVIDENTIARY HEARING
10            BEFORE THE HONORABLE KIYO A. MATSUMOTO
                   UNITED STATES DISTRICT JUDGE
11

12                      A P P E A R A N C E S :

13      For Plaintiff:      ALLAN WINSTON HORATIO JENNINGS, ESQ.
                               214-11 Northern Boulevard, Suite 2
14                             Bayside, New York 11361
                            BY: ALLAN JENNINGS, ESQ.
15
        For Defendant       MAKSUD AGADJANI - Pro Se
16      Maksud Agadjani:       6433 98th Street
                               Rego Park, New York 11374
17
        For Kishner Miller  FRANKFURT KURNIT KLEIN & SELZ, P.C.
18      Himes firm:            28 Liberty Street
                               New York, New York 10005
19                          BY: JEREMY BATES, ESQ.

20
        REPORTED BY:
21
        Kristi Cruz, RMR, CRR, RPR
22      Official Court Reporter
        kristi.edny@gmail.com
23
        Proceedings recorded by computerized stenography.  Transcript produced by
24      Computer-Aided Transcription.

25                      *     *     *     *     *
```

PROCEEDINGS                                    2

1              (In open court.)

2              THE COURT:  All right.  It's 11:17.  Are you

3    Mr. Jennings?

4              MR. JENNINGS:  Yes, Your Honor.

5              THE COURT:  Sir, you're late.

6              MR. JENNINGS:  Yes, Your Honor.  I apologize.

7              THE COURT:  I have another matter at 12:00, so it

8    doesn't really work when an attorney shows up late.

9              MR. JENNINGS:  I apologize.

10             THE COURT:  Have a seat.

11             Ms. Jackson, do you want to call the case, please?

12             THE COURTROOM DEPUTY:  Yes, Judge.

13             This is a Civil Cause For an Evidentiary Hearing,

14   docket 21-CV-7090, *Santiago v. Agadjani, et al.*

15             Counsel for the plaintiff, please state your

16   appearance.

17             MR. JENNINGS:  Allan Jennings for the plaintiff,

18   Mr. Santiago.

19             THE COURT:  Is your client here?

20             MR. JENNINGS:  No, he's not coming.

21             THE COURT:  And the pro se defendant, sir, please

22   state your name.

23             MR. AGADJANI:  My name is Maksud Agadjani.

24             THE COURT:  Thank you.

25             THE COURTROOM DEPUTY:  And the former counsel?

PROCEEDINGS                                    3

1          MR. BATES:  Jeremy Bates with Frankfurt Kurnit
2     Klein & Selz, professional responsibility counsel to the
3     defendant's former counsel.
4          THE COURT:  All right.
5          Your name, sir?
6          MR. MILLER:  Good morning, Your Honor.
7          Ryan Miller of Kishner Miller Himes P.C., former
8     counsel to Mr. Agadjani and Trax NYC.
9          THE COURT:  Thank you.
10          MR. HIMES:  And Scott Himes, Your Honor.
11          THE COURT:  All right.  I just want to deal with
12     some preliminaries.
13          First of all, I note that the Trax New York City
14     Corporation is in default.  They did not appear through new
15     counsel.  They fired their attorney.  A corporation cannot
16     proceed pro se.  I don't believe any lawyer has ever
17     appeared for the company.
18          So the plaintiffs may seek default of Trax at this
19     point, unless Mr. Agadjani can tell me you've got a lawyer
20     coming in to represent.
21          MR. AGADJANI:  I don't have a lawyer at this
22     moment, Your Honor.
23          THE COURT:  Well, Judge Pollak, I think, relieved
24     your lawyers of representation some time ago and advised you
25     that your corporation cannot proceed pro se.  So the

PROCEEDINGS                                    4

1    plaintiff may move to default your corporation.

2                MR. AGADJANI:  Okay.

3                THE COURT:  If you were to tell me that you had a

4    lawyer who was ready to make an appearance, I would ask

5    plaintiffs to hold off for a moment.  But I'm not hearing

6    that from you.

7                MR. AGADJANI:  I'm going to do my best to find a

8    lawyer.  I exhausted all my resources on these two

9    individuals here, Your Honor.

10               THE COURT:  All right.

11               The reason we're having this hearing, sir, is

12   because the Court, both Judge Pollak and I, would like to

13   believe that this case was settled.  We're now told that

14   Mr. Agadjani did not authorize his attorneys to settle on

15   his behalf in the amount that is at issue.

16               Let me just say as a preliminary matter,

17   Mr. Agadjani, usually you enjoy a privilege with your

18   lawyers, meaning that whatever you say to them or they say

19   to you remains confidential as just between you and your

20   lawyers.  Because you have raised an issue that bears

21   directly on their representation of you and conversations

22   you may have had with them and communications that you've

23   made to them, you have, in effect, waived your right to

24   confidentiality with regard to your conversations.

25               The attorney/client privilege may be waived if a

1    party puts privileged communications at issue by relying on

2    it to support a claim or defense.  This waiver may be

3    implied in circumstances where it is called for in the

4    interest of fairness.  This is a Second Circuit case, *In re*

5    *Sims*, 534 F.3d at 117, decided in 2008.

6            As examples, the Second Circuit gives a party

7    attempting to use the privilege both as a shield and a

8    sword, quoting *In re Grand Jury Proceedings*, 219 F.3d 175 at

9    182, decided by the Second Circuit Court of Appeals in 2000.

10   In other words, a party cannot partially disclose privileged

11   communications or affirmatively rely on privileged

12   communications to support its claim or defense and then

13   shield the underlying communication from scrutiny by the

14   opposing party.  Again, *In re Grand Jury Proceedings*,

15   219 F.3d at 182, and In re County of Eerie, 546 F.3d 222 at

16   229, decided in 2008.

17           Finally, I cite *United States v. Bilzerian*,

18   926 F.2d 1285 at 1292, decided in 1991, in which the Second

19   Circuit held that a defendant may not use the privilege to

20   prejudice his opponent's case or to disclose some selective

21   communications for self-serving purposes.  Whether we can

22   imply a waiver is determined on a case-by-case basis.  The

23   key to finding an implied waiver is some showing by the

24   party arguing for a waiver that the opposing party relies on

25   the privileged communication as a claim or a defense or as

PROCEEDINGS                                    6

1   an element of a claim or defense.

2          Now, here, what's happened is Mr. Agadjani has

3   necessarily waived his privilege, that is, his

4   communications with his lawyers regarding the settlement and

5   their authorization or lack of authorization to enter into a

6   settlement agreement by asserting that his attorneys entered

7   into the settlement without his consent in his opposition to

8   enforce the settlement.  As a result, I deem the attorney

9   client privilege over his communications with his attorneys

10  is waived, and I find that Mr. Agadjani's discussions with

11  his attorneys regarding their authorization to settle the

12  case or not settle the case are a proper topic for the

13  evidentiary hearing.

14         So what I'd like to do next is to hear from

15  Mr. Agadjani.

16         I note that you have submitted an opposition to

17  Judge Pollak's report and recommendation recommending that

18  the settlement be enforced.  And in support of that, you

19  claim that you have attached emails and texts in which you

20  have told your lawyers they may not settle the case for the

21  amount that was ultimately agreed to.

22         MR. AGADJANI:  Correct.

23         THE COURT:  You allege they acted without your

24  authority, that you were not told what the settlement amount

25  was, and that you wish not to be bound by it.

PROCEEDINGS                              7

1          Let me ask you to take the stand.  I'm going to

2     ask you to take an oath to testify under penalty of perjury,

3     meaning you must tell the truth.  If you don't tell the

4     truth, you could be subject to penalties of perjury.

5          So please step up to the witness stand.

6          MR. AGADJANI:  Thank you.

7          (Witness takes the stand and is sworn.)

8          THE COURTROOM DEPUTY:  State your full name,

9     please, and spell it for the record.

10         THE WITNESS:  Maksud Agadjani; M-A-K-S-U-D,

11    A-G-A-D-J-A-N-I.

12         THE COURT:  All right.  Thank you, sir.

13    **MAKSUD AGADJANI**,

14              called as a witness, having been first duly

15              sworn/affirmed, was examined and testified as

16              follows:

17    COURT INQUIRY:

18         THE COURT:  So you are the defendant in this

19    lawsuit; is that correct?

20         THE WITNESS:  Yes.  I had a countersuit.  I don't

21    really know what happened to it, but --

22         THE COURT:  Well, it was, we thought, settled.

23         Are you the sole owner of the other defendant,

24    Trax?

25         THE WITNESS:  Yes.

PROCEEDINGS                                          8

1          THE COURT:  There's no other owner?

2          THE WITNESS:  No.

3          THE COURT:  What form of corporate existence does

4    Trax have?  Is it an LLC or is it a partnership?  What kind

5    of --

6          THE WITNESS:  I believe it's an S corporation.

7    That's from what I recall.

8          THE COURT:  All right.  So as you know, there was

9    a lawsuit brought by Luciano Santiago.

10         THE WITNESS:  Yes.

11         THE COURT:  Who alleges that you falsely accused

12   him of stealing from you and alleges that you falsely

13   reported him to the police.

14         THE WITNESS:  Right.

15         THE COURT:  That he was thereafter arrested and

16   ultimately the prosecution was dropped.

17         THE WITNESS:  Correct.

18         THE COURT:  And so he has sued you for defamation.

19         THE WITNESS:  Okay.

20         THE COURT:  As well as whether you paid him under

21   the Fair Labor Standards Act as appropriate minimum wage and

22   overtime.

23         THE WITNESS:  Right.

24         THE COURT:  Am I describing the lawsuit correctly,

25   counsel?

PROCEEDINGS                                    9

1          MR. JENNINGS:  Yes, Your Honor.  There's a

2    departure where Mr. Agadjani went on the internet and

3    defamed my client on several internet broadcasts, calling

4    him a thief and showing his picture.

5          THE COURT:  All right.  So that is a part of the

6    defamation claim.

7          So Magistrate Judge Pollak conducted a settlement

8    conference.  Were you aware that the settlement conference

9    was going to occur?

10         THE WITNESS:  Yes.

11         THE COURT:  And did you attend the settlement

12   conference?

13         THE WITNESS:  No.

14         THE COURT:  Why didn't you attend?

15         THE WITNESS:  Well, I had a hard time

16   communicating with my attorneys.  Most of the time I tried

17   to reach out to them.  They only responded when they felt

18   like it.

19         THE COURT:  Well, I'm just asking a more simple

20   question:  Why did you not attend the settlement conference

21   if you were aware of it?

22         THE WITNESS:  I was relying on Mr. Miller.  I

23   asked explicitly several times that Mr. Himes to be relieved

24   and I don't have anything -- him on my case at all.  Somehow

25   he lingered on, and they just kept billing me and billing me

PROCEEDINGS                                          10

1    for money.  That's all that happened.

2           THE COURT:  Well, were you aware of the date and

3    time that the settlement occurrence?

4           THE WITNESS:  Not that I recall.

5           THE COURT:  Did you ask to participate in the

6    settlement conference?

7           THE WITNESS:  No, I did not.  I asked for an

8    offensive on my behalf because I'm a victim of a --

9           THE COURT:  You asked for what?

10          THE WITNESS:  An offensive, like a case that they

11   should be pursuing something on my end.  I'm the victim of a

12   crime.  This individual committed vast amounts of theft to

13   my jewelry store.  I have him on videotape.  I did

14   everything I can to make sure other clients were protected

15   from his crimes that this guy committed, and I wanted my

16   voice to be heard and they weren't doing that for me at all.

17   They were just billing me 20,000 here, 30,000 here, up to

18   $200,000.

19          THE COURT:  All right.  Well, let's just focus on

20   not the merits of the case, but the circumstances of the

21   settlement conference.  All right?

22          THE WITNESS:  Okay.

23          THE COURT:  Judge Pollak ordered a settlement

24   conference, and it appears that there were some discussions

25   that you submitted as part of your opposition to her report

PROCEEDINGS                    11

1    and recommendation --

2              THE WITNESS:  Right.

3              THE COURT:  -- in which she recommended that I

4    enforce the settlement agreement.

5              THE WITNESS:  Okay.

6              THE COURT:  There was first an email dated

7    February 8, 2022 between you and, it appears, Mr. Himes.

8              THE WITNESS:  Right.

9              THE COURT:  And there is discussion about a

10   settlement in which Mr. Himes recommends that you make a

11   nominal counteroffer to a settlement demand.

12             THE WITNESS:  Okay.

13             THE COURT:  That was something you submitted.

14   Now, this was long before the actual settlement conference,

15   which I believe occurred on October 30, 2023.

16             THE WITNESS:  Right.

17             THE COURT:  So more than a year and a half later.

18             THE WITNESS:  Right.

19             THE COURT:  You state in your submission, and this

20   is document number 51 on the docket, that:  As the case

21   progressed, I specifically communicated that any settlement

22   should not exceed $130,000.  The attached messages and

23   emails clearly substantiate my position and directives to

24   Mr. Himes and counsel.

25             And you attach thereto a text which appears to be

PROCEEDINGS                                    12

1   dated October 23, 2023, at 9:01.  Mr. Miller text you, it

2   appears:  Ryan Miller here (your attorney).  I just want to

3   ensure you are seeing my emails I sent to you last week and

4   this morning.  Please confirm.  Thanks.

5            So it appears that your attorney was trying to

6   reach you and to get your response, and you responded:  Will

7   check now.  And you responded:  The bottom line offer is

8   130.  Can I get a call back.  And Mr. Ryan Miller responds:

9   May I call you at 12 p.m. to discuss?  And you say:  Yes.

10           THE WITNESS:  Right.

11           THE COURT:  And then it appears that there was

12  some other communication.

13           So what happened during the conversation on

14  October 30th with Mr. Miller?

15           THE WITNESS:  Well, you know, I asked Mr. Miller,

16  what about on my complaints?  What about for me?  What about

17  the crime that was committed against me?  I'm sitting here,

18  I'm paying them; this guy wants more money, this guy wants

19  money.  Everybody wants money, but what about me and what I

20  suffered?  That's what I asked him.  And that was -- and

21  then I asked him, why is Mr. Himes on my case and continues

22  to collude with this other attorney that's on the opposing

23  side.  It boggled my mind why this would be happening to me,

24  until I finally broke down -- I trusted these two

25  individuals, and I finally broke down and I said I can't do

PROCEEDINGS                                    13

1   this with them anymore.  They were really pushing me for the

2   settlement like it's the only thing that matters in the

3   world, and this is what I have to do when I'm the victim of

4   a crime.

5          THE COURT:  Well, that wasn't my question, sir.

6   My question is:  What conversations did you have with

7   Mr. Miller on October 30th when he called you that day at

8   noon to discuss the settlement conference?

9          THE WITNESS:  I can't exactly remember the

10  conversation --

11         THE COURT:  Try your best.

12         THE WITNESS:  I'll most likely say, what about the

13  injury that's been done to me?

14         THE COURT:  Okay.  So you were upset that they

15  weren't bringing some claim on your behalf.  But what for

16  purposes of settlement did you authorize your lawyers to

17  offer at the settlement conference?

18         THE WITNESS:  $130,000 is something that, rather

19  than getting billed another 200,000, that I considered.

20         THE COURT:  All right.  And did you have any

21  conversations in which you agreed or indicated that you

22  could be flexible for more money?

23         THE WITNESS:  No, not that I recall.

24         THE COURT:  All right.  Did you ever say anything

25  in writing, or is this the extent of what you have in

PROCEEDINGS                                    14

1    writing with your attorneys regarding your authority that

2    you gave them to --

3              THE WITNESS:  I believe so, yes.  They might have

4    other documents; I don't know.

5              THE COURT:  Okay.  Because in your submission, I

6    think you suggested you have multiple texts and emails

7    regarding the settlement that either they did or didn't

8    have.

9              THE WITNESS:  Right.

10             THE COURT:  Is this all you have?

11             THE WITNESS:  I can't definitively say that that's

12   all I have.  I have to look deeper into --

13             THE COURT:  Well, you were given an opportunity to

14   submit what you had.

15             THE WITNESS:  Sure.  This is what I have to submit

16   at this point.

17             THE COURT:  Well, this is going to be the hearing.

18   We're having a hearing.

19             THE WITNESS:  Okay.

20             THE COURT:  We have all these people here.

21             THE WITNESS:  Sure.

22             THE COURT:  Do you have any other recollection

23   about what you said to them about the $130,000 settlement

24   amount?

25             THE WITNESS:  So when they were preparing the

1   documents, I said I don't want to settle, I want you guys to

2   be relieved as my attorneys and I need to find somebody who

3   is going to actually do my case.

4           THE COURT:  Well, you knew that they were going

5   there to settle the case on your behalf, correct?

6           THE WITNESS:  Yes.

7           THE COURT:  And you knew that you had told them

8   $130,000; is that correct?

9           THE WITNESS:  Yes.

10          THE COURT:  And you, as best you can recall, never

11  authorized to offer a penny more than $130,000?

12          THE WITNESS:  Correct.

13          THE COURT:  So when you got the settlement papers,

14  how soon after the settlement conference did you receive

15  those papers?

16          THE WITNESS:  I'm not sure.

17          THE COURT:  Well, you're going to have to try to

18  recollect.

19          THE WITNESS:  I never looked at those papers.

20  They were in my email --

21          THE COURT:  Well, if you never looked at them, why

22  would you say I don't want to settle?  I mean, why would you

23  say that the amount that they were --

24          THE WITNESS:  Because everything I asked my

25  attorney to do was ignored.  There was not one paper that

PROCEEDINGS                              16

1  was produced on the opposing counsel side, and I spent

2  $200,000 on these attorneys and they just pushed me along,

3  billed me along until they came up with a settlement that

4  was good for them.

5          THE COURT:  Well, I know you have opinions about

6  these attorneys, but if you would try to answer my questions

7  directly.

8          THE WITNESS:  Sure.

9          THE COURT:  What I'm trying to get to is what

10  communications you had with your lawyers, because what I

11  have to do is difficult.  I have to decide whether I believe

12  your version of the facts, and the more specific you can be

13  and the more documentation you can give me, the better.

14          THE WITNESS:  Okay.

15          THE COURT:  The same is true for them.  I'm going

16  to hear from them, and they're going to testify under oath

17  and under penalty of perjury, as well.

18          THE WITNESS:  Wonderful.

19          THE COURT:  Meaning if they don't tell the truth,

20  there are consequences for all parties who don't tell the

21  truth in court.

22          THE WITNESS:  Okay.

23          THE COURT:  So you had represented to me that you

24  had a lot of proof that you had not authorized the

25  settlement amount, and you just stated here today that you

PROCEEDINGS                                    17

1  objected to the settlement, but you said you never looked at

2  it; is that correct?

3         THE WITNESS:  Correct.

4         THE COURT:  All right.  So you're saying under

5  oath here today that you did not realize that the settlement

6  agreement set forth an amount of $180,000?

7         THE WITNESS:  The way it was worded to me is I

8  understood $130,000 is the amount that can be settled upon,

9  and I agreed to that amount to prevent myself from having

10  any more misery with these two attorneys.

11         And then when it came down to it and I have to

12  give this person who committed a crime against me more

13  money, I said I don't want these attorneys anymore, let me

14  get some attorneys that will actually work for the money

15  that I pay them.  That was the extent of my reasoning on my

16  end, Your Honor.

17         THE COURT:  All right.  So if your attorneys were

18  relieved, why haven't you found another attorney to step in

19  and represent you and your corporation?

20         THE WITNESS:  I was putting myself at the mercy of

21  the Court.  I spent $200,000.  I have no more money for -- I

22  lost in theft another $300,000 -- $500,000 of money.  I'm a

23  small business owner.  I don't have any more.

24         THE COURT:  Well, it seems to me that Judge Pollak

25  advised you, though, that your corporation could not proceed

1    pro se, correct?

2           THE WITNESS:  Correct.

3           THE COURT:  And the consequence of not coming in

4    with a lawyer, because you cannot represent the corporation,

5    is the corporation can have a default entered against it.

6    Do you understand?

7           THE WITNESS:  Right.

8           THE COURT:  And once a judgment is entered, that

9    judgment may be collected by the plaintiff's attorney.  Do

10   you understand?

11          THE WITNESS:  I understand that now.

12          THE COURT:  All right.

13          You say:  In clear defiance of my instructions,

14   Mr. Himes unilaterally agreed to a settlement of $180,000.

15   This agreement was made without my consent or approval.

16          Now, you testified here today that you never

17   looked at the settlement agreement and you didn't know about

18   the amount.  When did you become aware of the settlement

19   being $180,000?

20          THE WITNESS:  I don't remember ever hearing

21   $180,000, to be honest.

22          THE COURT:  Well, you say it in your papers, that

23   you're aware of this amount.  So when did you become aware

24   of it?

25          THE WITNESS:  Well, my assistant over there,

1  Mickey, at some point in time presented me the papers, and

2  this attorney Jennings came in with, oh, I want 180 or this

3  and that.  They were milking me for money, Your Honor.

4  That's all they were doing the whole time, the attorneys and

5  this guy.  Give me more, this is 30, this is 50, I want 120.

6  That's all I was hearing.  It was a blur of money grubbing,

7  so --

8       THE COURT:  You know what?  It's not going to do

9  anyone any good to have you name call and describe in

10  pejorative terms what you think about the plaintiff or their

11  lawyers or your former lawyers.  What I'm asking you is to

12  recite facts.

13      THE WITNESS:  Okay.

14      THE COURT:  Your opinion, I understand.  I

15  sympathize with you as a business owner what happened, or

16  what allegedly happened.  I'm not here to make decisions

17  about who is right or who is wrong in this case.

18      THE WITNESS:  Okay.

19      THE COURT:  What I'm trying to decide is whether

20  or not you can sustain your burden of overcoming a

21  presumption that there was a valid settlement and whether I

22  should enforce it.  That is the issue before me in this

23  hearing.  Do you understand?

24      THE WITNESS:  Yes.

25      THE COURT:  So let's try to stay on point.

PROCEEDINGS                          20

1          You say that Mr. Himes did not have authority to

2     settle the case for $180,000.  So none of your lawyers ever

3     had authority to settle for $180,000?

4          THE WITNESS:  For $180,000?  No.

5          THE COURT:  All right.  What communications, if

6     any, did you have with your lawyers about the settlement

7     process and the numbers that were being exchanged between

8     your lawyers and the plaintiff's lawyers?

9          THE WITNESS:  I was communicating with Mr. Miller.

10    I gave him the authority for $130,000.  That's what I have

11    as far as any recollection or documents.

12         THE COURT:  All right.  And did Mr. Miller ever

13    tell you that the plaintiff was asking for more than

14    $130,000?

15         THE WITNESS:  He was negotiating something back

16    and forth.  I don't remember hearing anything more than 130.

17         THE COURT:  Well, that was in your head.  What did

18    Mr. Miller or Mr. Himes tell you about what the plaintiff

19    was demanding?

20         THE WITNESS:  I asked Mr. Himes to be relieved on

21    my case for a long, long time.  I don't even know why he was

22    still on --

23         THE COURT:  So did you not talk to Mr. Himes --

24         THE WITNESS:  At all.

25         THE COURT:  So let's talk about Mr. Miller.

1            What did Mr. Miller tell you about the numbers

2    that --

3            THE WITNESS:  Mr. Miller called me up -- I'm

4    sorry.

5            THE COURT:  What do you recall about what

6    Mr. Miller said about plaintiff's demand for settlement, and

7    especially to the extent it may have exceeded the $130,000

8    you authorized?

9            THE WITNESS:  To be completely honest, Your Honor,

10   I don't remember.

11           THE COURT:  Well, I'm appreciating that you're

12   being completely honest because you have to be honest.

13           THE WITNESS:  Right.

14           THE COURT:  But you have the burden to show me

15   that you never authorized more than $130,000.

16           THE WITNESS:  Right.

17           THE COURT:  So if you don't recall, what it means

18   is if Mr. Miller gets up here and testifies under oath that

19   you gave him authority to go to 180, then I'm going to be

20   persuaded that you did, in fact, authorize it.

21           THE WITNESS:  Okay.

22           THE COURT:  So I'm asking you under oath what you

23   recall, if anything, about your conversations with

24   Mr. Miller regarding the $180,000 that plaintiff's counsel,

25   Mr. Jennings, thought you had agreed to.

PROCEEDINGS                                  22

1      THE WITNESS:  I sent an explicit email to

2  Mr. Miller saying I'm not going to go above $130,000.

3      THE COURT:  And that was your email of

4  October 30th that you've submitted?

5      THE WITNESS:  Yes.

6      THE COURT:  All right.  And then you had a

7  subsequent conversation with him, correct?

8      THE WITNESS:  Correct.

9      THE COURT:  What was the substance of your

10 conversation with Mr. Miller?

11     THE WITNESS:  The substance of my conversation

12 was, I was asking for him to be an actual attorney for me

13 and he was sitting there doing something else.  I don't

14 really know.

15     THE COURT:  Well, this is my question:  What did

16 you and Mr. Miller discuss with regard to the $130,000 that

17 you had authorized for settlement and whether there was any

18 play or any flexibility in going above 130?

19     THE WITNESS:  Your Honor, I was very irate at that

20 point.  I was trying to understand from Mr. Miller why I had

21 to pay anything.  I hired him as an attorney.  I'm the

22 victim of a crime.  I was continually asking him why this

23 would happen to me.  That's what I was asking.  They kept

24 pushing for a settlement.  I said, okay, 130 is better than

25 paying them another fortune.  That's all that happened on my

PROCEEDINGS                          23

1  end.

2          THE COURT:  All right.  So as you sit here today,

3  you are firm in your testimony under oath that $130,000 was

4  the top amount that you authorized to settle?

5          THE WITNESS:  Yes.

6          THE COURT:  All right.

7          Does Mr. Jennings have questions or does counsel

8  for the defendants have questions of this witness?

9          MR. JENNINGS:  Your Honor, very unorthodox, but

10 Mr. Agadjani represents himself.  I'm here listening him to

11 him testify.  He's putting himself down a road that he's not

12 going to be able to come back from.  I would ask if the

13 Court wouldn't mind if Mr. Agadjani and I have a conference

14 that maybe I can help him to settle right now before any

15 other testimony takes place in this courtroom, if that's

16 okay with you, Your Honor.

17         THE COURT:  Well, you don't --

18         MR. JENNINGS:  I know it's unorthodox.  I don't

19 represent him; he represents himself.

20         THE COURT:  Are you saying that if you don't do

21 the settlement, are you saying that you're going to

22 withdraw --

23         MR. JENNINGS:  Oh, no, I'm not going to do that at

24 all, Your Honor.

25         THE COURT:  Are you trying to give him warnings

PROCEEDINGS                                      24

1   about his position?  I don't quite understand what --

2          MR. JENNINGS:  I don't know if warnings is the

3   right word to use, but help him to settle today before more

4   testimony takes place.

5          THE COURT:  I don't know that he's going to settle

6   with you.

7          Is this something that you still want to

8   entertain, Mr. Agadjani?

9          THE WITNESS:  No, there's nothing further to

10  entertain, Your Honor.

11         THE COURT:  All right.

12         MR. JENNINGS:  I'm just trying to help him.

13         THE COURT:  Pardon me?

14         MR. JENNINGS:  I'm just trying to help him.

15         THE COURT:  Well, he doesn't want your help.

16         MR. JENNINGS:  No problem, Judge.

17         THE COURT:  Did you want to question this witness?

18         MR. JENNINGS:  Yes, Your Honor.

19         THE COURT:  If you want, you can stand at the

20  podium with the microphone, or Ms. Jackson can also activate

21  the microphone at the front.

22         MR. JENNINGS:  Thank you, Your Honor.

23  EXAMINATION BY

24  MR. JENNINGS:

25  Q    Good morning, Mr. Agadjani.  How are you doing today?

PROCEEDINGS                                    25

1  A    Pretty good.

2  Q    That's good.

3       Mr. Agadjani, in your testimony a while ago you

4  mentioned that Mr. Jennings came in.  When and where did

5  myself, Allan Jennings, come in to see you?

6  A    Nowhere.

7  Q    But you testified that I came in to see you.

8  A    No, I didn't.

9  Q    You just -- would you like us to read the record?

10 A    Sure.

11      MR. JENNINGS:  Is that possible to read the record

12 back where he states Mr. Jennings came in to see me?

13      THE COURT:  If the court reporter can find it.

14      (Record read.)

15      MR. JENNINGS:  Thank you.

16 Q    So, Mr. Agadjani, when did I come in to see you --

17 A    I didn't say you came in to see me.

18 Q    She just read --

19 A    Came in with 180 as a figure.

20 Q    She just read your testimony under oath --

21 A    Okay.

22 Q    -- where you under oath said that I came in.

23 A    Came in --

24 Q    I just want to know where and when I came in to see

25 you.

PROCEEDINGS                                26

1        THE COURT:  He didn't say that you came in to see
2    him.  He said Mr. Jennings came in, meaning he made a demand
3    of 180.  I didn't take that as came into his office to see
4    him personally.
5        MR. JENNINGS:  Okay.
6    Q    So did I ever call you and talk to you about that prior
7    to your terminating your attorneys?
8    A    No.
9    Q    Had you ever met me prior to you coming into court?
10   A    Prior to coming into court?  No.
11   Q    Okay.  So I never picked up the phone at any time and
12   called you while you were being represented by your
13   attorneys; is that correct?
14   A    Not that I remember.
15   Q    Mr. Agadjani, is it correct that you often broadcast
16   the things that you do on the internet; where you go, when
17   you go?
18   A    Sure.
19   Q    On October 30, 2023, you testified under oath that you
20   knew there was going to be a settlement hearing.
21   A    Yeah.
22   Q    And how many days before that hearing did you speak to
23   Mr. Miller or Mr. Himes?
24   A    I don't recall how many days.
25   Q    Would it be fair to say that you spoke to them sometime

PROCEEDINGS                                    27

1   that week prior to the hearing?

2   A    I think that's possible, yeah.

3   Q    Okay.  And in that conversation, did you not have a

4   discussion about settling on October 30, 2023?

5   A    Yes.

6   Q    So you knew the purpose of that hearing was to settle

7   this case, right?

8   A    Correct.

9   Q    And put it behind you.

10  A    Yeah.

11  Q    Did you not discuss with them or give them

12  authorization of up to how much you can settle for?

13  A    Yes.

14  Q    Why is it that you were not at the hearing itself on

15  that day?

16  A    The stress of being in this situation was breaking me

17  down, to be honest.  I just left it up to them.

18  Q    So you knew there was a hearing.

19  A    Yeah.

20  Q    But sitting here now, it's your testimony that you

21  didn't go because you were under stress?

22  A    Yes correct.

23  Q    Were you in the country at that time?

24  A    Actually, I might not have.  I don't know; I don't

25  remember.

PROCEEDINGS                          28

1   Q    Subsequent to the October 30th hearing, did your

2   attorneys call you?

3   A    Subsequent?

4   Q    Yeah.  On that day, on that day did they call you?

5   A    On that day?  I don't remember.

6   Q    Well, in your testimony, I believe there was an email

7   read where you went back and forth between Mr. Miller, and

8   Mr. Miller said can you talk at 12 noon on the 30th.

9   A    Right.

10  Q    That would have been sometime after the hearing.

11  A    Okay.

12  Q    That would have took place in the morning.

13  A    Okay.

14        THE COURT:  Just to be correct, I think the

15  settlement conference was on October 31st, not October 30th.

16        MR. JENNINGS:  I apologize.

17        THE COURT:  So this was a conference that he might

18  have had with his lawyer the day before the settlement

19  conference.

20        MR. JENNINGS:  Right.

21  Q    On October 31st, there was a settlement conference on

22  the 31st.

23  A    Okay.

24  Q    Did you not speak to your attorneys sometime on that

25  same day after the conference?

PROCEEDINGS                                    29

1   A    I could have, quite possibly, yes.

2   Q    And what did they discuss with you?

3   A    I don't know.

4   Q    You don't know?

5   A    I don't remember talking to them, to be honest.

6   Q    If they spoke to you on that day after the conference

7   where it was settled for the amount, would your attorneys

8   have told you the amount it was settled for on that day?

9   A    They should have, yes.

10  Q    Then they would have told you we settled for 180,000,

11  right?

12  A    I don't remember hearing that number at all.

13  Q    Okay.  Let me ask you a question:  When you knew there

14  was a settlement, you know the settlement took place on

15  October 31st, so you know a settlement took place; is that

16  right?

17  A    I know a conference took place, yeah.

18  Q    And your attorneys would have advised you that it

19  settled.  Did they tell you you have to write a check right

20  away or you can make payments?

21  A    Make payments.  I told them that would be the best

22  thing, yeah.

23  Q    So they called you on the 31st, told you the amount,

24  and then you discussed with them the terms of the payments,

25  then, right?

PROCEEDINGS                    30

1  A    I said I would be comfortable with $20,000 a month for

2  $120,000 or $130,000.

3  Q    So you told them that you would pay it, $20,000 a

4  month.

5  A    Something along those lines.  I can't definitively say.

6  Q    Sometime on the 31st?

7  A    Yeah.  It may be; I don't know.

8  Q    And days after that, did you continue to have other

9  discussions with them about your payment plan?

10 A    Discussions of my payment plan?  Not that I recall.

11 The only discussions I remember, if I may speak off the

12 script, so to speak --

13 Q    Sure.

14 A    -- is why isn't even one shred of document being

15 produced on my end for the $200,000 I spend with them?

16 That's the number one question I was asking --

17           THE COURT:  I'll tell you something; that's not

18 the issue.  What you paid your attorneys is not of concern

19 to me and I told you that before.

20           THE WITNESS:  All right.

21           THE COURT:  What's of concern to me is whether or

22 not you were aware and authorized a settlement of $180,000

23 payable over time in increments of between $20,000 and

24 $30,000.

25           THE WITNESS:  Okay.

1          THE COURT:  That's the only issue before me, okay?

2     Whatever beef you have with your attorneys, that's between

3     you and your attorneys.

4          THE WITNESS:  Okay.

5     BY MR. JENNINGS:

6     Q    Just going back, just a few minutes ago you stated

7     after they told you the amount, you agreed to a payment

8     plan.  You stated it's $20,000.

9     A    Yes.

10    Q    Okay.  Would you be surprised if I told you -- let me

11    go back.

12          After that day on the 31st, were there other days

13    of discussing with your attorneys, Mr. Ryan o Mr. Himes, of

14    the amount of time you would need to make the payment plan?

15    A    Not that I recall.

16    Q    So -- okay.

17          THE COURT:  Sir, were you intending just to pay

18    the 130 up front?

19          THE WITNESS:  I was paying -- as I remember, it

20    was 120, with 20,000 for six months per month.

21          THE COURT:  So now you're saying that the

22    settlement that you believe your attorneys achieved was

23    $120,000, not $130,000?

24          THE WITNESS:  I gave them authority to go up to

25    130, and I was hoping that they at least did at least 10,000

PROCEEDINGS                          32

1   under that.  That's my understanding of it.

2          THE COURT:  So you were told, you have a specific

3   recollection that your attorneys told you they settled it

4   for $120,000?

5          THE WITNESS:  That's my recollection, $120,000

6   for --

7          THE COURT:  How did they communicate that amount?

8          THE WITNESS:  Maybe on the phone?  I'm not sure.

9   That's what's in my mind as far as the settlement is

10  concerned.

11         THE COURT:  Go ahead.

12         MR. JENNINGS:  Thank you, Your Honor.

13  BY MR. JENNINGS:

14  Q    So on the 31st, it's now your testimony on October 31st

15  they told you 120 and not 180?

16  A    I don't remember hearing 180.

17  Q    Okay.

18         THE COURT:  But answer the question.  What about

19  130?

20         THE WITNESS:  130?  The only recollection I have

21  of 130 is saying that's my limit, and my understanding is

22  120.

23  Q    Could it be that the reason why you didn't hear the 180

24  is because you were a little bit maybe emotional and irate

25  when you were speaking with them?  Were you upset with them?

1   Could that be it?  You didn't hear any number because you

2   were upset?

3   A    I find that quite possible.  I'm not definitively

4   saying that's the case or not.

5   Q    So it's possible that because you were so upset, you

6   just didn't hear a number?  You were so upset because you

7   thought they weren't doing a good job for you?

8   A    Correct.

9   Q    Okay.  Very well.

10            During the month of November, before Thanksgiving,

11  did you at any time speak to your attorneys?

12  A    I don't recall speaking to them, but it's likely that I

13  did.

14  Q    And during those conversations between -- up to

15  Thanksgiving, did they discuss with you that they had

16  finished drafting and had a settlement plan that was -- a

17  settlement document that was completed between the plaintiff

18  and the defendant's attorneys?

19  A    I don't remember hearing that.

20  Q    Did they ask you at some point to come to their office

21  to sign the settlement agreement?

22  A    I don't remember being asked to come over and sign

23  anything.

24  Q    So it's your testimony that they never told you that

25  you had to come in and sign the settlement agreement?

1   A    If they would have told me to come in, I would have

2   came in.

3   Q    So you would have came in and signed it?

4   A    Yes.

5           THE COURT:  Do you recall if they ever sent you

6   the settlement documents to review?

7           THE WITNESS:  I was -- when I received the

8   settlement documents to review was when they asked me to

9   sign it, and that was when I was in Ireland, and that's when

10  I told them to relieve themselves as my attorneys.

11          THE COURT:  And when was that, sir?

12          THE WITNESS:  That was in March or something

13  around -- maybe my assistant knows.

14          UNIDENTIFIED SPEAKER:  It was around like --

15          THE COURT:  Wait.  You're not under oath.  You're

16  not allowed to speak.  If somebody wants to hear from you,

17  we'll let you know.

18          So you think it was sometime in March of 2024?

19          THE WITNESS:  It was -- yeah, that's what I

20  believe, from what I remember.

21          THE COURT:  You said that your assistant told you

22  at some point that the settlement amount was $180,000.  What

23  did your assistant tell you about that and when did he tell

24  you?

25          THE WITNESS:  He told me after I recused the

PROCEEDINGS                                   35

1    attorneys and I relied on him --

2              THE COURT:  Give me a month, please.

3              THE WITNESS:  The definitive time was just even

4    last month, I think, in August.

5              THE COURT:  You say that you did not know about

6    the settlement amount until August of 2024?

7              THE WITNESS:  That's when I started reviewing the

8    documents that they --

9              THE COURT:  Why wouldn't you review the documents

10   before that if this was such an emotionally charged,

11   important case for you?

12             THE WITNESS:  Just the sight of the documents and

13   the loss that I've sustained would send me into a spiral,

14   so...

15             THE COURT:  Well, as a businessman and as a named

16   defendant and with a corporation that's also been named, an

17   S corporation that's also been named as a defendant, it

18   would seem to me prudent that you would review the documents

19   and be very interested in what those documents said.  You're

20   saying you were too emotionally upset to do it?

21             THE WITNESS:  I relied on my attorneys who I felt

22   betrayed me and --

23             THE COURT:  You had relieved your attorneys in

24   October or November of 2023.

25             THE WITNESS:  Right.

PROCEEDINGS                                    36

1          THE COURT:  So why wouldn't you look at the
2     documents --
3          THE WITNESS:  Why wouldn't I --
4          THE COURT:  -- at all until August?  Is that your
5     testimony, that you --
6          THE WITNESS:  Yes, because the financial burden
7     that I endured with my attorneys and with everything else, I
8     just put myself at the mercy of the Court.
9          THE COURT:  It's not about the Court at that
10    point.  The Court was just waiting to get the final
11    settlement documents.
12         THE WITNESS:  I was relying on my assistant to
13    look at it and do whatever we could do at this point.
14         THE COURT:  Do you know if your assistant was
15    engaged in any discussions with your lawyers?
16         THE WITNESS:  Not that I'm aware of, no.
17         THE COURT:  Did you authorize your assistant to
18    discuss settlement with your lawyers?
19         THE WITNESS:  Settlement?  I never authorized him
20    for anything like that.
21         THE COURT:  All right.  Go ahead, sir.
22    BY MR. JENNINGS:
23    Q    Mr. Agadjani, do you recall what month you terminated
24    your attorneys?
25    A    What month?  I don't recall, to be honest.

1    Q    Do you remember the year?

2    A    The year?  Well, it should be 2023.

3    Q    Okay.  Would it be --

4    A    Or maybe this year.

5    Q    Okay.  Sometime after Thanksgiving, which would be the

6    27th of November of 2023, around that time.

7    A    Okay.

8    Q    And you go into the month of December 2023.

9    A    Right.

10   Q    Did you have any other discussions with your attorneys?

11   A    I had discussions with them, yes.

12   Q    And did they discuss with you they needed you to come

13   in and sign the settlement agreement?

14   A    I don't remember hearing that.

15   Q    Did they at some point tell you sometime, say, after

16   the 7th of December, thereafter, that we have a signed copy

17   of the settlement agreement from the plaintiff,

18   Mr. Santiago, that he signed the settlement agreement and we

19   need you to come in for you to sign that agreement too?

20   It's already been signed by Mr. Santiago, we're just waiting

21   for your signature?

22   A    I heard that from -- from Mr. Santiago.  I did hear

23   that he signed some sort of a document.

24   Q    You heard it from Mr. Santiago himself?

25   A    No.

1  Q    Who did you hear it from?

2  A    From my attorney.

3  Q    Okay.  So your attorneys spoke to you sometime in

4  December and told you that Mr. Santiago had signed it?

5  A    I did remember hearing something like that.

6  Q    And they wanted you to come in and sign it?

7  A    I didn't remember them telling me to come in.

8  Q    No?

9  A    No.

10 Q    Did they ask you to sign it via email and send it back

11 to them?

12 A    Every conversation I had with my attorney was asking

13 them what I spent my money on.

14 Q    I understand.

15        THE COURT:  Did you understand that if there was

16 to be a settlement, that you would have to sign it?

17        THE WITNESS:  Correct, yes, I understood that.

18        THE COURT:  So you understood Mr. Santiago had

19 signed the settlement agreement, correct?

20        THE WITNESS:  Yes.

21        THE COURT:  And at some point they informed you

22 that you would also have to sign the agreement, correct?

23        THE WITNESS:  Correct, yes.

24        THE COURT:  And at some point you received a copy

25 of the settlement agreement to sign, correct?

PROCEEDINGS                    39

1          THE WITNESS:  I did receive that document, yes.

2          THE COURT:  And you didn't look at it until August

3    of this year, correct?

4          THE WITNESS:  Correct, yeah.

5          THE COURT:  All right.  Because it was too

6    upsetting?

7          THE WITNESS:  It was too upsetting, and I relieved

8    them of counsel and I didn't agree with whatever they were

9    saying in the settlement.

10          THE COURT:  All right.  So you're saying you

11    received a copy of Judge Pollak's report and recommendation,

12    though, in July of 2024, correct?

13          THE WITNESS:  July of 2024 report and

14    recommendation?  Yes, I received the documents from the

15    Court.  I tried to understand it as best I could.

16          THE COURT:  So she recommended that I order that

17    the settlement agreement for $180,000 be enforced, correct?

18          THE WITNESS:  Okay.  I understand that now, yes.

19          THE COURT:  Well, you wrote an objection to this

20    in August of 2024, correct?

21          THE WITNESS:  Correct.

22          THE COURT:  When did you first understand that

23    there was a $180,000 understanding for a settlement on the

24    plaintiff's behalf?

25          THE WITNESS:  Around that time.  Around the time I

1    received those documents and had to look at it and make

2    these objections.

3              THE COURT:  At what point did you relieve your

4    attorneys?

5              THE WITNESS:  Beforehand.

6              THE COURT:  And when you relieved them, was it

7    based on the amount of the settlement that you believed had

8    been negotiated without your authority?

9              THE WITNESS:  It was based on their whole entire

10   performance.  When they came to me with a settlement, I said

11   none of my concerns were addressed and they're just bringing

12   before a settlement that was being pushed through by -- it's

13   like I didn't even have attorneys, to be honest.

14             THE COURT:  So when did they come to you with a

15   settlement?

16             THE WITNESS:  They came to me -- they were working

17   on this document with Jennings post that conversation and

18   roughly in October, and by the time they came to me with

19   this document, I didn't agree with anything they were doing

20   and I said you know what, guys, I don't want you as my

21   attorneys, I don't know what you're doing.

22             THE COURT:  So in October of 2023, your attorneys

23   were working on and came to you with a settlement agreement,

24   correct?

25             THE WITNESS:  The only thing I directly recall is

PROCEEDINGS                                      41

1    a ceiling of $130,000, which I put in an email.

2              THE COURT:  No.  When your attorneys came to you

3    with a settlement agreement, that was, you said, October

4    2023?

5              THE WITNESS:  When they came to me with a

6    settlement agreement was not October 2023.  That was

7    already, I believe, this year.  I believe this year, earlier

8    in the year.  I'm not exactly sure.  All I remember, I was

9    in Ireland at the time, so I would have to check when I was

10   there.

11             THE COURT:  Do you have any other questions,

12   Mr. Jennings?

13             MR. JENNINGS:  Yes, Your Honor.

14   BY MR. JENNINGS:

15   Q    Mr. Agadjani, do you recall sometime before October,

16   maybe September, you went to Dubai?

17   A    Yes.

18   Q    Did you post a video on the internet when you were in

19   Dubai?

20   A    On the internet?

21   Q    Yes.  Did you make a video --

22   A    I made plenty of videos while I was there.

23   Q    A lot of videos.

24   A    A lot of videos, yes.

25   Q    I saw them all.  They were very nice.

PROCEEDINGS                                    42

1    A    Thank you.

2    Q    During a video when you were in Dubai, you complained

3    that you weren't able to use drugs or do marijuana, a lot of

4    the things that you like to do normally, right?

5    A    Excuse me?

6              THE COURT:  Wait.  What was that question?

7    Q    During your trip in Dubai.

8    A    Right.

9    Q    On these videos, you complained that you weren't able

10   to smoke marijuana or do anything --

11   A    I don't recall making such a complaint.

12   Q    Okay.  Are you under the influence here today?

13   A    No.

14   Q    So you have not taken any type of substance at all,

15   right?

16   A    No.

17             MR. JENNINGS:  I have no more questions.

18             THE COURT:  Does counsel for the lawyers want to

19   be heard or to question?

20             MR. BATES:  Yes, Your Honor.

21             THE COURT:  All right.  Please proceed.

22             MR. BATES:  Thank you, Your Honor.

23   EXAMINATION BY

24   MR. BATES:

25   Q    Jeremy Bates with Frankfurt Kurnit Klein & Selz,

PROCEEDINGS                            43

1   professional responsibility counsel to Mr. Agadjani's former

2   counsel, Mr. Miller and Mr. Himes.  I just have a brief

3   series of questions, Mr. Agadjani --

4   A    Good morning.

5   Q    -- about what documents you have placed before the

6   Court previously.

7   A    Okay.

8   Q    I've heard that you submitted to the Court an email

9   dated February 8, 2022; is that correct?

10  A    Yes.

11  Q    I've heard that you submitted to the Court a text

12  message dated October 23, 2023; is that correct?

13  A    Correct, yes.

14  Q    What other documents did you place before the Court?

15  A    What other documents?  Just correspondence that I

16  provided my assistant to draft.  Whatever correspondence we

17  had in our emails.

18          THE COURT:  Let me just be clear for the record.

19  There are no other documents other than Mr. Agadjani's --

20  it's document number 51 in the docket, it is his response to

21  the report and recommendation, and it attaches the email in

22  February of 2022 as well as October 2023 text screenshot.

23  That's it.

24          MR. BATES:  Thank you, Your Honor.

25          THE COURT:  Is that it?

PROCEEDINGS                    44

1          MR. BATES:  That's it in the way of questions to

2   Mr. Agadjani, yes.

3          THE COURT:  Okay.  Thank you.  You can step down.

4          THE WITNESS:  Thank you.

5          THE COURT:  If we need you again, we'll call you.

6   You're welcome to sit at the table.

7          (Witness leaves the stand.)

8          THE COURT:  Let's talk about, was Mr. Himes the

9   first attorney to be retained by Mr. Agadjani?

10          MR. MILLER:  No, Your Honor, I was; Ryan Miller.

11          THE COURT:  Do you mind taking the stand?

12          MR. MILLER:  Absolutely, Your Honor.

13          (Witness takes the stand and is sworn.)

14          THE COURTROOM DEPUTY:  Have a seat, please.

15          State and spell your full name for the record.

16          THE WITNESS:  Ryan O. Miller; R-Y-A-N, O period --

17   my middle initial -- Miller, M-I-L-L-E-R.

18          THE COURT:  Thank you.

19   **RYAN O. MILLER**,

20          called as a witness, having been first duly

21          sworn/affirmed, was examined and testified as

22          follows:

23   COURT INQUIRY:

24          THE COURT:  Mr. Miller, when did you first become

25   retained by Mr. Agadjani?

PROCEEDINGS                    45

1          THE WITNESS:  In this particular case, Your Honor,

2     it was in 2019.

3          THE COURT:  All right.  And was it shortly after

4     the lawsuit was filed?  Actually, this suit was filed in

5     2021.

6          THE WITNESS:  There was a State Court proceeding

7     that had been previously filed by plaintiff's predecessor

8     counsel, and that State Court proceeding ultimately was

9     removed into this court in 2021, Your Honor.

10         THE COURT:  All right.  Thank you for that

11    clarification.

12         Did you remove it?

13         THE WITNESS:  My law firm removed it, yes, Your

14    Honor.

15         THE COURT:  All right.  And at some point,

16    settlement was raised, correct?

17         THE WITNESS:  Settlement had been raised, Your

18    Honor, throughout the entirety of the proceeding, as I do

19    with all clients when any matter comes to me.  It is one of

20    the very first things that I speak about with a client.

21    And, in fact, generally, the advice that I give to a client

22    with respect to settlement in general is court should be our

23    last resort, not our first.

24         THE COURT:  And did you have this conversation

25    with Mr. Agadjani?

PROCEEDINGS                          46

1        MR. BATES:  Your Honor, may I be heard briefly at

2  that point?

3        THE COURT:  Yes.

4        MR. BATES:  I've heard Your Honor's discussion of

5  attorney/client privilege and waivers, so I take it if I

6  were to object to a question as trending into privileged

7  areas, that objection would be moot.

8        THE COURT:  Well, yes.  I mean, actually, the

9  privilege is the client's to assert.  Mr. Agadjani has, in

10  effect, waived his privilege by calling into question his

11  attorney's representation and putting into dispute the

12  conversations that he had with his attorney.

13        MR. BATES:  And the attorney work product

14  protection is, of course, the attorney's, not so much the

15  client's.

16        THE COURT:  All right.

17        MR. BATES:  I understand that that is not so much

18  duplicated here because Mr. Agadjani has already gone into

19  these areas.

20        THE COURT:  Right.

21        MR. BATES:  But thirdly, we have Rule 1.6 of the

22  Rules of Professional Conduct as to confidential information

23  of the client.  That is subject to the exception of a court

24  order, when a Court orders that such confidential

25  information be revealed by the attorney.

PROCEEDINGS                    47

1          So I just wanted to raise that subject and

2   establish a record as to whether the Court is ordering that

3   such confidential information be revealed.

4          THE COURT:  Do you have any objection to me

5   ordering that since the issue before the Court for purposes

6   of this hearing is whether or not Mr. Agadjani authorized

7   Mr. Miller to resolve the case in the amount of $180,000,

8   thereby, I think, squarely waiving his privilege?  Do you

9   have any objection to me issuing an order that Mr. Miller

10  should discuss his conversations with Mr. Agadjani regarding

11  the circumstances surrounding the settlement?

12         MR. BATES:  Regarding the authority to settle,

13  Your Honor, we have no objection to such an order.

14         THE COURT:  All right.  So I will order that.

15         Just for the record, Mr. Miller, you are ordered

16  to testify under oath regarding conversations you had with

17  Mr. Agadjani regarding the authority that he gave you or

18  didn't give you regarding the settlement of this particular

19  action.

20         MR. BATES:  Thank you, Your Honor.

21         THE WITNESS:  Thank you, Your Honor.

22         THE COURT:  So you said that it is your practice

23  to discuss settlement with all of your clients, and I was

24  asking you whether you had conversations regarding the

25  upside or downside of settlement with Mr. Agadjani.

PROCEEDINGS                    48

1          THE WITNESS:  Absolutely, yes.

2          THE COURT:  All right.  So at some point it

3    appears Judge Pollak scheduled a settlement conference in

4    late October of 2023.  Was that the first settlement

5    conference that she had?

6          THE WITNESS:  No, Your Honor.

7          THE COURT:  All right.  So she had attempted to

8    settle this before?

9          THE WITNESS:  Yes, Your Honor.

10          THE COURT:  And had you participated in settlement

11    discussions with opposing counsel before Judge Pollak before

12    October 31, 2023?

13          THE WITNESS:  Yes, Your Honor.  We had an

14    in-person settlement conference.  I don't recall the year

15    specifically.  I know that it was COVID time and we were

16    wearing masks still in the courtroom, and we were in person

17    in the courtroom for several hours before Judge Pollak to

18    attempt to settle the case, and unfortunately at that time

19    we were not successful.

20          THE COURT:  And I'm sure I could find it on the

21    docket.  Was your client, Mr. Agadjani, present at that

22    settlement conference, the earlier one where it was in

23    person?

24          THE WITNESS:  Yes, Your Honor, he was.

25          THE COURT:  All right.  Were numbers discussed at

1   that conference?

2          THE WITNESS:  I would say generally the answer to

3   that is yes, but we were still very far apart in terms of

4   numbers at that time.

5          THE COURT:  Okay.  It appears, if we look back at

6   the docket, June of 2022, does that ring a bell?

7          THE WITNESS:  That certainly sounds about the

8   right time frame that that kind of conference took place,

9   yes, Your Honor.

10          THE COURT:  All right.  There's a docket entry

11  June 28, 2022:  Minute entry for settlement conference held

12  before Chief Magistrate Judge Cheryl Pollak on June 27,

13  2022.  Appearing for plaintiff, Allan Winston Horatio

14  Jennings, Luciano Santiago, plaintiff.  Appearance for

15  defendant, Ryan O. Miller and Maksud Agadjani, individual

16  defendant.  And she noted that in-person settlement was

17  unlikely to succeed, and she ordered a proposed Amended

18  Complaint and set a new status conference date.

19          Does that ring a bell?

20          THE WITNESS:  Yes, Your Honor, that sounds

21  accurate.

22          THE COURT:  All right.  So do you recall whether

23  there was any other settlement conference after June 27,

24  2022?

25          THE WITNESS:  There was no other settlement

PROCEEDINGS                                    50

1   conference other than the one that's been referred to

2   earlier today that occurred on October 31, 2023.

3          THE COURT:  All right.  So if you could recall in

4   the days or months or weeks leading up to the October 31,

5   2023 settlement conference, what conversations did you have

6   with Mr. Agadjani regarding the authority that he either

7   gave or didn't give you to resolve this case?

8          THE WITNESS:  The conversations during the course

9   of even 2023 expanded and became a lot more specific

10  beginning actually in August of 2023.  I had emails with my

11  former client with regards to settlement and settlement

12  amounts, where the plaintiff was with respect to their

13  demand, as well as Mr. Agadjani's authority at that time,

14  which in August of 2023 was $130,000.

15         Settlement conversations then progressed from

16  there between my law partner, Mr. Himes, and plaintiff's

17  counsel, Mr. Jennings.  And conversations resulted in

18  further reductions of demands by plaintiff's counsel to

19  settle this case.

20         It was then on October 23, 2023, after the text

21  message Your Honor saw that apparently my former client

22  provided to the Court, where I did have a phone call with my

23  former client.  And during that phone call, he actually

24  authorized me to settle the matter for up to $200,000.  I

25  then followed up that phone call with an email to my former

1  client confirming the conversation that we had and the

2  authorization that he provided to me.

3           And I am here today, Your Honor, with that email

4  communication.  I have it redacted in anticipation of where

5  Your Honor might be issuing rulings about attorney/client

6  privilege and disclosure.  The redactions, we feel, do not

7  speak to issues of authority and should remain privileged.

8  But the remainder of that email, which is really an email

9  chain, speaks to the authority and also the conversation

10 that I had with my former client at that time.

11          THE COURT:  All right.  Would you like to proffer

12 it as an exhibit?  We'll mark it as -- this is rather

13 extraordinary -- we'll call this Defense Counsel Exhibit A.

14          MR. BATES:  This is the October 30th?

15          THE WITNESS:  No, 23rd.

16          MR. BATES:  23rd.

17          THE COURT:  Wait.  October 23, 2023?

18          THE WITNESS:  That's correct.  I have another --

19 there's more communications.

20          THE COURT:  October 23, 2023 email between

21 Mr. Agadjani and Mr. Miller?

22          THE WITNESS:  Yes, Your Honor.  It's an email from

23 myself to my former client on October 23rd.

24          THE COURT:  All right.  Thank you, sir.  We'll

25 call this Defense Counsel Exhibit A.

PROCEEDINGS                              52

1              (Defense Counsel Exhibit A marked and received in

2    evidence.)

3              THE COURT:  Do we have a copy for Mr. Agadjani?

4              MR. BATES:  Yes, Your Honor.  We just handed it to

5    him.

6              THE COURT:  Okay.  Thank you.

7              Do you have a copy, sir?

8              THE WITNESS:  I believe --

9              THE COURT:  We can put this on ELMO if you'd like.

10             THE WITNESS:  No, we have an extra copy.

11             MR. BATES:  May I approach?

12             THE COURT:  Yes.

13             MR. BATES:  Thank you.

14             THE COURT:  Just so you know, counsel, this

15   criminal matter that I had at noon, I'm now putting it over

16   until 12:30, so we'll take a little break at that point.

17             I have before me Defense Counsel Exhibit A, which

18   is an email from Mr. Ryan Miller to Maksud Agadjani, copy to

19   Brian Kishner, regarding Update, Santiago versus Trax New

20   York City, et al., 21-CV-7090.

21             Would you tell us about this email, Mr. Miller?

22             THE WITNESS:  Yes.  I wrote this email to my

23   former client to memorialize a conversation that both he and

24   I had prior to the date and time that's listed on this email

25   and to make clear to my former client exactly what he was

PROCEEDINGS                                    53

1  authorizing me to settle this case for so that there could

2  be no confusion between either he or I.

3          THE COURT:  All right.  Was there a response to

4  this email, either an oral response, a phone call, a return

5  email, or some other communication from Mr. Agadjani?

6          THE WITNESS:  There was a follow-up email that I

7  wrote, but there was no follow-up email or communication

8  from my former client other than just the normal course in

9  which we communicated with one another.

10          THE COURT:  Can you walk us through this exhibit,

11  Counsel Exhibit A?  The first email in this page, and we're

12  going in reverse time order, is October 23rd, 11:54 a.m.

13  from you to Mr. Agadjani.  In that, you appear to confirm --

14  it states, quote:  "As we discussed, while you have

15  authorized me to settle this matter for up to $200,000 with

16  a payment plan of 10K per month, you have also made clear

17  that we need to press Lou and his attorney to work a bit

18  more on discovery while also talking settlement, and that

19  you want us to squeeze them further down to a number closer

20  to 130K (which of course we will do all we can to achieve

21  that level of result for you).  We will report back as

22  matters continue to progress, but, as always, feel free to

23  call upon me as and when needed."

24          So you're saying you did not receive any response

25  from Mr. Agadjani to this email, sir?

PROCEEDINGS                          54

1    THE WITNESS:  I did not, because the purpose of
2    the email was to confirm the verbal authority that the
3    client had already provided to me prior to me writing this
4    email.
5         THE COURT:  And when did you have that discussion
6    in which he authorized you to settle up to $200,000?
7         THE WITNESS:  That conversation occurred on
8    October 23, 2023, at the -- I don't know the approximate
9    time, but it was definitely before I wrote this email and it
10   was definitely after the text messages that Your Honor has
11   seen that my former client has presented to this Court.
12        THE COURT:  All right.  Did you see the document
13   that Mr. Agadjani presented to the Court?
14        THE WITNESS:  No, Your Honor.  We had written to
15   our former client asking him to provide a copy because we
16   were unable to access any of Docket Number 51, I believe, on
17   the Court's docket.
18        THE COURT:  All right.  Well, I'm going to give
19   you my copy.  You should disregard the --
20        Do we have a clean copy of this, document
21   number 51?
22        THE COURTROOM DEPUTY:  I can print a copy.
23        THE COURT:  Okay.  I'm handing the witness the
24   submission by Mr. Agadjani, which is Document Number 51 in
25   the docket.  It was filed August 12, 2024.  It's five pages

PROCEEDINGS                              55

1   long.

2          THE WITNESS:  I've taken a very quick read of this

3   document, Your Honor.

4          THE COURT:  Maybe what we should do is take a

5   break and do the criminal matter just so you can look at

6   this document, and I will address the criminal matter.

7          I would just say, please just put your --

8          (Pause in proceedings.)

9          THE COURT:  Do you mind just picking up your

10  documents and moving them?  We usually seat the defendant at

11  that side of the table.

12         You may step down.

13         (Witness leaves the stand.)

14         (Recess was taken.)

15         THE COURT:  We're reconvening in the Santiago

16  versus Trax matter.  All counsel are present, as is

17  Mr. Agadjani.

18         For the witness, you're still under oath, sir.

19         I think when we adjourned, you were handed Counsel

20  Exhibit A, which is an email dated October 23, 2023 sent at

21  11:54 a.m. from Mr. Miller to Mr. Agadjani.

22         I don't know if there was a question pending.  I

23  don't think so.

24         THE WITNESS:  I don't recall.

25         THE COURT:  But what we have is Mr. Agadjani's

PROCEEDINGS                              56

1    text message that he submitted with document number 51.  It

2    was a text message on October 23rd, at 9:01 a.m., in which

3    he states:  The bottom line offer is 130, can I get a call

4    back.

5              And you respond:  May I call you at 12 p.m. to

6    discuss?

7              And he says:  Yes.

8              So to the extent that you are able to just focus

9    on the sentence that has your authority to settle the case

10   and the amount, I would appreciate it.

11             Did you, in fact, have a call with him at 12:00?

12             THE WITNESS:  It was a little before 12:00, Your

13   Honor.  And I can make that statement because the email that

14   I wrote to my former client on that same date was written at

15   11:54 a.m.  So clearly I spoke to him that morning, and I

16   assuredly called him after his text message to me that

17   morning and before the email that was issued on October 23,

18   2023, at 11:54 a.m.

19             THE COURT:  All right.  So this email that is in

20   Counsel Exhibit A is the follow-up, following your

21   conversation with Mr. Agadjani?

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  All right.  And you state that he has

24   authorized you to settle for up to $200,000, again with a

25   goal of keeping it closer to 130,000?

PROCEEDINGS                                    57

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  All right.  Was there any discussion

3    about a confession of judgment in the amount of $650,000 if

4    he were to default on the terms of the settlement?

5          THE WITNESS:  At that time, the only discussions

6    we had regarding a confession of judgment or something of

7    that nature finding its way into an agreement was that I

8    informed the client that with a payment plan, the other side

9    is going to push for some type of a hammer over his head in

10   the event that he were to default under a payment plan.  But

11   we did not at that time discuss any specifics, an amount or

12   the like.

13          (Pause in proceedings.)

14          THE WITNESS:  We did not discuss any specifics or

15   an amount, merely just that a concept of a hammer or a

16   confession of judgment was something that we did discuss

17   even at that early stage.

18          THE COURT:  All right.  And did he have any

19   objection to that?

20          THE WITNESS:  No, there was no objection at that

21   time because we were still not even settled.

22          THE COURT:  All right.  And did you discuss a

23   monthly payment amount for payment of the settlement by your

24   client?

25          THE WITNESS:  At that time, the only discussions

1    we had regarding a payment plan were what my client had

2    informed me during that phone call he could afford, which

3    was a ten-thousand-dollar-per-month payment.

4            THE COURT:  All right.  So can you describe what

5    conversations, if any, you had about the settlement terms as

6    the proposed settlement agreement was being negotiated and

7    passed back and forth between you and plaintiff's counsel?

8            THE WITNESS:  Yes, Your Honor.

9            I wrote an email to the client on October 30, 2023

10   in which I informed the client at that time that we were

11   able to achieve a figure based on his authorization of

12   $180,000.  And we do have that email also present here today

13   if the Court would like to see it, and it is also with

14   certain redactions based on the Court's ruling with respect

15   to what I am authorized to speak about today.

16           THE COURT:  All right.  Well, does counsel for the

17   lawyers want it entered into the record as a counsel

18   exhibit?

19           MR. BATES:  Yes, please, Your Honor.

20           THE COURT:  All right.  Counsel Exhibit B.

21           (Defense Counsel Exhibit B marked and received in

22   evidence.)

23           THE COURT:  Do you have the copy of it,

24   Mr. Miller?

25           THE WITNESS:  I do, Your Honor.

PROCEEDINGS                              59

1          THE COURT:  So we have Counsel Exhibit B, it's an

2     email dated October 30, 2023 from Ryan Miller to Maksud

3     Agadjani.  The time is 11:28 a.m., copy to Brian Kishner.

4          Who is Brian Kishner?

5          THE WITNESS:  Brian Kishner is my law partner.  He

6     is the Kishner of Kishner Miller Himes PC.

7          THE COURT:  Go it, okay.

8          Can you tell us about your familiarity with this

9     email and what you intended to do in communicating this

10    information?

11         THE WITNESS:  Yes.  I knew that we had an upcoming

12    settlement conference with the Court.  There had been

13    back-and-forth with plaintiff's counsel, as I had informed

14    Mr. Agadjani not but a week prior.  That back-and-forth with

15    plaintiff's counsel was being conducted by my other law

16    partner, Mr. Himes, who is here today.  And during that

17    back-and-forth communication, there was an agreement or an

18    understanding with respect to an amount for a prospective

19    settlement where plaintiff was willing to accept a

20    settlement of $180,000.

21         I then informed the client of the good news,

22    because we settled the matter for less than what he had

23    authorized us to.  I also, during that email, had begun

24    discussing the issue of a payment plan because I was clear

25    from our prior communication and phone call that a payment

1    plan was something that was important to him.

2            And so I acknowledged that we still have work left

3    to do, we might have settled on the number, but we still

4    clearly have work left to do because we've got to figure out

5    a payment plan that both you and plaintiff can tolerate, but

6    at least we can report to the Court that we are heading

7    towards a settlement now that we've gotten past sort of the

8    big, quote/unquote, hurdle of figure as far as what we'd be

9    settling on.

10           THE COURT:  So when you emailed Mr. Agadjani on

11   October 30th at 11:28 a.m., what, if any, response did you

12   get from him?

13           THE WITNESS:  I don't recall any specific response

14   that my former client provided to me in any way, shape,

15   form.  This was merely me reporting to the client, and I

16   wasn't even really seeking too much of an update from the

17   client at this point other than yes, I know I wrote that,

18   let's get on a call and talk.  We ended up -- we may have

19   spoken that day.  I don't recall the totality of that

20   conversation.

21           I certainly do recall a conversation right around

22   this time, whether it was October 30th or the morning of the

23   31st, but I definitely recall a conversation with the former

24   client talking about an amount, and then dealing with a

25   payment plan.  I even recall during that conversation

PROCEEDINGS                                    61

1    starting to have that heart-to-heart with the client about

2    the cost/benefit analysis of continuing the litigation of

3    this nature and the costs, just the legal costs and expenses

4    to take a case of this nature from where it was in that

5    moment through a trial.  And I recall specifically saying to

6    the client that it's going to be hundreds of thousands of

7    dollars and it's going to be more than what you settle, and

8    that's assuming you prevail.  If you lose, plus all of the

9    money you might end up having to spend on my firm to

10   continue this case forward.

11          Putting emotion off to the side, and I have to

12   have this type of a call with clients often about removing

13   the emotion from a decision like this and allowing you to

14   make a business decision with respect to your exposure, the

15   costs in continuing to litigate, coupled with the certainty

16   of ending a case of this nature and knowing that the

17   proverbial bleeding will stop by way of a settlement.

18          He did not yet in that moment authorize me with

19   respect to timing on payment, but I was beginning to help

20   the client appreciate that he might not be happy with an

21   amount or a timing, but generally, when clients leave a

22   little unhappy with a settlement, that means that we

23   achieved a good result.  And I say that line to clients

24   often.  I undoubtedly made that statement to this client not

25   only on this phone call, but then on a subsequent phone call

PROCEEDINGS                              62

1    he and I had.

2            So we were edging towards a settlement at this

3    time in totality, but at least in this moment the amount of

4    money we were settling on I believed was agreed to by both

5    my client and the other side.

6            THE COURT:  All right.  Well, let me just be

7    clear.  The settlement conference was October 30th or

8    the 31st?  I thought it was the 31st for some reason.  The

9    docket says that Judge Pollak writes that the settlement

10   conference occurred October 31, 2023.  Your email is dated

11   October 30, 2023.

12           Are you saying that you had an agreement with

13   plaintiff's counsel before the October 31st settlement

14   conference with Judge Pollak?

15           THE WITNESS:  Only as to an amount, Your Honor.

16   Not with respect to anything else at that time.

17           THE COURT:  Okay.  What, if anything, can you

18   recall about Mr. Agadjani's response to you when you

19   informed him that you got the plaintiff to accept $180,000?

20           THE WITNESS:  My former client, throughout this

21   entire case, was upset.  So it was a difficult but

22   professional phone call.  He was upset, but I believe he

23   understood and appreciated the realities as I just explained

24   to Your Honor under oath with respect to continuing to fight

25   a case of this nature and proceeding forward with a

PROCEEDINGS                          63

1  settlement as we had been discussing.  So I think that the

2  client understood and appreciated it.

3          I think that the client was upset just in general

4  because this was an emotionally-driven case to begin with.

5  And that was more or less the extent of what I recall from

6  that conversation, Your Honor.

7          THE COURT:  All right.  Well, your email of

8  October 30th to Mr. Agadjani does talk about the -- a

9  request for 50 percent down, or $90,000, paid by

10  Thanksgiving, and the balance in equal monthly installments

11  of $90,000 -- a -- total of $90,000, but the installments

12  would be $30,000 each starting January 1st, February 1st,

13  and March 1st.

14          Did he respond to that payment schedule?

15          THE WITNESS:  He did not respond in writing.  We

16  began discussing a payment schedule during that phone call

17  that I was just referencing, and certainly made it very

18  clear to me that where the plaintiff was with respect to a

19  payment schedule is not something that he could afford or

20  could agree to, which was clear to me during that October 30

21  call that he and I had.

22          THE COURT:  So you had the call after 11:28 a.m.

23  on October 30th?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Do you have records that would

PROCEEDINGS                64

1    indicate when that call occurred?

2           THE WITNESS:  I could pull my phone records, Your

3    Honor.  I have my phone records for a different call that

4    the former client and I had on November 27th, but I could

5    certainly pull my phone records to pinpoint the exact time

6    of day we had that call.

7           THE COURT:  All right.  Thank you.

8           So at the conclusion of your phone call on

9    October 30, 2023, did you then attend a settlement

10   conference?

11          THE WITNESS:  I did not.  My law partner, Scott

12   Himes, attended the settlement conference.  Mr. Himes and I,

13   of course, in advance of that settlement conference sat

14   down.  It was very clear to both he and I in terms of where

15   we did and did not have authority at that time in terms of

16   where we were with settlement, and I believe Mr. Himes

17   conveyed exactly that to the Court with respect to

18   settlement at an amount.  But we were still working on a

19   potential payment plan and the contours of how that would

20   work with plaintiff's counsel.

21          THE COURT:  Did Mr. Agadjani attend that

22   settlement conference?

23          THE WITNESS:  Not to my knowledge.

24          THE COURT:  Why not?

25          THE WITNESS:  It was a teleconference, from my

PROCEEDINGS                    65

1    understanding, Your Honor, and it was, from my

2    understanding, intending to be an update to the Court in

3    general with respect to where we are on potential

4    settlement.

5            We did not, I don't believe, have either clients

6    available, and I think, in part, that was due to the

7    progress we had made with respect to an amount.  We felt

8    that without having to waste the Court's time and bringing

9    clients in, it was more of a, Judge, here's where we are,

10   give us a little bit more time to get the parties to work

11   and come together on a payment plan and the contours of a

12   settlement agreement, we're making progress towards a

13   settlement.  And so, that was our actions that we took as a

14   result that day, Your Honor.

15           THE COURT:  "That day" meaning October 31st?

16           THE WITNESS:  October 31st, yes, Your Honor.

17           THE COURT:  All right.  So when did you next

18   communicate with Mr. Agadjani about the settlement;

19   finalizing the settlement terms and the progress of your

20   discussions with Mr. Jennings on this?

21           THE WITNESS:  Yes, Your Honor.  That was

22   November 27, 2023.

23           THE COURT:  Why was there such a long period of

24   time?

25           THE WITNESS:  There was --

PROCEEDINGS                    66

1      THE COURT:  There was no communication between you

2  and your client between October 30th and November 27th?

3      THE WITNESS:  No, Your Honor, there was none.

4      THE COURT:  Do you know why?

5      THE WITNESS:  There was no actual occurrences

6  occurring in the case, and I know that my law partner

7  Mr. Himes was speaking with Mr. Jennings to get the

8  plaintiff up as far as a payment schedule that the plaintiff

9  could tolerate.

10      And from my understanding in speaking with my law

11  partner, that took a little bit of time to get the plaintiff

12  to a schedule that they could tolerate, which by

13  November 27th I understood to be a six-month, equal payment

14  plan on the settlement.

15      THE COURT:  Of the entire amount?

16      THE WITNESS:  Correct.

17      THE COURT:  So by November 27th it had gone from

18  50 percent down before Thanksgiving with $30,000 over three

19  months to -- what was it -- $180,000 divided by monthly

20  payments of what?

21      THE WITNESS:  It was going to be 30,000 a month,

22  Your Honor.

23      THE COURT:  All right.  And that was --

24      THE WITNESS:  Six months.

25      THE COURT:  -- something that your client was able

PROCEEDINGS                    67

1    to do or had agreed to do?

2            THE WITNESS:  So, on November 27 I contacted my

3    former client, first by email.  I provided him a redline of

4    the settlement agreement.  The settlement agreement redline

5    did not yet have specifics on the term.  It did have

6    specifics on the amount.

7            I then texted my client subsequent to that email

8    saying I need to get on a call with you as soon as possible.

9    He texted me back at 3:08 p.m. on that date.

10           THE COURT:  November 27th?

11           THE WITNESS:  Yes, Your Honor.  And I have the

12   text messages here if Your Honor would like to see those.

13           THE COURT:  Okay.

14           THE WITNESS:  I then called my former client at

15   3:10 p.m.  I have my phone records here showing the

16   seven-minute phone call that took place on that date.  And

17   during that phone call, I was, again, imploring on the why

18   this is a really good idea to be settling at this time.

19           I reiterated the business rationale, and I stated

20   to the client they want six months for the payment schedule.

21   I was strongly encouraging the client to settle.  There were

22   other reasons beyond just the good business sense, which I

23   will not speak about here today to preserve my former

24   client's privileges.  But there were other things discussed

25   as well during that phone call.

1          And at the end of that seven-minute phone call, my

2    former client authorized me to settle at the six-month

3    payment period.

4          I also had at that time reminded the client about

5    the concept of a confession of judgment.  Once again, we did

6    not yet discuss amounts, what that confession would look

7    like, although I did inform the client it would be a heavy

8    hammer and you must assume it's going to be at least two to

9    three times the amount that's being discussed in a

10   settlement because there needs to be some level of assurance

11   for plaintiff that you're going to pay in accordance with

12   the payment schedule.

13         As soon as I hung up that phone call with my

14   former client, and I have my phone records here to show it,

15   I immediately called my law partner Scott Himes and we had a

16   similar, maybe six-minute phone call with one another, and

17   the crux of that conversation was get the deal done at six

18   months at 180,000.  And that is then what my law partner

19   began working on to memorialize with plaintiff's counsel

20   immediately subsequent to that date.

21         THE COURT:  Okay.  So during this conversation

22   that you had with Mr. Agadjani, though, on November 27th,

23   you said it was a seven-minute call, did Mr. Agadjani

24   reaffirm or start to waffle about the settlement amount that

25   he had authorized, or did he say anything regarding the

1    earlier amount of 130,000?

2              THE WITNESS:  No.  The only thing that was stated

3    was he was upset about just the totality of this

4    circumstance, but that conversation, I left with a clear

5    understanding as to my authority with respect to an amount,

6    which he had authorized a month prior, as well as the term,

7    which he verbally authorized to me on that date.

8              THE COURT:  So the amount was the 180,000 and the

9    term was six months?

10             THE WITNESS:  Yes, Your Honor.

11             THE COURT:  In equal monthly installments?

12             THE WITNESS:  Yes, Your Honor.

13             THE COURT:  All right.  You said you have phone

14   records of the calls you made to Mr. Agadjani and to your

15   law partner Mr. Himes?

16             THE WITNESS:  Yes, Your Honor.  And they're here

17   today with proper redactions if the Court would like me to

18   submit them.

19             THE COURT:  All right.  Why don't we see those as

20   Counsel Exhibit C.

21             THE WITNESS:  Your Honor, would you also like to

22   see the text messages and email I sent on those dates?

23             THE COURT:  Yes, yes.

24             So first, Counsel Exhibit C will be the text

25   messages and emails on November 27th between Mr. Miller and

PROCEEDINGS                    70

1   Mr. Agadjani.

2          And Exhibit D will be the phone records between

3   Mr. Miller and Mr. Agadjani, and Mr. Miller and Mr. Himes.

4          Is that one document, sir?

5          THE WITNESS:  No, the email, Your Honor, is a

6   separate document.

7          THE COURT:  No, I'm talking about Counsel

8   Exhibit C will be the text message and emails, and then

9   Counsel Exhibit D will be the phone records.

10          Is that how it was broken out?

11          THE WITNESS:  Sorry, Your Honor.  We had broken

12   out first the text messages as a separate document.

13          THE COURT:  Okay.

14          THE WITNESS:  And then the November 27 email as a

15   separate document with the draft agreement annexed.

16          THE COURT:  Okay.

17          THE WITNESS:  And then the phone records as a

18   separate document.  I apologize.

19          THE COURT:  No, that's all right.

20          So Counsel Exhibit C is text messages between

21   Mr. Miller and Mr. Agadjani.

22          And then Counsel Exhibit D is November 27, 2023

23   emails between Mr. Miller and Mr. Agadjani.

24          And Counsel Exhibit E are the phone records.

25          Is that an accurate description?

PROCEEDINGS                              71

1          THE WITNESS:  That's correct, Your Honor.  Thank

2    you.

3          THE COURT:  That's from November 27th.  These are

4    phone records showing calls between Miller and Agadjani and

5    between Miller and Himes.

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  All right.

8          (Defense Counsel Exhibits C, D and E marked and

9    received in evidence.)

10         MR. BATES:  May I, Your Honor?

11         THE COURT:  Yes, of course.

12         THE WITNESS:  Your Honor, if I may, so that the

13   Court and counsel and my former client doesn't have to thumb

14   around on the phone records which is mostly redacted.

15         THE COURT:  Yes.

16         THE WITNESS:  The phone calls in question are on

17   page 14 of that document.  You can see the page 14 in the

18   bottom right-hand corner.

19         THE COURT:  Not on my copy.  I don't have pages on

20   mine -- oh, I see.  Okay.

21         So looking at page 14 of Counsel Exhibit E,

22   page 14 has November 27, 3:10 p.m., the (917) 842-7728

23   number.

24         Whose number is that?

25         THE WITNESS:  That is my former client, Maksud

1   Agadjani's phone number.

2         THE COURT:  Okay.  And at 3:17 there's another

3   cell phone number there, (917) 741-3316.

4         Who is that?

5         THE WITNESS:  That is my law partner Mr. Scott

6   Himes.

7         THE COURT:  All right.  And the numbers seven and

8   eight, is that the length of the call, seven minutes and

9   eight minutes, sir?

10        THE WITNESS:  Yes, Your Honor.

11        THE COURT:  All right.  I think there's nothing

12   else on this document of relevance, correct?

13        THE WITNESS:  Other than my name.

14        THE COURT:  Yes.

15        THE WITNESS:  Just so that it's clear that this is

16   my phone records and I can certainly represent to the Court

17   that the cell phone number also that you see at the top of

18   page 14 underneath my name is my cell phone number.

19        THE COURT:  All right.  So you have two different

20   phones that you use, and you used -- oh, I see, no, forgive

21   me.  301 is your phone number.  (917) 842 is Mr. Agadjani,

22   and (917) 741 is Mr. Himes, correct?

23        THE WITNESS:  Yes, Your Honor, that's correct.

24        THE COURT:  All right.  So let's go to Counsel

25   Exhibit C.  These are the text messages between you and

PROCEEDINGS                    73

1   Mr. Agadjani.

2          We have, once again, the October 23rd text

3   messages regarding the 130 bottom line that Mr. Agadjani

4   describes and asks for a call back.

5          And the next text appears to be October 30th at

6   11:28 indicating that you just emailed Mr. Agadjani on the

7   Santiago case and you ask him to read it and get back to you

8   as soon as possible, correct?

9          THE WITNESS:  Yes, Your Honor, that's correct.

10         THE COURT:  And then you have the conversation

11  that you've described?

12         THE WITNESS:  Yes, Your Honor.

13         THE COURT:  Mr. Agadjani has responded:  Okay,

14  will do.

15         So are you saying there are no other texts between

16  you and Mr. Agadjani, then, between October 30th and

17  November 27th?

18         THE WITNESS:  That's correct, Your Honor.  This is

19  the totality of the text message chain between myself and my

20  former client from October 23 to December 11.

21         THE COURT:  Okay.  So in between we have an email

22  dated November 27th at 3:02 p.m. from you to Mr. Agadjani,

23  and you ask him to read the email regarding the Santiago

24  case and get back to either Brian -- is who?

25         THE WITNESS:  Brian is my law partner, Brian

1   Kishner.

2          THE COURT:  Oh, Kishner, all right.  Brian or

3   myself as soon as possible.

4          And he responds:  Hey guys, call me any time.

5          So did you have a conversation?  Was that the

6   conversation you described?

7          THE WITNESS:  Yes.  The -- so, Your Honor, you

8   can't see the timestamp as to when my former client texted

9   me, although I can see it on my cell phone.

10         THE COURT:  Okay.

11         THE WITNESS:  Which is why I was able to represent

12  for the record, that text message of "hey guys call me any

13  time" from my former client on November 27th was at

14  3:08 p.m., and then two minutes later I called my former

15  client.

16         THE COURT:  Okay.  Thank you.

17         And then the next entry is December 8th at

18  1:41 p.m., and this is your text to Mr. Agadjani saying:  I

19  just emailed you on the Santiago case.  Please read the

20  email and get back to either Brian or myself if have you any

21  questions.  Thanks.

22         And he responds:  Okay.

23         Is that pretty much the same day that he

24  responded?

25         THE WITNESS:  Yes, that was the same day that my

PROCEEDINGS                    75

1   former client responded, correct.

2             THE COURT:  And did you have a conversation on

3   December 8th with him or not, or at any time after this?

4             THE WITNESS:  I emailed my former client right

5   around this time, and we have a redacted email with respect

6   to that email to my former client on December 8th.  In that

7   email, I provided to Mr. Agadjani what I believed to be a

8   finalized settlement agreement to memorialize the amount,

9   payment plan, et cetera.

10            THE COURT:  Did you then speak to Mr. Agadjani on

11  December 8th --

12            THE WITNESS:  I did not.

13            THE COURT:  -- after you sent the settlement

14  agreement?

15            THE WITNESS:  I did not, Your Honor.  Not by

16  phone.

17            THE COURT:  When did you next hear from

18  Mr. Agadjani?

19            THE WITNESS:  I then sent a follow-up email to

20  Mr. Agadjani.  Then I sent follow-up text messages, which

21  Your Honor can see on the very next page.  Then it was on

22  this date where Mr. Agadjani began equivocating on any

23  settlement, and it was on this date, December 11, when it

24  appeared that Mr. Agadjani was not proceeding with a

25  settlement.  That is when our attorney/client relationship

PROCEEDINGS                    76

1  began to spiral, and shortly thereafter we sought to be

2  relieved as Mr. Agadjani's counsel with a filing in court.

3         THE COURT:  So on December 11th, based on

4  Mr. Agadjani's text response to you, you decided that it

5  would be best to terminate your relationship?

6         THE WITNESS:  No, Your Honor, it was not on

7  December 11.

8         THE COURT:  Okay.

9         THE WITNESS:  We had subsequent calls, emails,

10 which are not necessarily, Your Honor, relevant to the issue

11 of authority.

12        THE COURT:  Okay.

13        THE WITNESS:  But there were follow-up emails and

14 phone calls -- and not just with myself, but also with my

15 other law partner, Brian Kishner, who also over the years

16 had established a really nice working relationship with

17 Mr. Agadjani -- to try and see if we couldn't salvage where

18 we were.

19        THE COURT:  All right.  So after December 11th --

20 how soon after December 11th did you make the determination

21 that your relationship with Mr. Agadjani was not going too

22 smooth?

23        THE WITNESS:  I'm sorry, made the determination

24 that we needed to be relieved as his counsel?

25        THE COURT:  Well, I think you said that you either

PROCEEDINGS                    77

1   asked to be relieved or he relieved you?  I don't know what

2   the circumstances were.

3          THE WITNESS:  It was still several weeks after

4   this December 11 text message.  As I indicated to Your

5   Honor, there were subsequent emails to the client detailing

6   why we felt this was a good path for him.  There were phone

7   calls subsequent to December 11, as well.

8          It was sometime after December, I want to say 18th

9   or 19th, when it became obvious that the attorney/client

10  relationship had become irreparable.  There was -- it became

11  obvious to my firm at that time.  And so sometime after that

12  date is when we actually had to file a motion to be relieved

13  as counsel.  There was no necessarily affirmative

14  termination, although it was pretty obvious to us we were

15  also being terminated by our former client.

16         THE COURT:  He terminated you?

17         THE WITNESS:  Effectively, yes, Your Honor.  It

18  was clear after that December 18, 19 date that we could not

19  proceed -- he could not proceed with us.  The relationship

20  had become irreparable.

21         THE COURT:  Was there any point in time that you

22  believed that your client and the plaintiff reached an

23  agreement for an overall amount, payment terms, and other

24  aspects of the settlement?

25         THE WITNESS:  So I would say as to payment terms

1    and payment amount, the payment amount, in my mind, was

2    achieved as early as October 23.

3                THE COURT:  That was $180,000 as of October 23?

4                THE WITNESS:  Well, I was authorized, actually,

5    for $200,000 as of that date.  We achieved $180,000 a week

6    later on October.

7                As to the term, that I believe was resolved as of

8    November 27.  The only aspect of the settlement agreement

9    which I did not have a specific conversation with my client

10   about was the specific details of that confession of

11   judgment.

12               I did have high-level conversations with the

13   client about the notion and the concept, but we did not have

14   specific conversations about that confession of judgment or

15   the parameters of it, and I don't believe it was ever even

16   really in his mind an aspect of it because it was never once

17   raised to us as an issue.  But I can say that I did not have

18   any specific conversations about the specifics of that

19   confession of judgment other than me providing the client

20   with the terms, the details, and why a settlement of this

21   nature was a positive outcome for him in my December 8 email

22   to the client with what I believed to be a finalized

23   settlement agreement.

24               THE COURT:  On December 8th?

25               THE WITNESS:  That's correct, Your Honor.

PROCEEDINGS                          79

1          THE COURT:  Okay.  So it included details

2   regarding confession of judgment?

3          THE WITNESS:  It did, Your Honor.

4          THE COURT:  All right.

5          THE WITNESS:  I have that email here today, and if

6   Your Honor wants to see that email.

7          THE COURT:  Yes, I do.

8          THE WITNESS:  It will have redactions in there.

9          THE COURT:  Okay.

10         THE WITNESS:  Because there are aspects of that

11  email that don't speak to authority.

12         THE COURT:  Yes, I do want to see it.  That will

13  be Counsel Exhibit F.

14         (Defense Counsel Exhibit F marked and received in

15  evidence.)

16         THE COURT:  December 8th, you said, 2023?

17         THE WITNESS:  Yes.  2023, Your Honor.

18         THE COURT:  Okay.  Thank you.

19         All right.  So Counsel Exhibit F is a December 8,

20  2023 email sent at 1:30 p.m. from Mr. Miller to

21  Mr. Agadjani, copied to Mr. Kishner, with the finalized

22  settlement agreement and setting forth the terms, asking

23  Mr. Agadjani to review it to ensure that it meets his

24  understanding and approval, and requesting that he arrange

25  to sign it.

1          What was the response?

2          THE WITNESS:  The response was the text messages,

3    Your Honor, that are already before the Court beginning on

4    December 11, 2023 from my former client.  There was no

5    written response by email.

6          THE COURT:  And you had other conversations with

7    him by phone?

8          THE WITNESS:  Subsequent to this December 8 email,

9    yes.

10          THE COURT:  You said by December 18th or 19th it

11    was apparent that the relationship was not -- the

12    attorney/client relationship was not going to be moving

13    forward, correct?

14          THE WITNESS:  That's correct, Your Honor.

15          THE COURT:  Are there any gaps you can fill in of

16    what happened between Mr. Agadjani's December 11, 2023 text

17    to you regarding the settlement and December 18th or 19th,

18    when the relationship was terminated?

19          THE WITNESS:  Beyond what I've already testified

20    to, Your Honor?

21          THE COURT:  Yes.

22          THE WITNESS:  No, there's nothing else that I

23    recall.

24          THE COURT:  Did you have any doubt that you were

25    authorized to settle this case up to the amount of $200,000

PROCEEDINGS                          81

1    before Magistrate Judge Pollak?

2              THE WITNESS:  No doubt at all.

3              THE COURT:  All right.

4              THE WITNESS:  I was, in my mind, fully authorized

5    as early as October 23 to settle this case for up to

6    $200,000.

7              THE COURT:  Did Mr. Agadjani ever indicate to you

8    that you did not have authority to appear and settle this

9    case on his behalf in the amount of $200,000?

10             THE WITNESS:  No.  I was still very much

11   Mr. Agadjani's counsel through the months of October,

12   November, really December, of course, as well until the

13   Court removed us as counsel in January.

14             THE COURT:  All right.  So when you appeared for

15   settlement conferences, during your conversations with

16   Mr. Jennings, did you ever represent to Mr. Jennings or the

17   Court, meaning Magistrate Judge Pollak, that there was some

18   question as to whether or not Mr. Agadjani had authorized

19   you to settle for $200,000 -- I'm sorry, $180,000?

20             THE WITNESS:  I never had any conversation of that

21   effect ever with Mr. Jennings or the Court, that I was not

22   authorized to settle this case up to $200,000.

23             THE COURT:  At what point, if any, do you believe

24   that you had an agreement to settle this case in the amount

25   of $180,000 with payment terms over a period of months?

PROCEEDINGS                    82

1        THE WITNESS:  I was of the -- I became -- I

2    believed that that was achieved as of November 27, when I

3    knew that plaintiff was willing to accept a six-month

4    payment plan of $30,000, and then I had that call with my

5    client on that date regarding the payment plan.

6        THE COURT:  Do you have any doubt as to whether or

7    not you had actual or apparent authority to settle this case

8    on behalf of Mr. Agadjani and Trax?

9        THE WITNESS:  No, I had no doubt.

10        THE COURT:  All right.

11        Were there any questions that Mr. Jennings or

12    counsel or Mr. Agadjani had for this witness?

13        Mr. Jennings?

14    EXAMINATION BY

15    MR. JENNINGS:

16    Q    Good afternoon, Mr. Miller.  How are you doing today?

17    A    Good afternoon, Mr. Jennings.

18    Q    Mr. Miller, how long have you been an attorney?

19    A    I have been licensed in the state of New York since

20    February of 2007.

21    Q    Have you ever had to take the stand before as a

22    witness?

23    A    One time I have had to take the stand when I was

24    representing a client in a foreclosure proceeding and there

25    needed to be an accounting done for my client as a lender

PROCEEDINGS                    83

1   sending payments to my office's attorney escrow account to

2   then pay for certain aspects of a piece of real property

3   that my client was a lender on so that I could have an oath

4   and report then issued by a referee and ultimately

5   confirmed.

6           So I was forced to take the stand with respect to

7   the flow of money in that case.  But that is the only time

8   that I've ever had to take the stand before --

9   Q    Until --

10  A    -- today.

11  Q    Until today.

12  A    Correct.

13  Q    It's not easy being on that side of the stand.

14  A    I love being in a courtroom, and as far as I'm

15  concerned, I was under oath the moment I crossed the

16  threshold of this courthouse.  So it makes no difference to

17  me.  Here to tell the truth.

18  Q    So you understand the consequences of perjury.

19  A    Absolutely.  I very much understand them.

20  Q    And you know that if you committed perjury in this

21  case, not only you would be in jeopardy of losing your

22  license, but actually charged of perjury in a Federal Court?

23  A    Absolutely.  I'm very aware of the seriousness of

24  today's proceeding and to be telling the truth.  And,

25  frankly, that is also why my law firm, in the interest of a

PROCEEDINGS                    84

1   former client, separately hired ethics counsel to ensure

2   that today we only discuss the limited communications I had

3   with my client on authority and nothing else.

4   Q    Well, I think my understanding of ethic 1.6 is that

5   once the client charges misconduct against his attorney, the

6   attorney can breach that privilege no matter what he

7   discloses.

8           You understand that in any way?

9   A    I am familiar with that ethical rule, yes.

10          MR. BATES:  Your Honor, I believe that misstates

11  the rule.

12          THE COURT:  Yes.  I mean, he has counsel here,

13  Mr. Jennings.

14          MR. JENNINGS:  Okay.

15          THE COURT:  What is the relevance of your

16  questioning?

17          MR. JENNINGS:  All right.  No further questions,

18  thank you, Your Honor.

19          THE COURT:  All right.

20          Did you have questions, counsel?

21          MR. BATES:  I do have one further document,

22  Your Honor.

23          THE COURT:  All right.

24          Just so I understand, you've been licensed to

25  practice law in New York since 2007?

PROCEEDINGS                                    85

1          THE WITNESS:  Yes, Your Honor, and I was licensed

2     in the state of New Jersey since November of 2006.

3          THE COURT:  Okay.  Thank you.

4          THE WITNESS:  This court, I'm definitely licensed

5     in this courthouse as well, Your Honor.  This is now the

6     memory test.  I want to say it was 2012.  I got sworn in

7     first in the Southern District, and then there's a window of

8     time, Your Honor, where you can, once you're sworn in, in

9     the Southern District, you can quickly come over to the

10    Eastern District with that, having sworn in in the Southern

11    to get sworn in in the Eastern.

12          So I was sworn in sometime in, I believe it was

13    2012, but I have the license on my wall in my office, so I

14    could fill that in for the Court if you'd like.

15          MR. BATES:  Your Honor, as I believe it's now

16    Counsel Exhibit G.

17          THE COURT:  Right.

18          MR. BATES:  I would put before the Court an email

19    from Mr. Agadjani, dated October 30, 2023, to Mr. Miller.

20    It is a response to his email from earlier that day at 8:28.

21    I just wanted to put that before the Court for the sake of

22    the completeness of the record.

23          THE COURT:  All right.

24          (Defense Counsel Exhibit G marked and received in

25    evidence.)

PROCEEDINGS                    86

1          THE COURT:  So this was the response to

2   Mr. Miller's email of October 30th confirming the settlement

3   amount of $180,000 and the proposed payment terms as

4   requested by the plaintiffs.

5          MR. BATES:  Correct, Your Honor.

6          THE COURT:  Is that correct, Mr. Miller?

7          THE WITNESS:  I don't remember the email offhand.

8   I'd want to look at it to refresh my recollection on it.

9          THE COURT:  Can you show him, please?

10          MR. BATES:  Yes.

11          THE WITNESS:  So, yes, Your Honor, this is an

12   email back from Mr. Agadjani on October 30, 2023, at

13   11:32 a.m., showing that he got the email I had issued about

14   the settlement number, and then Mr. Agadjani giving me a

15   sense of his capacity to make payments based on that

16   settlement number at terms at that time that he could afford

17   as he indicated.

18          THE COURT:  Well, did you have any doubt that when

19   you were negotiating with Mr. Jennings, about the payment

20   terms and the payment amount, that you were authorized?

21   Here Mr. Agadjani seems to be telling you I can't do it, I

22   don't have the money.

23          THE WITNESS:  I had no doubt at that time that my

24   client was authorizing me to settle the matter at $180,000.

25   What was still at issue, which is clear from the email and

PROCEEDINGS                    87

1   from subsequent conversations I had with the client, was

2   that the payment terms still needed work and we needed to

3   negotiate that term because he could not afford to pay as

4   fast as Mr. Jennings and his client had requested, which I

5   had detailed in my email to the client on October 30, 2023.

6           So in this email, I understood it to mean you need

7   to work on that payment plan because I don't have the money

8   to pay in the schedule that they're demanding.  And so at

9   that time I knew I had more work left to do to negotiate a

10  payment plan that my client could afford.

11          THE COURT:  Thank you.

12          MR. BATES:  I have no further questions, Your

13  Honor.

14          THE COURT:  Does anyone have any questions for

15  Mr. Miller?  Mr. Agadjani or Mr. Jennings, anything else?

16          MR. JENNINGS:  No.

17          THE COURT:  You may step down, sir.

18          THE WITNESS:  Thank you, Your Honor.

19          (Witness leaves the stand.)

20          THE COURT:  Is there any reason for me to hear

21  from Mr. Himes?

22          MR. HIMES:  I'm happy to testify, Your Honor, if

23  there's anything I can answer that's -- that is still on

24  your mind.

25          THE COURT:  Well, I did have a question about your

PROCEEDINGS                                    88

1    presence at the October 31st conference before Magistrate

2    Judge Pollak in which you purportedly, according to her,

3    reached a settlement on this case.

4             She states on November 1, 2023:  Minute entry for

5    settlement conference, proceeding held before Magistrate

6    Judge Cheryl Pollak on 10/31/23.  Appearance for plaintiff

7    Allan Winston, Horatio Jennings, Junior.  Appearance for the

8    defendants Scott Himes.  Parties reached settlement.

9    Working out payment plan and drafting settlement papers.

10   Papers due November 17, 2023.

11            I'm just reading this minute entry and why

12   Mr. Himes's testimony might be illuminating.

13            Go ahead and administer the oath.  Thank you.

14            (Witness takes the stand and is sworn.)

15            THE COURTROOM DEPUTY:  Please have a seat and

16   state and spell your full name.

17            THE WITNESS:  Scott M. Himes, H-I-M-E-S.

18            THE COURTROOM DEPUTY:  Thank you.

19   **SCOTT M. HIMES,**

20            called as a witness, having been first duly

21            sworn/affirmed, was examined and testified as

22            follows:

23   COURT INQUIRY:

24            THE COURT:  Sir, you are a partner of Mr. Ryan

25   Miller; is that correct?

PROCEEDINGS                        89

1          THE WITNESS:  Yes.

2          THE COURT:  When did you first get involved in the

3    Agadjani litigation by Mr. Santiago?

4          THE WITNESS:  Your Honor, I became involved in, I

5    believe, 2019 when the case was were originally filed in

6    State Supreme Court, Queens County.

7          THE COURT:  All right.  And did Mr. Agadjani

8    retain you or your firm, or what was his point of contact to

9    retaining you?

10         THE WITNESS:  Well, Your Honor, I believe our

11   engagement letters specify that the client retains the firm,

12   and then we discuss internally how the case will be handled.

13   I certainly met and worked with Mr. -- our former client at

14   that time, and we worked together extensively.  We made a

15   motion to dismiss in the State Court, and I worked directly

16   with Mr. Agadjani at that time.

17         THE COURT:  And then at some point your firm

18   removed the action to Federal Court, correct?

19         THE WITNESS:  Yes, Your Honor.

20         THE COURT:  Did the State Court grant any part of

21   your motion to dismiss?

22         THE WITNESS:  I believe so, Your Honor.  I believe

23   one of the New York common law claims was dismissed.

24         THE COURT:  All right.  So you then had the case

25   removed.

PROCEEDINGS                                      90

1          How would you describe your role in defending

2     Mr. Agadjani and Trax?  Were you the primary attorney or was

3     it Mr. Miller?

4          THE WITNESS:  Well, initially and for some period

5     of time I handled the primary legal work; that is,

6     day-to-day issues, motions that came up, discovery, and I

7     was always in constant communication with Mr. Miller about

8     what's going on in the case.  He had had a long relationship

9     with the former client going back, I believe, many years, I

10    believe before I had even joined the firm.

11         But I was essentially the -- I would say the

12    lawyer handling the case, the legal work, day-to-day and as

13    to the specifics of what needed to be done, again, just

14    keeping Mr. Miller always informed and brainstorming with

15    him as needed.

16         THE COURT:  So had your firm conducted other legal

17    services for Mr. Agadjani?  Without telling me what they

18    were.

19         THE WITNESS:  Yes, I believe so, and I had handled

20    one other case in particular for him.

21         THE COURT:  Thank you.  So let's fast-forward to

22    the point of settlement, when Judge Pollak ordered a

23    settlement conference in this case.

24         Mr. Miller testified that you attended the

25    settlement conference on October 31st.  Had you attended any

PROCEEDINGS                    91

1   other settlement conferences?

2           THE WITNESS:  Your Honor, I had not attended any

3   in-person settlement conferences.  I have some recollection

4   of possibly participating in a prior telephonic conference

5   much earlier.  I'm not a hundred percent certain of the

6   timing.  But the conference that you're referring to I

7   recall being a telephonic conference.  I believe it was

8   fairly short and sweet.

9           THE COURT:  When you say "fairly short," what

10  approximate time?

11          THE WITNESS:  Oh, kind of a rough estimate, but

12  maybe fifteen, twenty minutes, just as an approximation,

13  Your Honor.

14          THE COURT:  All right.  And then did you have

15  conversations with Mr. Agadjani about your settlement

16  authority; that is, the amount of settlement that you

17  would --

18          MR. BATES:  Your Honor, I'm sorry, just briefly,

19  again, it's my understanding as witness's counsel that the

20  waiver analysis applies to Mr. Himes's testimony as well,

21  and that the Rule 1.6 order applies to this testimony, as

22  well.

23          THE COURT:  Yes, it was intended to.  But just to

24  be clear --

25          MR. BATES:  Thank you, Your Honor.

PROCEEDINGS                                          92

1      THE COURT:  -- I'm ordering that he may testify
2  about his conversations with Mr. Agadjani regarding the
3  settlement amount and terms.
4      MR. BATES:  Thank you, Your Honor.
5      THE WITNESS:  Your Honor, I did not communicate
6  with our former client in that period of time.  Those
7  communications were handled by Mr. Miller.  Mr. Miller and I
8  coordinated, obviously, as to what would be communicated.  I
9  handled the communications with Mr. Jennings, with the
10  plaintiff's counsel.
11      THE COURT:  All right.  So, in other words,
12  whatever you were conveying to Mr. Jennings came through
13  Mr. Miller, but you didn't have direct conversations with
14  Mr. Agadjani?
15      THE WITNESS:  Correct, Your Honor, not in that
16  time frame.
17      THE COURT:  At what point and how did you become
18  aware that Mr. Agadjani had authorized $200,000 to settle
19  the case?
20      THE WITNESS:  Well, when I spoke to Mr. Miller and
21  I was either copied on emails or he advised me of the emails
22  that he exchanged with our former client.
23      THE COURT:  So you learned from Mr. Miller or
24  through his emails that Mr. Agadjani had authorized up to
25  $200,000?

PROCEEDINGS                    93

1          THE WITNESS:  Absolutely.

2          THE COURT:  Did Mr. Agadjani ever object to you,

3    either directly or through Mr. Miller, did he object to your

4    representing him during settlement discussions with

5    Mr. Jennings or before the Magistrate Judge?

6          THE WITNESS:  He did not object to my representing

7    him at that point in time, Your Honor.  My understanding is

8    that Mr. Miller had a conversation with our former client

9    about how the representation would be handled.

10          THE COURT:  All right.  So Mr. Agadjani never

11   indicated directly to you, or to your knowledge, indirectly

12   through Mr. Miller, that he did not want you representing

13   him on the case?

14          THE WITNESS:  At this point in time, no.  There

15   was an earlier point in time that precedes this considerably

16   where that was an issue.

17          THE COURT:  Mr. Agadjani had concerns about your

18   involvement in the case?

19          THE WITNESS:  Yes, Your Honor.

20          THE COURT:  When you say it precedes this time

21   "considerably," by this time are you talking about the

22   October 31, 2023 settlement conference before Judge Pollak?

23          THE WITNESS:  At that point in time, there was no

24   issue or concern of our former client --

25          THE COURT:  When did --

PROCEEDINGS                                    94

1          THE WITNESS:  -- to all of my understanding, and

2     I'm confident that that's the case.

3          THE COURT:  All right.  So when did you become

4     aware that Mr. Agadjani had issues with your involvement in

5     his litigation?

6          THE WITNESS:  Your Honor, it was much earlier

7     and --

8          THE COURT:  Much earlier than October 31, 2023?

9          THE WITNESS:  Yes, Your Honor.  There was an

10    issue, expressed issue in I believe it's February 2022.

11         THE COURT:  Did he not authorize you to represent

12    him in this litigation, or did he say anything that he did

13    not want you to appear or speak for him?

14         THE WITNESS:  Your Honor, just to clarify, this

15    goes -- is considerably earlier than the matters we've been

16    discussing.

17         THE COURT:  Right.

18         THE WITNESS:  It's obviously a privileged

19    communication --

20         THE COURT:  Well, I have to decide whether you

21    were authorized to participate in the settlement conference

22    or any discussions with Mr. Jennings regarding the

23    settlement.

24         So you're saying as early as February 2022,

25    Mr. Agadjani expressed concerns about your participation in

PROCEEDINGS                              95

1   this litigation on his behalf, correct?

2           THE WITNESS:  At that period of time, he raised an

3   issue, and then amongst discussions internally amongst

4   ourselves, we decided upon the best way to proceed for the

5   client, and my understanding is Mr. Miller discussed that

6   with Mr. Agadjani, and we proceeded ahead on that basis.

7           I certainly believe -- I understand our former

8   client knew, understood that I was handling the negotiations

9   with Mr. Santiago's counsel.

10          THE COURT:  How do you know that?

11          THE WITNESS:  The communications with Mr. Miller.

12          THE COURT:  So you never spoke to Mr. Agadjani

13  yourself and confirmed or said to him:  I am handling the

14  negotiations with Mr. Jennings on your behalf regarding any

15  resolution?

16          THE WITNESS:  I believe that's correct, Your

17  Honor.  I believe that Mr. Miller had that discussion with

18  Mr. Agadjani.

19          THE COURT:  Well, can you tell me why you believe

20  that?

21          THE WITNESS:  Because of what Mr. Miller told me,

22  what Mr. Miller and I discussed about the settlement

23  negotiations, and we were working together in lockstep to

24  try to get the case resolved.  I was negotiating with

25  Mr. Jennings, communicating with Mr. Miller, and Mr. Miller

PROCEEDINGS                                          96

1  was communicating with the former client.

2          THE COURT:  Do you know this from personal

3  knowledge or is this based on hearsay?

4          THE WITNESS:  Well, it's based on my discussions

5  with Mr. Miller.

6          THE COURT:  Were you ever witness to a

7  conversation when Mr. Miller said to Mr. Agadjani:

8  Mr. Himes is going to be negotiating with Mr. Jennings on

9  your behalf to try to resolve this?

10         THE WITNESS:  Not that I recall, Your Honor, in

11 this period of time.  Mr. Miller and I discussed at length

12 my negotiations with Mr. Jennings, and then, in turn, his

13 communications with our former client.  And so I kept him

14 apprised of the negotiations with Mr. Jennings, he kept me

15 apprised of the negotiations with our former client.

16         THE COURT:  "He" being and "him" being Mr. Miller?

17         THE WITNESS:  Mr. Miller kept me apprised of the

18 discussions with our former client.  And so I knew -- was

19 informed of the Miller/former client discussions, and

20 Mr. Agadjani was informed of my negotiations with

21 Mr. Jennings.  There was never any indication, to my

22 knowledge, of our former client not -- not being aware of my

23 negotiations.  And in the past, previous to the settlement

24 negotiations, I had handled the motion practice, discovery,

25 preparation of motion papers, et cetera.

PROCEEDINGS                    97

1          THE COURT:  Was your name on all the papers that

2   were submitted on behalf of Mr. Agadjani?

3          THE WITNESS:  I believe so, yes.

4          THE COURT:  And do you know if copies were sent to

5   Mr. Agadjani of the motions you filed on his behalf?

6          THE WITNESS:  I believe they were.

7          THE COURT:  Just so I'm clear, you had no direct

8   conversations with Mr. Agadjani, no direct emails, no direct

9   text messages regarding your role in the litigation on his

10  behalf; is that correct?

11         THE WITNESS:  I had none of those communications

12  with respect to this period of time for the settlement

13  discussions.  Previous to that, I had been in touch

14  frequently with our former client about whatever was

15  happening at the time, and then at a point in time that

16  changed.

17         THE COURT:  Okay.  So previous to the settlement,

18  which that date would be October 31, 2023?

19         THE WITNESS:  But I'm sorry, Your Honor, that

20  date --

21         THE COURT:  You said previous to the settlement

22  you were in touch with Mr. Agadjani.

23         THE WITNESS:  Yes.

24         THE COURT:  Is that October 31, 2023?

25         THE WITNESS:  No, no, it was considerably earlier,

PROCEEDINGS                                    98

1    Your Honor.  Approximately the spring -- I would say about

2    the spring of --

3               THE COURT:  2022?

4               THE WITNESS:  -- 2022, when the communications

5    with the former client were principally, principally then

6    handled by Mr. Miller.

7               THE COURT:  Well, you said that you had

8    communications with Mr. Agadjani, as well, regarding the

9    settlement, or previous to the settlement.

10              So, when was that?

11              THE WITNESS:  Well, as I mentioned, Your Honor, in

12   2019 motion to dismiss was filed in State Court.  There was

13   an affidavit from our former client.  I dealt with a former

14   client in the discovery matters, document production, I

15   believe answering interrogatories or admissions, and we

16   were -- directly, I was in communication with him about

17   those matters.

18              THE COURT:  In communication with Mr. Agadjani?

19              THE WITNESS:  Yes, yes.

20              THE COURT:  So was there a point in time that

21   Mr. Agadjani just said I'm not dealing with you, Mr. Himes,

22   don't speak to me, I'm only dealing with Mr. Miller?

23              THE WITNESS:  Yes, in effect, Your Honor.

24              THE COURT:  And approximately when did that occur?

25              THE WITNESS:  Approximately February of 2022, I

PROCEEDINGS                                    99

1   believe.  I believe I had some communications with our

2   former client afterwards, but by the time of -- but for the

3   most part, Mr. Miller was handling the communications, and

4   then that continued into the period of the settlement

5   negotiations.

6                THE COURT:  So when you appeared for the

7   settlement conference before Judge Pollak on October 31,

8   2023, you were not authorized to appear for Mr. Agadjani,

9   were you?

10               THE WITNESS:  No, I don't -- I don't think that's

11  the case at all, Your Honor.

12               THE COURT:  Oh, okay.  So please enlighten me.

13               Why were you authorized to appear on his behalf

14  before Judge Pollak regarding the settlement conference that

15  she scheduled on October 31, 2023?

16               THE WITNESS:  Well, because I am a member of the

17  law firm that's representing our former client.  Mr. Miller

18  and I often would -- we were both very involved in the case.

19  We would -- I believe Mr. Miller attended a prior in-person

20  conference.  I participated in other telephonic conferences.

21  And that's how we handled the representation, Your Honor.

22  We were both on the team, so-to-speak, and our former client

23  understood that.

24               THE COURT:  But you said in February of 2022

25  Mr. Agadjani said I don't want you working on my case

PROCEEDINGS                    100

1  anymore.

2        THE WITNESS:  He raised that issue, Your Honor.

3  There was discussion, again, both internally and then with

4  our former client, about how the matter would then be

5  handled going forward amongst us as a firm, amongst

6  Mr. Miller, myself, and to a lesser extent, Mr. Kishner, who

7  also had a relationship with our former client.

8        THE COURT:  All right.  So how many of these

9  discussions did you participate in?  And by discussions, I

10  mean with Mr. Agadjani so that you were clearly continuing

11  to represent him.

12        THE WITNESS:  Well, prior to February of 20 --

13        THE COURT:  I'm not talking about prior to.

14        I'm talking about since February of 2022, when

15  Mr. Agadjani purportedly told you that he didn't want you

16  working on his case, what discussions did you directly have

17  or were you present when your firm's role in his litigation

18  was discussed?

19        THE WITNESS:  Well, I believe, Your Honor, I can't

20  be -- I believe there was a conversation after that point in

21  time, after we, together as a team, provided a memorandum to

22  our former client.  I believe that occurred later in the

23  spring of 2022.  I'm not a hundred percent positive of that.

24        But in that point in time, I was handling the

25  case, dealing with what needed to be done in the case.  Our

PROCEEDINGS                    101

1   former client knew I was doing that kind of work.  That's

2   absolutely my understanding.  We had the arrangement which

3   we thought was working effectively, that I was handling the,

4   call it the lion's share of the litigation work itself.  And

5   then I was dealing with plaintiff's counsel, both in the

6   discovery, litigation matters, and that obviously led to

7   settlement discussions --

8            THE COURT:  Right, just think about my question,

9   please.  I was just trying to get a sense of what

10  conversations you recall after February of 2022 regarding

11  your role in continuing to represent Mr. Agadjani.

12           What conversations or emails or texts do you

13  recall where you were copied or you participated, where you

14  had personal knowledge of communications with Mr. Agadjani

15  regarding your role, your continued role in defending him.

16           THE WITNESS:  Well, I had communications with

17  Mr. Miller --

18           THE COURT:  Right.  But that wasn't my question.

19           THE WITNESS:  I understand.

20           Again, I recall, I believe it was after February

21  2022, though I admit I'm not positive, but I recall one very

22  significant conversation which included Mr. Miller and our

23  former client, and I continued to handle what was being done

24  for the litigation at that point in time.  I don't believe

25  there was a great deal of communication with our former

PROCEEDINGS                    102

1   client in that period until we got back into the settlement

2   mode.

3            THE COURT:  All right.  I'm afraid we're going to

4   have to call Mr. Miller back to the stand.

5            Did Mr. Agadjani know that you were appearing on

6   October 31, 2023 before Judge Pollak on his behalf regarding

7   the settlement?

8            THE WITNESS:  I believe so, yes.

9            THE COURT:  Why do you believe it?  What personal

10  knowledge do you have?  Did you tell him?

11           THE WITNESS:  I did not tell him, no.  It's based

12  upon --

13           THE COURT:  Did you see an email where Mr. Miller

14  communicated with Mr. Agadjani that you were going to be

15  appearing at the settlement conference?

16           THE WITNESS:  I don't recall that specific email.

17  I believe it was discussed, I believe, from my conversations

18  with Mr. Miller, that our former client understood how we

19  were proceeding and that I was appearing at that conference.

20           THE COURT:  All right.  Did you, between February

21  of 2022 and October 31, 2023, did your firm send bills to

22  Mr. Agadjani for your legal services that had a line item

23  for your legal work?

24           THE WITNESS:  Well, I'm -- I'm -- our bills -- I

25  believe the answer is yes.  Without looking back at our

1   billing records, I can't say exactly when bills were sent.

2   I believe they were sent regularly in that time frame, and

3   our billing records show the attorney providing the services

4   in a time records fashion, and that would have shown

5   principally my time.

6            THE COURT:  All right.  And did he pay the bills

7   or raise any objection to your doing legal work for him?

8            THE WITNESS:  No, not to my knowledge, Your Honor.

9   And I believe the bulk of the legal bills were paid.  Yes,

10  from our billing system, I understand the bulk of our legal

11  services were paid for.  May have been at the very end that

12  there were bills unpaid.

13           THE COURT:  All right.

14           Does anyone have any questions for this witness?

15           MR. JENNINGS:  Yes, Your Honor.

16           THE COURT:  Mr. Jennings, go ahead.

17  EXAMINATION BY

18  MR. JENNINGS:

19  Q    Good morning, Mr. Himes.

20  A    Good morning -- good afternoon.

21  Q    Good afternoon.

22           Mr. Himes, is it the practice of your law firm to

23  give a retainer to your clients?

24  A    An engagement letter?

25  Q    Yes.

PROCEEDINGS                                104

1    A    Yes.

2    Q    A retainer that's signed by your client of the services

3    that you're going to provide.

4    A    Yeah.  I would call it an engagement letter.  But yes,

5    a letter that describes the services.

6    Q    Does your retainer have a place on it for your client

7    to sign saying that he's agreeing to the contract of your

8    services?

9    A    Yes.

10   Q    In your retainer agreement, he's hiring your law firm;

11   is that right?

12   A    I believe that's correct, yes.

13   Q    Does your retainer state that other associates can work

14   on his case?

15   A    As a general matter, our retainer/engagement letters

16   often describe who will be working on the case.

17   Q    Does it specifically say the names of individuals in

18   the case or does it just generally state that individuals

19   and associates can work on the case?

20   A    Well, again, in general, the engagement letter is

21   issued and signed by either a partner, or it could be by

22   another lawyer in the firm, and depending on the nature of

23   the representation, it may include who will be -- who we

24   anticipate working on the matter.

25   Q    Does your firm have other associates working in your

PROCEEDINGS                    105

1   firm outside of Mr. Kishner, yourself, and Mr. Miller?

2   A    In general do we have other associates?

3   Q    Yes.

4   A    Yes.  Well, we have other lawyers, counsel, associates.

5   Q    So when you engage a client, your firm, when it comes

6   to writing motions and complaints and answers, other

7   associates in the firm participate in the workload.  Yes?

8   A    Yes, often.

9   Q    Do you have to tell the client which attorney typed the

10  document up for you in your firm?

11  A    We don't feel --

12        MR. BATES:  Your Honor, that's kind of a legal

13  question.

14        THE COURT:  Yes.

15        MR. JENNINGS:  I'll withdraw it.

16        THE COURT:  I think it doesn't matter which

17  attorney does the typing; I would assume most attorneys do

18  their own typing.

19        MR. JENNINGS:  Thank you, Your Honor.

20  Q    And members of your firm from time to time go to court

21  on behalf of clients.  Yes?

22  A    Yes, of course.

23  Q    And had your firm ever had any need to send an of

24  counsel to court because you're not available or

25  Mr. Miller's not available?

1   A    Yes.

2   Q    Does the client have to particularly authorize an of

3   counsel to go to court on your behalf?

4   A    I don't believe so.

5   Q    So --

6   A    The client -- the client hires the firm.  The client

7   knows who's working on the case, typically, sometimes

8   someone has to cover for something else in a case.

9   Employers with my firm will go to court, yes.

10  Q    In your firm work is divided among the partners and the

11  associates, right?

12  A    Work is divided among the lawyers often.

13  Q    So when you have a case that's assigned to you, for

14  example, and you can't go to court, then of counsel who is

15  not even a member of your firm can appear in court on the

16  firm's behalf for a client.  Yes?

17  A    I don't recall a situation where I asked someone who

18  was not with my firm in some capacity to handle anything in

19  court.  No, I don't --

20  Q    But law firms in general sometimes, even though they --

21           THE COURT:  We don't need to get into

22  general hypotheticals.

23  Q    Your firm -- your firm --

24           THE COURT:  I don't think that's relevant.  I

25  think you should focus on the issues at hand.  It doesn't

1    matter hypothetically what else his firm does regarding

2    other attorneys.

3    Q    Your firm -- you're stating that your firm has never

4    sent an outside counsel, of counsel, to court?  It's never

5    happened?

6    A    I can't speak for the whole firm and all of my

7    partners.  I don't recall my ever asking a lawyer outside my

8    firm to appear on behalf of a firm client.  I mean, it just

9    doesn't --

10   Q    But your firm could do that, though, right?

11   A    I don't know the answer to that.  That would not be my

12   practice.

13              MR. JENNINGS:  It's really not a hypothetical

14   answer, Your Honor --

15              THE COURT:  Well, I want to know what happened.  I

16   want to know what --

17              MR. JENNINGS:  I'm trying to establish the general

18   practice of a lawyer is that we do send outside attorneys,

19   our attorneys, to work on behalf of a client without having

20   to get permission from the client.

21              THE COURT:  Right.  But the key is if a client has

22   specifically said I don't want this lawyer to represent me

23   or to appear on my behalf.  That's what I think we have in

24   this record.  So focus on that scenario if you want to focus

25   on this issue.

PROCEEDINGS                                    108

1      THE WITNESS:  If that's a question from Your

2  Honor, I could answer that, if I might.

3      THE COURT:  Well, you testified that Mr. Agadjani

4  told you in February of 2022 he didn't want you working on

5  his case.

6      MR. BATES:  Your Honor, I don't think that's an

7  accurate summary of that testimony.

8      THE COURT:  He didn't want Mr. Himes representing

9  him.

10      MR. BATES:  With respect, that's not the way I

11  recall the testimony.

12      THE COURT:  All right.

13      So this is the thing that I think is curious.  I

14  don't see Mr. Himes copied on any of these communications

15  between Mr. Miller and Mr. Agadjani.  Is there a reason for

16  that?

17      THE WITNESS:  I don't -- I don't know if there's a

18  reason for that in particular.  It might -- I typically was

19  informed by Mr. Miller, either by forwarding the email, some

20  of them could have been blind copied to me, I don't really

21  recall.  But I believe we had a very clear arrangement as to

22  what I was handling on the case at that point in time and

23  what Mr. Miller was doing.  And to my understanding, our

24  former client knew, understood, and agreed to that.

25      THE COURT:  All right.  And so when you appeared

PROCEEDINGS                    109

1    on October 31st at the conference before Judge Pollak, did

2    you indicated that you were authorized to appear for

3    Mr. Miller?

4              THE WITNESS:  To appear for Mr. Miller?

5              THE COURT:  I mean, I'm sorry, that you were

6    authorized to appear for Mr. Agadjani because Mr. Miller was

7    not present at that conference.

8              THE WITNESS:  Well, I certainly -- I would have

9    said I'm here on behalf of the defendants.  I don't recall

10   saying because Mr. Miller was not available or not.  I don't

11   think that was -- would have entered what I would represent

12   to the Magistrate Judge.  I would have said I'm here on

13   behalf of the defendants.  I was representing both clients

14   then.  I was counsel of record.  I had appeared extensively.

15   Mr. Miller had attended one other conference.  I don't think

16   that there was any question that I was representing the

17   defendants and that our former client knew and understood

18   that fully.  There was simply this division of the

19   communications, and my handling of representation in court

20   with Mr. Jennings in negotiating the settlement, and I don't

21   believe there's any reason for our former client to have

22   believed otherwise.

23             THE COURT:  All right.  Well, we don't know what

24   was in his mind.  What we can go on is what the

25   communications were, what he was notified of, where your

PROCEEDINGS                    110

1    name appeared on documents that were submitted to the Court

2    on his behalf, whether you were copied on communications,

3    whether you were present at meetings or, as Mr. Miller's

4    discussed with Mr. Agadjani, his case, identified to him

5    whether you were or were not on a call.  I mean, that's what

6    I'm trying to understand, because as you know the standard

7    is whether somebody has actual or apparent authority to

8    appear on behalf of somebody and to act on their behalf.

9    Now, I understand your firm may have been authorized, but he

10   just revealed that Mr. Agadjani, as of February 2022, had

11   issues with Mr. Himes appearing on his behalf.  So that's

12   what I'm trying to understand.

13           MR. JENNINGS:  Nonetheless, Your Honor --

14           THE COURT:  And he claims that he was aware of it.

15   We might have to hear from Mr. Miller again.

16           MR. JENNINGS:  Your Honor, as you heard on the

17   testimony from Mr. Miller that on October 30th, the

18   plaintiff's counsel and the firm had came up with a

19   settlement amount and Mr. Miller communicated that amount to

20   his client who agreed to settle up to $200,000.

21           THE COURT:  I understand.  I understand.

22           MR. JENNINGS:  And then the next day there was a

23   hearing.  And it wouldn't have mattered if Mr. Himes

24   appeared, Mr. Miller appeared, or if an of counsel had

25   appeared, because if of counsel appeared with the

1    authorization from the firm itself saying, hey, you're going

2    to go to that conference and you're going to settle and

3    you're going to come up with an amount not to exceed -- but

4    that agreement had already been made on the 30th with this

5    counsel and their firm on the 30th.  So all they did when

6    they reappeared on the 31st was convey what had already took

7    place the day before.

8            THE COURT:  I understand.  I understand.

9            What other questions do you have?

10   BY MR. JENNINGS:

11   Q    Mr. Himes, do you recall why, back in February of 2022,

12   the client did not want you to work on his case anymore?

13   A    I do.

14   Q    Can you tell the Court?

15           MR. BATES:  I'm sorry.  Could I hear that question

16   again, please?

17   Q    Do you recall why the client did not want you to work

18   on the case anymore?

19           MR. BATES:  I object to the question.  I think it

20   misstates the testimony.

21           MR. JENNINGS:  Okay.

22   Q    Could you tell us the reasons that you heard either

23   from the client or from Mr. Miller why the client did not

24   want you to work on his case anymore in 2022?

25   A    Yes, sir.  May I --

PROCEEDINGS                                112

1    Q    Please.

2    A    -- explain it again?

3    Q    Why he didn't want you working.

4         THE COURT:  You said --

5    A    There were numerous issues in the case, and in

6    particular, there are claims of defamation.  And our former

7    client was engaged in posting matters on social media.  I

8    remember very distinctly giving my best legal advice to him

9    about the advisability of that conduct.  I may have written

10   an email, as well, but I remember a very heated conversation

11   where our former client became very, very upset and very

12   agitated and, frankly, very angry at me personally.  And it

13   was shortly thereafter that I believe I received an email

14   from one of his employees advising that our former client

15   preferred to work with others in the firm.

16        At that point I had been handling the matter, as

17   I've said, for what was years.  And at that point in time we

18   met internally, we communicated internally to figure out the

19   best game plan to represent the client to the best of our

20   ability and to accomplish his best interests.  And that's,

21   really, at that point in time, I would say we agreed and

22   everyone agreed, including our former client, Mr. Miller

23   would handle the communications with our former client, that

24   I would be kept apprised and I would keep Mr. Miller

25   apprised of everything being done, and that I would continue

PROCEEDINGS                          113

1   to handle the litigation matters itself.  And again, that

2   evolved into the settlement discussions, which I then

3   handled as far as the negotiations with Mr. Jennings and, as

4   I've described, with Mr. Miller having the direct

5   communications with our former client.

6   Q    So basically, because you talked to the client

7   regarding continuing to post things on the internet that

8   were possibly derogatory, defamatory, he got upset with you

9   and he did not want to communicate with you anymore

10  directly.  Is that right?  Would that be fair?

11  A    I think it's fair to say that I gave my best legal

12  advice about -- in particular about the advisability of

13  those sorts of public communications, and there was a heated

14  conversation with the client and a very negative reaction.

15  Q    So at that point you guys pretty much divided the work.

16  So the work was divided that Mr. Miller from now on

17  communicates directly with the client.  You don't, but you

18  continue to work on the case.  Would that be fair to say?

19  A    Yes.  Generally -- I think that's generally a fair

20  characterization.  As I've said, I believe I had some

21  subsequent involvement on -- particularly on issues within

22  my area of experience and might be called in.  And I do

23  recall another significant conversation with the client with

24  Mr. Miller that I'm confident -- that I believe occurred

25  afterwards.  We gave other legal advice to the client about

PROCEEDINGS                                    114

1    the matter and events that were evolving in the case.

2    Q    This is after February of 2022; is that right?

3    A    Yes.

4    Q    Thank you.  And would it be fair to say, Mr. Himes,

5    that you're the one who did the bulk of the documentation

6    work in terms of doing motions?

7    A    Yes.

8    Q    And even after the October 31st conference, you're the

9    one that participated and did the drafting of the settlement

10   agreement?

11   A    Yes.

12            MR. JENNINGS:  I have no further questions, Your

13   Honor.

14            THE COURT:  Any questions from you, counsel?

15            MR. BATES:  No, Your Honor.

16            MR. AGADJANI:  I might have a question.

17            THE COURT:  Okay.  Go ahead, Mr. Agadjani.

18            MR. AGADJANI:  Should I approach?

19            THE COURT:  Yes.  Just stand back no closer than

20   the podium there.  All right?

21   EXAMINATION BY

22   MR. AGADJANI:

23   Q    Mr. Himes, I explicitly asked -- are you aware that I

24   explicitly asked Mr. Miller and Mr. Kishner that you would

25   not have anything to do with my case?

PROCEEDINGS                                    115

1    A    That you asked them that?

2    Q    I sent an email in regards to that, made numerous phone

3    calls and text messages.  Are you aware of any of them?

4    A    I'm --

5              MR. BATES:  Objection to form.

6              THE COURT:  All right.  One question at a time.

7    That's called a compound question when you ask three

8    questions at once.  You can break it down.

9    Q    Are you aware that I sent an email to the firm asking

10   that you do not have anything to do with my case going

11   forward?

12   A    I'm aware of an email I think sent to me, I'm not sure

13   who was copied, but asking -- I don't -- asking that one of

14   the other partners in the firm take -- I think take over the

15   case.

16   Q    Then why were you still involved in the case after that

17   point?

18   A    Because I had been involved throughout in the prior

19   proceedings.  Mr. Miller and I and I think Mr. Kishner was

20   involved in the discussions, and we decided on a course of

21   action that we felt -- a manner of representation that we

22   believed was in your best interests with respect to handling

23   the legal work, handling the motion practice, discovery.

24   And that was a discussion we had internally, which I

25   understand was fully conveyed to you, sir, with your

PROCEEDINGS                          116

1   agreement going forward.  So that's my understanding.

2   Q    So even though I explicitly asked that you have nothing

3   to do with my case, you continued to work on my case, as I

4   understand it?

5             MR. JENNINGS:  Objection.  Asked and answered,

6   Your Honor.

7             THE COURT:  It was asked and answered.  You don't

8   need to ask it more than once.

9             MR. AGADJANI:  Okay.

10            THE COURT:  And I don't see an email where you

11  made this request.  In any event, he gave you an answer.

12  What's your next question?

13            MR. AGADJANI:  I don't have any further questions.

14            THE COURT:  Thank you.

15            Are there any further questions from counsel for

16  the lawyers?

17            MR. BATES:  No, Your Honor.

18            THE COURT:  I don't have any questions for you.  I

19  think when -- I just don't think I've got anything more to

20  add.  Thank you.

21            THE WITNESS:  Thank you, Your Honor.

22            THE COURT:  Thank you.  You're excused, sir.

23            (Witness leaves the stand.)

24            THE COURT:  I might have one more question for

25  Mr. Miller.

PROCEEDINGS                    117

1              (Witness takes the stand.)

2              THE COURT:  So, Mr. Miller, you're still under

3    oath.

4              THE WITNESS:  Yes, Your Honor.

5    **RYAN O. MILLER,**

6              re-called as a witness, having been previously

7              sworn/affirmed, was examined and testified further

8              as follows:

9    FURTHER COURT INQUIRY:

10             THE COURT:  Can you tell us what communications

11   you had with Mr. Agadjani regarding Mr. Himes's continued

12   role, including handling litigation and appearing at a

13   settlement conference on his behalf before Judge Pollak on

14   October 31, 2023?

15             THE WITNESS:  I'd have to go back in time first,

16   Your Honor, to lead up to the answer to that question.

17             I have seen that February 2022 email.  We had many

18   subsequent conversations by phone --

19             THE COURT:  "We," being who?

20             THE WITNESS:  Myself, Mr. Agadjani, and also at

21   that time my law partner Mr. Kishner.  Because as Mr. Himes

22   correctly testified, I had a very longstanding relationship

23   with Mr. Agadjani that spanned well over a decade prior to

24   the representation that commenced on this case.  And the

25   representations from Mr. Agadjani span several different

PROCEEDINGS                    118

1   courthouses and matters in many different jurisdictions.

2          During those conversations with Mr. Agadjani, and

3   this is in 2022, we made very clear that Mr. Himes is

4   critical to the continued representation on the case and his

5   work with respect to the case.

6          THE COURT:  Did you ever respond in writing to the

7   email that he purportedly sent advising that he didn't want

8   Mr. Himes on the case?

9          THE WITNESS:  I was not actually on that email,

10  but yes, subsequent to that email I was made aware of the

11  client's displeasure with Mr. Himes.  And I had several

12  heart-to-heart talks with my former client regarding why

13  Mr. Himes was so important to carry on representation in

14  this case.

15         And Your Honor actually raised an excellent

16  comment regarding billing.  I actually handle, as managing

17  partner of the practice, the billing that goes to clients.

18  And I can state unequivocally that the vast bulk of billing

19  that occurred from 2022 through 2023 would show that

20  Mr. Himes was unquestionably the one carrying the torch, if

21  you will, or doing the vast bulk of the work with respect to

22  the case.  And that is very clearly detailed on our invoices

23  and Mr. Agadjani received those invoices and then

24  Mr. Agadjani would make payments on those invoices.

25         And so I think, in all fairness to the former

PROCEEDINGS                          119

1   client, there was a little bit of a personality issue

2   between my law partner, Mr. Himes, and my former client.

3   And so being that I had such a longstanding relationship

4   with my former client, I was certainly obviously involved

5   and familiar with the specifics of this lawsuit and the work

6   that was going into it.  I felt, as did the client and as

7   did Mr. Himes, that it was okay then to proceed where most

8   of the communications would occur between myself and

9   Mr. Agadjani; and then vice-versa, when it pertained to

10  work, the communications between myself and Mr. Himes.

11          Now, I would like to add, Your Honor, that

12  Mr. Himes is referencing a very specific conversation,

13  communication that my office put together and then had a

14  very important phone call with our former client that

15  Mr. Himes was clearly on the communication to the client

16  because it was a memo to the client, and the first person's

17  name who was listed on the memo was Scott Himes.  My name

18  was after that.

19          We then had a very --

20          THE COURT:  What's the time frame, please?

21          THE WITNESS:  This was April 2023.

22          THE COURT:  April 2023.  Okay.  It was a memo to

23  client from the law firm?

24          THE WITNESS:  That is correct, but specifically it

25  was from Scott Himes and Ryan Miller.

PROCEEDINGS                    120

1          THE COURT:  Okay.  Regarding this litigation?

2          THE WITNESS:  Regarding aspects of this

3    litigation, yes.

4          THE COURT:  Okay.

5          THE WITNESS:  We then had a subsequent call with

6    the client with respect to that memo, and there's no

7    question that my former client was obviously aware of

8    Mr. Himes's continued involvement, representation, court

9    filings, and the like.

10         As it pertains to the specifics of that telephonic

11   settlement conference, I don't recall specifically saying to

12   the client on my communication and phone call with him on

13   October 30, Scott's making this appearance, I'm not.

14         THE COURT:  Why didn't you?

15         THE WITNESS:  Because it was understood by the

16   client that there were times where I would be making

17   appearances in court and Mr. Himes would be making

18   appearances in court.  And this is certainly something that

19   was understood by the client because our bills and prior

20   communications would show who was doing the work or making

21   court appearances and the like, and I was attempting to

22   maintain, what had otherwise been throughout my entire

23   representation with this specific client, a good

24   relationship.  And so that's why Mr. Himes is not on the

25   emails, because I was trying to just make sure the client

PROCEEDINGS                    121

1   knows that I'm the one dealing with you and we will maintain

2   that good discourse even if it's a difficult conversation or

3   advice you might receive from me about the case, and I am

4   able to convey it in a way that -- I call it bedside manner.

5   I say even the harsh things nicely.  Because at the end of

6   the day, we really were looking out for the best interests

7   of this client and wanted to continue to do so knowing that

8   this client was receiving excellent representation both from

9   myself and Mr. Himes.

10          And so it was a modus operandi that had been

11  established for, you know, 18 months, 20 months by this

12  point in time in terms of how we were handling the

13  representation of this client.  It was working and working

14  fine.  The client was not having any more blowups at one of

15  my partners because he was dealing now only with me.  And

16  yes, there were, I readily admit, times where even me and

17  the former client would have hard -- I wouldn't say heated,

18  but hard conversations where if I had not been conducting

19  that call, I could see the conversation spiralling fast.

20  And so that is how we had determined it was in the best

21  interest of this client to proceed with this case, this

22  representation.  And it was working in that way.

23          I mean, even you look at my November 27 -- I mean,

24  my November 27th communications with the client is a perfect

25  example of how we felt how well the communications and

PROCEEDINGS                          122

1    authorizations and setups were working.  I would email the

2    client, I would text the client, I then immediately called

3    the client, I then immediately hung up the phone and called

4    my law partner about, hey, we have a deal finally on the

5    term.  And that is the nature in which our representation

6    proceeded.  And at no point in time during our

7    representation of this client did he ever object, ever.

8                THE COURT:  All right.  So you said in April of

9    2023, Mr. Himes and you wrote a memo to Mr. Agadjani

10   regarding the litigation and other matters and that there

11   was a phone conversation subsequent to that memo.

12               THE WITNESS:  That's correct, Your Honor.

13               THE COURT:  And was Mr. Himes on that call?

14               THE WITNESS:  Yes, he was.

15               THE COURT:  And this was a call between you,

16   Mr. Agadjani, and Mr. Himes, correct?

17               THE WITNESS:  That is correct.

18               THE COURT:  Do you have anything, any email, text,

19   or recollection of a phone call or other memo informing

20   Mr. Agadjani that Mr. Himes would continue to have a role in

21   defending the litigation on his behalf?

22               THE WITNESS:  You mean Mr. Himes would have a

23   role?

24               THE COURT:  Mr. Himes would have a role to defend

25   Mr. Agadjani.

PROCEEDINGS                    123

 1            THE WITNESS:  There was no -- nothing in writing

 2    other than our billing, which was occurring frequent

 3    throughout 2022 and frequent throughout 2023.  And then

 4    there was, of course, the specific memo that was what we

 5    felt extremely important to be in writing to the client.

 6            THE COURT:  All right.  So when you submitted

 7    interrogatories or interrogatory responses, anything that

 8    was in writing on behalf of Mr. Agadjani, did you send him

 9    copies of your submissions?

10            THE WITNESS:  Absolutely.

11            THE COURT:  And was Mr. Himes's name on it?

12            THE WITNESS:  Everywhere.  Mr. Himes's name was on

13    all filings in the court, and the client received all of

14    those.

15            THE COURT:  All right.

16            Does anyone have any questions for Mr. Miller

17    before we wrap this up?

18            MR. JENNINGS:  Yes, Your Honor, very quickly.

19            THE COURT:  Okay.

20    FURTHER EXAMINATION

21    BY MR. JENNINGS:

22    Q    Mr. Miller, would it be fair to say that between

23    February of 2022 up to October of 2023 there are at least a

24    little bit more than a half a dozen court hearings,

25    telephonically and in person?

PROCEEDINGS                                124

1    A    That sounds about right to me.

2    Q    Would it be fair to say that you only attended one of

3    those in-person hearings, which was the settlement

4    conference?

5    A    That sounds about right.  I may have also been on one

6    of the Court conference calls with Mr. Himes.  But as far as

7    by myself without anyone else, it was only that one

8    in-person settlement conference.

9    Q    And outside the one telephonic conference you were on

10   with Mr. Himes, is it fair to say that of the other maybe

11   five or six other hearings, that it was only Mr. Himes that

12   appeared on behalf of the defendant?

13   A    I can't speak to the number, but I believe that there

14   were several hearings where I was not present and my law

15   partner, Scott Himes, who was also counsel of record, would

16   make an appearance on behalf of our client.

17   Q    So all the hearings, with the exception of the one that

18   you were in person when he wasn't, it was Mr. Himes as the

19   only other person that appeared on behalf of the defendant;

20   is that correct?

21   A    That is correct.  We never have of counsel.  That is

22   not a practice that my law firm engages in.  We do not hire

23   outside counsel to be representing any client in any matter.

24   As Mr. Himes correctly spoke, we do from time to time task

25   more than just two attorneys on a case so that if there is a

PROCEEDINGS                            125

1    conflict in terms of court appearances for various

2    attorneys, there's at least one other or maybe sometimes

3    depending upon the case two other attorneys in our own

4    office who are capable of making an appearance on behalf of

5    a client.

6             In this particular case, that never occurred.  It

7    was either myself or Mr. Himes who appeared on behalf of

8    this client.

9             MR. JENNINGS:  Thank you.  No other questions.

10            THE COURT:  Anything else?  Do you have any

11   questions, sir?

12            MR. BATES:  No, thank you, Your Honor.

13            THE COURT:  What about you, Mr. Agadjani?

14            MR. AGADJANI:  No, Your Honor.

15            THE COURT:  You're excused.  Thank you.

16            THE WITNESS:  Thank you, Your Honor.

17            THE COURT:  Thank you for coming back.

18            (Witness leaves the stand.)

19            THE COURT:  So we have submissions from the

20   parties regarding the enforcement of the settlement.  We now

21   have the hearing.  The court reporter was here; you can

22   order a transcript if you want.

23            I ask whether the parties want to make additional

24   submissions or not.  If so, when you will do that.  And I'm

25   not going to give you a lot of time.  I'd like to just find

PROCEEDINGS                                126

1   out how the parties intend to proceed.

2          Does the plaintiff want to stand by his motion to

3   enforce the settlement?

4          MR. JENNINGS:  Yes, Your Honor.  And also, Your

5   Honor, to be fair to my client, our firm had expected a

6   settlement to take place and finish back in December.

7          THE COURT:  I understand.

8          MR. JENNINGS:  And we expected the payments would

9   be finished by June.  Your Honor, since December, I have

10  been engaged in so much more work that's beyond what was

11  expected of me.  I had to file motions, I had to make other

12  appearances, I had to be here today.

13         I would ask Your Honor to take into consideration

14  if we could give you of a billing of my attorney's fees from

15  the time of February until now, number one.

16         Number two --

17         THE COURT:  Well, I'm not going to entertain an

18  oral motion because I would say if I find that there was an

19  enforceable settlement, maybe you have grounds to seek your

20  attorney's fees.  If I find there was not an enforceable

21  settlement, you don't really have grounds.  I'll just set a

22  trial date.

23         Anything else?

24         MR. JENNINGS:  No, Judge.

25         THE COURT:  What about from defense counsel?

PROCEEDINGS                    127

1          MR. BATES:  We may have further documents for the

2     Court.

3          THE COURT:  Okay.

4          MR. BATES:  Would the Court be interested in the

5     bills that were referred to?  We can put some of those in.

6          THE COURT:  These are the bills where Mr. Agadjani

7     is being informed that Mr. Himes is actively working on his

8     behalf?

9          MR. BATES:  Correct.

10          THE COURT:  I think that would be fine.

11          MR. BATES:  Okay.  Would a week from now be --

12          THE COURT:  Yes, that would be fine.

13          Does Mr. Agadjani have anything else he wants to

14     submit?

15          MR. AGADJANI:  Yes.  Oh, submit?  Say?

16          THE COURT:  Submit.  Any other documents?

17          MR. AGADJANI:  I don't have any documents.

18          THE COURT:  You've given us what you have?

19          MR. AGADJANI:  Yes.

20          THE COURT:  All right.  Well, you did mention some

21     communication, but it's fine.

22          I'm happy to hear a bit further, but I don't

23     really want rehashing of what's already been submitted.  I

24     would say, Mr. Agadjani, unless you have documentation to

25     support your statements, and I say this to all the lawyers,

PROCEEDINGS                    128

1   I'm not necessarily going to just accept what you tell me.

2   We need evidence that supports the assertions that you're

3   making.

4           MR. AGADJANI:  Okay.

5           THE COURT:  I don't know how much more I need to

6   consider.

7           MR. AGADJANI:  Just a small thing.  I mean, this

8   is -- I think my former attorneys provided my text message

9   correspondence when I agreed to a bottom line of 130.  I

10  stand behind what I agreed on text and not any hearsay or

11  any other conversations.

12          THE COURT:  Well, the reason that we had the

13  hearing is so that I could assess the credibility of the

14  witnesses regarding conversations that occurred subsequent

15  to that text message.  Maybe Mr. Miller has billing records

16  for -- you know, he submitted phone records, maybe he has

17  billing records for the conversations that he had in which

18  he believes you authorized him to settle for up to $200,000.

19  I don't necessarily want to take a limited view of the text

20  that you sent him when there was clearly a follow-up phone

21  call and you indicate that you are willing to speak to him

22  further about it, and then there's a follow-up email.

23          So I understand your point, but it appears that

24  there's more to it than your text authorizing $130,000.

25          Is there anything else?

PROCEEDINGS                           129

1          MR. JENNINGS:  Your Honor, may I have leave to

2     file the motion for default judgment against the

3     corporation?

4          THE COURT:  Have you had the default entered yet

5     by the Clerk of Court?

6          MR. JENNINGS:  No, Your Honor.

7          THE COURT:  Read the Federal Rules of Civil

8     Procedure.  Read the local rules regarding default.  You

9     must give notice to the defendants, the defaulting

10    defendant, and there's certain attachments you must affix to

11    your motion.

12         So you're granted, of course you can start the

13    steps to default Trax.

14         MR. JENNINGS:  Thank you.

15         THE COURT:  Is there anything else we need to

16    address?

17         I mean, the only other thing I would say to you

18    all is that Trax is technically in default, and I think Trax

19    has had sufficient time to find an attorney.  A corporation

20    just cannot appear on its own or through its sole

21    shareholder or executive.  If the default is granted, there

22    will be a judgment entered against Trax, even if

23    Mr. Agadjani continues to litigate on his behalf if I find

24    that he did not authorize the settlement that was reached

25    before Judge Pollak.

PROCEEDINGS                    130

1        So I guess my bottom line is the parties really

2   should think about resolving this case.  It doesn't appear

3   that Mr. Agadjani wants to settle anymore on the terms that

4   we've been discussing here, which is $180,000 with payments

5   over a set period of time.  If that is no longer on the

6   table, and if I don't enforce the settlement, then we'll

7   have a trial.  But these are all steps along the way.

8   There's nothing that prohibits plaintiff's counsel from

9   proceeding with the process of default against Trax.

10       Is there anything else?

11       Let's set a date for additional submissions.  What

12  did we decide?  Is one week sufficient?

13       MR. BATES:  A week is fine by us to put in the

14  bills.  They may be redacted of other matters.

15       THE COURT:  Mr. Agadjani, if you have other

16  evidence you wanted to submit, one week from today.  All

17  right?

18       MR. AGADJANI:  Thank you.

19       THE COURT:  Is plaintiff going to submit anything

20  more?

21       MR. JENNINGS:  No, Your Honor.

22       THE COURT:  Thank you.

23       MR. BATES:  Your Honor, would we e-file any of

24  that?  I'm limited in what I can see on the docket

25  electronically at the moment.

1           THE COURT:  Are you?

2           MR. BATES:  Yes.  That's why I was asking about

3    those two --

4           THE COURT:  Oh, all right.  Ms. Jackson will grant

5    access to you to see whatever Mr. Agadjani submits.  You're

6    no longer counsel of record; I accept that.  But since this

7    pertains to your representation, I think it's appropriate

8    that you're able to see whatever Mr. Agadjani has submitted

9    so that you're not unaware.

10          MR. BATES:  Thank you.

11          THE COURT:  All right?

12          MR. HIMES:  Your Honor, if I may, time records, if

13   we're going to present those, should those be submitted *in*

14   *camera* or need to be e-filed?

15          THE COURT:  I don't think so.  I mean, everything

16   gets filed on the public docket.  There's a presumption of

17   transparency and open dockets unless someone makes a case to

18   me that the presumption should not apply.

19          MR. HIMES:  Understood.

20          THE COURT:  Okay.

21          THE COURTROOM DEPUTY:  Mr. Bates should file a

22   notice of appearance in order to be able to file documents.

23          THE COURT:  Oh, all right.

24          File your notice of appearance on this docket so

25   that you can file and also receive notifications.  All

PROCEEDINGS                                          132

1    right?

2              MR. BATES:  Sure.

3              THE COURT:  Thank you.

4              MR. BATES:  Thank you, Your Honor.

5              THE COURT:  All right.

6              Thank you, counsel.  Nice to see everybody.

7              Thank you, Mr. Agadjani.

8              (Matter adjourned.)

9

10                              *   *   *

11

12                    CERTIFICATE OF REPORTER

13
     I certify that the foregoing is a correct transcript of the
14
     record of proceedings in the above-entitled matter.
15

16
      /s/ Kristi Cruz
17     _____
     Kristi Cruz RMR, CRR, RPR
18   Official Court Reporter

19

20

21

22

23

24

25

133

**I N D E X**

**WITNESS**                                                      **PAGE**

**MAKSUD AGADJANI**

    COURT INQUIRY                                      7

    EXAMINATION BY MR. JENNINGS                       24

    EXAMINATION BY MR. BATES                          42

**RYAN O. MILLER**

    COURT INQUIRY                                     44

    EXAMINATION BY MR. JENNINGS                       82

**SCOTT M. HIMES**,

    COURT INQUIRY                                     88

    EXAMINATION BY MR. JENNINGS                      103

    EXAMINATION BY MR. AGADJANI                      114

**RYAN O. MILLER**

    FURTHER COURT INQUIRY                            117

    FURTHER EXAMINATION BY MR. JENNINGS              123

134

1                          **E X H I B I T S**

2

3

4     Defense Counsel Exhibit A                    Page 52

5

6     Defense Counsel Exhibit B                    Page 58

7

8     Defense Counsel Exhibits C, D and E          Page 71

9

10    Defense Counsel Exhibit F                    Page 79

11

12    Defense Counsel Exhibit G                    Page 85

13

14

15

16

17

18

19

20

21

22

23

24

25